UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CENTRO PRESENTE, a membership organization; JUAN CARLOS VIDAL; ANNE CHRISTINE NICOLAS; CHRIS JEAN BAPTISTE; MERCEDES MATA; CAROLINA MATA; WILL ARIAS; JUAN AMAYA; and MARIA GUERRA, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:18-cv-10340 |
| v. | ) ) | |
| DONALD J. TRUMP, President of the United States in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN NIELSEN, Secretary of the Department of Homeland Security in her official capacity; and ELAINE COSTANZO DUKE, Deputy Secretary of the Department of Homeland Security in her official capacity, | ) ) ) ) ) ) ) ) ) ) | **COMPLAINT** |
| Defendants. | ) ) | |

## INTRODUCTION

1.      Plaintiffs, eight recipients of Temporary Protected Status ("TPS") from El Salvador and Haiti and a non-profit organization with TPS recipient members, bring this action seeking a declaratory judgment that the Trump Administration's termination of TPS designation for those two countries should be set aside as unconstitutional and contrary to federal law and further enjoining the Administration from violating Plaintiffs' Constitutional rights.   The decision by Defendants President Donald J. Trump; the U.S. Department of Homeland Security ("DHS"); Kirstjen Nielsen ("Nielsen") in her official capacity as the current Secretary of DHS; and Elaine C. Duke ("Duke") in her official capacity as Acting Secretary of DHS, to terminate

TPS designation for Salvadorans and Haitians was impermissibly infected by invidious discrimination on the basis of race, ethnicity, and/or national origin and therefore cannot stand.

2.      TPS is intended to provide safe haven in the United States for foreign nationals whose nation is experiencing a humanitarian or environmental crisis.   The conditions that initially led to the TPS designations of El Salvador and Haiti are nothing short of extreme and, in many ways have only worsened over time.   In 2001, El Salvador was struck by a devastating series of earthquakes.   The earthquakes caused at least 1,100 deaths and displaced an estimated 1.3 million people.   The earthquakes damaged or destroyed 220,000 homes, 1,696 schools, and 856 public buildings with losses across economic sectors estimated at $2.8 billion.   Since 2001, recovery has been stalled and plagued by subsequent humanitarian and environmental crises, including hurricanes, mudslides, floods, and volcanic eruptions.   These problems are compounded by the emergence of extreme gang violence.   El Salvador remains economically stagnant and fragile.

3.      Haiti's TPS designation started in 2010 after the country experienced a cataclysmic earthquake.   Reports indicate that three million Haitians were affected by the earthquake.   Homes, hospitals, schools, and vital government buildings collapsed, and the country's infrastructure, including electric and water services, was decimated.   Since 2010, Haiti's recovery has been stalled by recent natural disasters such as Hurricane Matthew.   Haiti has also experienced a devastating cholera epidemic, which has killed hundreds of thousands of people to date.   Gender-based violence has also emerged as a major social problem.   Haiti remains economically stagnant with ill-functioning infrastructure.

4.      Defendants' stated reasons for terminating TPS for Salvadorans and Haitians ignore these conditions and are nothing but a thin and pretextual smokescreen for a racially

discriminatory immigration agenda -- one that the President has been astonishingly blunt about articulating.  President Trump has long made clear his dislike and disregard for Latino and Black immigrants, including equating Latino immigrants with rapists, asserting that African immigrants who have seen America would never "go back to their huts," and saying a group of Haitian immigrants "all have AIDS."   Most recently, in discussing immigration policy with Congressional leaders in January 2018, he referred to Haiti and other TPS nations as "shithole countries," further driving home the racial motive by saying that the United States should let in more immigrants from Norway instead.   The animus directed towards Latino and Black immigrants is a clear and unfortunate thread running throughout President Trump's statements -- and is actualized by his Administration's policies, such as the ones challenged by this lawsuit.

5.      The Administration's decision to terminate TPS for El Salvador and Haiti, which is impermissibly tainted by racial animus, will be devastating for hundreds of thousands of people who currently call the United States home.  There are 242,900 Salvadoran TPS recipients currently in the United States.  These individuals have jobs, homes, and families, including an estimated 192,700 U.S citizen children.[1]  Approximately 93,500 Haitians are similarly currently under TPS protection in the United States.   They too have established livelihoods and communities here, with an estimated 27,000 U.S. citizen children.[2]  In Massachusetts alone there are 6,058 Salvadoran TPS beneficiaries and 4,735 Haitian beneficiaries.[3]  The greater Boston

---

[1] Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti*, 5 Journal of Migration and Human Security 577, 581 (2017).

[2] *Id.*

[3] Shannon Dooling, *Data Show More Than 12,000 Immigrants In Mass. Have Temporary Status*, WBUR (Nov. 9, 2017), http://www.wbur.org/news/2017/11/09/temporary-status-data-update.

area is home to the country's third-largest Haitian diaspora, and an estimated one in ten Haitians in Massachusetts are TPS beneficiaries.[4]

6.      Termination of TPS for El Salvador and Haiti would wreak havoc on the lives of hundreds of thousands of people.  As the individual Plaintiffs' experiences reflect, entrepreneurs will lose their businesses; property owners will lose their family homes; and families with U.S. citizen children will be torn apart.  People who have lived in the United States for decades now risk being rounded up and removed from the neighborhoods where they have built their lives, raised children, and invested in their communities.  Moreover, neither El Salvador nor Haiti has the capacity to receive a massive influx of returning immigrants.

7.      The Trump Administration's decision to terminate TPS for Salvadorans and Haitians harkens back to some of the darkest and most discredited chapters in U.S. history.[5]  The nation has striven to move beyond a time when invidious discrimination drove immigration policy and resulted in exclusion of disfavored racial groups from legal protections.  But sometimes the pendulum swings back -- and we are confronted again in Defendants' decision to terminate TPS for Salvadorans and Haitians with governmental action impermissibly infected by racial discrimination.  By this complaint, Plaintiffs ask this Court to rule that such action violates the U.S. Constitution and federal law, and to enjoin it.

---

[4] *Id.*

[5] *See* Act of May 6, 1882 (Chinese Exclusion Act), ch. 126, 1, 22 Stat. 58, 58 (repealed 1943) (prohibiting immigration of Chinese laborers); *see also* Julia Preston, *Obama Lifts a Ban on Entry into U.S. By H.I.V.-Positive People*, N.Y. Times (Oct. 30, 2009), http://www.nytimes.com/2009/10/31/us/politics/31travel.html (announcing the end of a 22-year ban on travel to the United States by people living with HIV).

## PARTIES

A.    <u>Plaintiffs</u>

8.      Established in 1981, Centro Presente is a state-wide Latin American immigrant membership organization dedicated to the self-determination and self-sufficiency of the Latin American immigrant community of Massachusetts.  The non-profit organization was founded by Sister Rose Marie Cummings in direct response to the rapidly growing community of refugees fleeing violence during the civil war conflicts in Central America in the 1980s.  Operated and led primarily by Central American immigrants, Centro Presente struggles for immigrant rights and for economic and social justice.  Through the integration of community organizing, leadership development and basic services, Centro Presente strives to give members a voice and to build community power.

9.      Centro Presente has a staff of seven and provides English as a Second Language (ESL) classes; legal services; immigration clinics; advocacy; and leadership development to over three thousand families, youth, and children each year.  Through its programming, community outreach, and educational activities, Centro Presente serves hundreds of TPS beneficiaries – including their families and children.

10.      Today, Centro Presente has over 1,500 members.  Of those members, a number are TPS beneficiaries from El Salvador.  Centro Presente's membership also includes U.S. citizens and non-citizens.

11.      The Trump Administration's announcement of TPS rescission has negatively affected Centro Presente by forcing the organization to divert limited staff and scarce resources from critical programs in order to educate and assist individuals affected by the rescission, including helping individuals and families navigate the specter of immigration enforcement.

12.     The organization has experienced challenges encouraging current and prospective members to seek services in its various program areas because they fear imminent deportation in light of the announcement of TPS rescission.  TPS rescission has deterred Centro Presente's members and prospective members by making them fearful to attend meetings and to participate in activities because of the specter of immigration enforcement, and the toxic anti-immigrant climate on the ground replete with discrimination and violence.

13.     The Trump Administration's announcement of TPS rescission is interfering with the organization's essential mission and has forced Centro Presente to re-allocate its limited resources to ensure that its members feel safe and to address confusion and fear in response to discriminatory immigration policies.

14.     Juan Carlos Vidal, a Salvadoran immigrant, is a successful entrepreneur and property owner residing in Revere, Massachusetts.  He is currently a TPS beneficiary and has been since 2001.

15.     Mr. Vidal has two U.S. citizen children -- 5 and 7 years-old -- both born in Massachusetts.

16.     Rising through the ranks from kitchen assistant to chef, Mr. Vidal worked for more than a decade at Blue Fin, a restaurant in Cambridge, Massachusetts.  Through hard work and thrift, Mr. Vidal opened his first restaurant.  A successful restaurateur, Mr. Vidal is now co-owner of four restaurants located in Massachusetts contributing substantially to the local economy.

17.     Anne Christine Nicolas is a 25 year-old Haitian immigrant who lives in Boston, Massachusetts.  She is currently a TPS beneficiary and has been since 2010.

18.     Ms. Nicolas is a successful college graduate.   With a deep commitment to teaching and learning, she currently works at the intersection of education and arts.  She earned a Bachelor of Fine Arts from Lesley University in Cambridge, Massachusetts.   Before it was announced that TPS designation for Haiti would be rescinded, she was preparing for the future and exploring master's degree programs in arts and education.

19.     Chris Jean Baptiste is a 19 year-old Haitian immigrant who lives in Boston, Massachusetts.  He is currently a TPS beneficiary and has been since 2010.

20.     Mr. Jean Baptiste graduated from Milton High School in Milton, Massachusetts, and is currently enrolled in Bunker Hill Community College.  He also works as the manager of a franchise of one of the largest American restaurant chains.

21.     Mercedes Mata is a Salvadoran immigrant residing in Leominster, Massachusetts, where she purchased her home approximately six months ago.   She is currently a TPS beneficiary and has been since 2001.

22.     Ms. Mata is a clerk in the Fitchburg Municipal Office.  In Fitchburg, a community that is nearly 25 percent Latino,[6] she is one of a handful of bilingual employees in the municipal office with the linguistic competence to serve a burgeoning Spanish-speaking Latino population.

23.     Ms. Mata has two children, who were both born in Massachusetts.  Her 21 year-old U.S. citizen daughter is enrolled in Mount Wachusett Community College in Gardner, Massachusetts.  Her 7 year-old U.S. citizen son is in first grade in elementary school.

24.     Ms. Mata is active in her church and in community affairs.

25.     Ms. Mata is an active member of Centro Presente.

---

[6] Census Reporter, Fitchburg, Massachusetts,
https://censusreporter.org/profiles/16000US2523875-fitchburg-ma/.

26.     Carolina Mata is a Salvadoran immigrant residing in Leominster, Massachusetts. She is currently a TPS beneficiary and has been since 2001.

27.     Ms. Mata has two children, both born in Massachusetts.  Her 19 year-old U.S. citizen son is a first-year college student at Fitchburg State University in Fitchburg, Massachusetts.  Her 11 year-old U.S. citizen daughter is in fifth grade in elementary school.

28.     Ms. Mata is an active member of Centro Presente.

29.     Will Arias is Salvadoran immigrant residing in Everett, Massachusetts.  He is currently a TPS beneficiary and has been since 2001.

30.     Mr. Arias is a custodian at the John Adams Courthouse where the Massachusetts Supreme Judicial Court sits in Boston.

31.     Mr. Arias and his wife, in 2016, purchased a home in Everett, Massachusetts, where they are raising two children born in Massachusetts: their 2 year-old U.S. citizen son; and a 16 year-old U.S. citizen son who is currently in 11th grade in Everett High School.  As a junior in high school, their eldest son has college aspirations and is beginning to explore college options.

32.     Juan Amaya, a Salvadoran immigrant, is a resident of Lynn, Massachusetts.  He is currently a TPS beneficiary and has been since 2001.

33.     Mr. Amaya is a high-rise window washer.  Rappelling off skyscrapers, he cleans the glass façades of gleaming towers across Boston's skyline.

34.     Mr. Amaya has four children.  His eldest children both graduated from Lynn Vocational Technical Institute and are DACA recipients.  His youngest children are both U.S. citizens born in Massachusetts.  His U.S. citizen daughter is 10 years-old.  His U.S. citizen son,

an 11th grade student at Lynn Classical High School in Lynn, Massachusetts, would like to go to college and is starting to explore options for higher education.

35.     Maria Guerra is a Salvadoran immigrant residing in Somerville, Massachusetts, where she purchased her home over a decade ago.  She is currently a TPS beneficiary and has been since 2001.

36.     Ms. Guerra is a domestic worker, and takes care of children as a nanny for a family in Arlington, Massachusetts.

37.     Ms. Guerra has four children.  Her two eldest children -- 25 and 22 years-old -- are DACA recipients.  Both her eldest sons work in information technology services at Harvard University.  Her 22 year-old son is also studying at Bunker Hill Community College.  Her youngest children -- 17 and 19 years-old -- are U.S. citizens both born in Massachusetts.  They are attending high school, and looking forward to graduating and studying in college.

38.     Ms. Guerra is an active community member in Somerville.

B.     Defendants

39.     Defendant Donald J. Trump is currently President of the United States, a position he has held since January 20, 2017.  As chief executive, President Trump oversees all executive agencies and cabinet members including Defendants.

40.     Defendant Department of Homeland Security is a department of the Executive Branch of the United States government.  DHS and its component agencies, U.S. Customs and Border Protection ("CBP"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Citizenship and Immigration Services ("USCIS"), have the authority to administer and enforce U.S. immigration laws and policies, including the TPS program at issue here.

41.     Defendant Kirstjen Nielsen has been Secretary of Homeland Security since December 6, 2017, and is currently DHS' senior official.  She was appointed to the position by

President Trump.  Defendant Nielsen is responsible for DHS oversight and for implementing and enforcing immigration laws and policies.  Defendant Nielsen authorized the rescission of El Salvador's TPS designation on January 18, 2018.  She is sued in her official capacity.

42.     Defendant Elaine Costanzo Duke was appointed by President Trump as Acting Secretary of Homeland Security from July 31, 2017, to December 6, 2017.  Defendant Duke currently serves as Deputy Secretary of DHS.  As Acting Secretary, Defendant Duke was responsible for DHS oversight and for implementing and enforcing immigration laws and policies.  Defendant Duke authorized the rescission of Haiti's TPS designation on November 20, 2017.  She is sued in her official capacity.

## JURISDICTION AND VENUE

43.     This Court has proper jurisdiction over this matter under 28 U.S.C § 1331.

44.     Venue is proper in this Court under 28 U.S.C § 1391.

## FACTS

### *The TPS Program*

45.     The purpose of the TPS program is to provide safe haven in the United States for foreign nationals whose nation is experiencing a humanitarian or environmental crisis.  TPS is promulgated under Section 244(c)(2) of the Immigration and Nationality Act ("INA") and 8 U.S.C. § 1254a.  The program is designed to address serious concerns that arise when civil unrest, armed conflict, extreme violence, or natural disasters compromise the ability of foreign nationals in the United States to safely return to their native country.

46.     When the Secretary of Homeland Security[7] finds that conditions in a foreign country prevent its nationals from returning safely or where a foreign country is unable to adequately handle the return of its nationals, the Secretary, after consultation with the appropriate federal agencies including the U.S. Department of State, may grant TPS status to foreign nationals of that country.

47.     Foreign nationals from such countries may then apply for TPS status and must meet rigorous qualifications, including having no serious criminal record.

48.     Foreign nationals under TPS protection cannot be removed from the United States.   A foreign national who is granted TPS receives proof of registration and a work authorization document.

49.     The Secretary of Homeland Security may grant TPS protection to foreign nationals if the Secretary determines that: (a) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the foreign state resulting in a substantial, but temporary, disruption of living conditions in the area affected; the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state; and the foreign state officially has requested TPS designation; or (b) there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety.[8]

50.     The Secretary of Homeland Security may issue TPS for periods of six to eighteen months.   After the initial designation, the Secretary must review the conditions in the foreign

---

[7] Under 8 U.S.C. § 1254a, the Attorney General was originally authorized to administer the TPS program.  With the formation of the Department of Homeland Security, the authority to designate countries and administer the TPS program was transferred from the Attorney General to the Secretary of Homeland Security in 2003.  *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002).

[8] 8 U.S.C. § 1254a(b)(1).

state for which the designation is in effect and must determine whether the conditions for such designation continue to be met.  If the Secretary determines that a foreign state continues to meet the conditions for designation under the TPS statute, the nation may be re-designated, or the period of designation may be extended for up to eighteen months.  Provided that such conditions are met, there is no statutory limit for how many times TPS designation may be extended.

51.    The Secretary's decision to extend, re-designate, or terminate TPS protection must be published in the Federal Register.  The timing of the Secretary's publication has important implications for TPS recipients because of the notice it provides regarding their immigration status and because of the protections attached to TPS such as employment authorization.

*El Salvador's TPS Designation*

52.    On March 1, 2001,[9] former Attorney General John Ashcroft designated El Salvador for TPS, making TPS protection available to Salvadoran nationals "continuously physically present" in the United States since March 9, 2001, and who have "continuously resided" in the United States since February 13, 2001.[10]  This initial designation was set to run through September 9, 2002.

53.    Attorney General Ashcroft's TPS designation was based on the urgent request of the Salvadoran government and the following findings indicating that El Salvador was "unable, temporarily, to handle adequately the return of its nationals":

a.    El Salvador suffered a "devastating earthquake on January 13, 2001, and experienced two more earthquakes on February 13 and 17, 2001";

---

[9] The notice announcing designation of El Salvador was dated March 1, 2001 and recorded in the Federal Register on March 9, 2001.

[10] Designation of El Salvador Under Temporary Protected Status Program, 66 Fed. Reg. 14214 (Mar. 9, 2001).

b.       These earthquakes resulted in at least 1,100 deaths, and displaced an estimated 1.3 million people (17% of the country's total population); and

c.       The earthquakes damaged or destroyed "220,000 homes, 1,696 schools, and 856 public buildings" with losses to the housing, infrastructure, and agricultural sectors estimated at $2.8 billion.[11]

54.       On July 11, 2002, Attorney General Ashcroft extended El Salvador's TPS designation from September 9, 2002, to September 9, 2003.[12]

55.       Attorney General Ashcroft based this extension on a finding that El Salvador still met all of the requirements for TPS designation, particularly because the earthquake caused substantial damage to the country's infrastructure, including housing, roads, hospitals, and schools.  Attorney General Ashcroft further noted that the situation in El Salvador had worsened in some respects from the time of its initial designation because subsequent droughts left "35,000 subsistence farming families destitute" and "200,000 people . . . threatened by 'food insecurity.'"[13]

56.       On July 16, 2003, former DHS Secretary Tom Ridge extended El Salvador's TPS designation from September 9, 2003, to March 9, 2005.[14]

---

[11] *Id.* at 14214.

[12] Extension of the Designation of El Salvador Under the Temporary Protected Status Program; Automatic Extension of Employment Authorization Documentation for Salvadorans, 67 Fed. Reg. 46000 (July 11, 2002).

[13] *Id.* at 46001.

[14] Extension of the Designation of El Salvador Under Temporary Protected Status Program; Automatic Extension of Employment Authorization Documentation for El Salvador, 68 Fed. Reg. 42071 (July 16, 2003).

57.     Secretary Ridge based this extension on a finding that El Salvador continued to meet all of the requirements that prompted its initial designation, particularly that the "economy of El Salvador [was] not yet stable enough to absorb returnees from the United States."[15]

58.     On January 7, 2005, former Secretary Ridge extended El Salvador's TPS designation from March 9, 2005, to September 9, 2006.[16]

59.     Secretary Ridge based this extension on a finding that El Salvador continued to meet all of the requirements that prompted its initial designation.  He noted severe damage and slow recovery in all sectors, including housing, schools, and hospitals.[17]

60.     On June 15, 2006, former DHS Secretary Michael Chertoff extended El Salvador's TPS designation from September 9, 2006, to September 9, 2007.[18]

61.     Secretary Chertoff based this extension on a finding that El Salvador continued to meet all of the requirements that prompted its initial designation.  He noted that new natural disasters -- including the "eruption of the Santa Ana volcano that was immediately followed by mudslides and flooding caused by Hurricane Stan" -- had substantially slowed rebuilding efforts in El Salvador.[19]

---

[15] *Id.* at 42072.

[16] Extension of the Designation of Temporary Protected Status for El Salvador; Automatic Extension of Employment Authorization Documentation for El Salvador TPS Beneficiaries, 70 Fed. Reg. 1450 (Jan. 7, 2005).

[17] *Id.* at 1450-51.

[18] Extension of the Designation of Temporary Protected Status for El Salvador; Automatic Extension of Employment Authorization Documentation for El Salvadoran TPS Beneficiaries, 71 Fed. Reg. 34637 (June 15, 2006).

[19] *Id.* at 34638.

62.     On August 21, 2007, Secretary Chertoff extended El Salvador's TPS designation from September 10, 2007, to March 9, 2009.[20]

63.     Secretary Chertoff based this extension on a finding that El Salvador continued to meet all of the requirements that prompted its initial designation.  The extension was also supported by a request from the Salvadoran government, and by the fact that, despite some progress in rebuilding efforts, living conditions remained substantially disrupted in El Salvador.[21]

64.     On October 1, 2008, Secretary Chertoff extended El Salvador's TPS designation from March 9, 2009, to September 9, 2010.[22]

65.     Secretary Chertoff based this extension on a finding that El Salvador continued to meet all of the requirements that prompted its initial designation.  He noted that: "El Salvador has still not completed reconstruction of the infrastructure damaged by several severe 2001 earthquakes.  Transportation, housing, education and health sectors are still suffering from the 2001 earthquake, the lingering effects of which limit El Salvador's ability to absorb a large number of potential returnees."[23]

66.     On July 9, 2010, former DHS Secretary Janet Napolitano extended El Salvador's TPS designation from September 9, 2010, to March 9, 2012.[24]

---

[20] Extension of the Designation of El Salvador for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Salvadoran TPS Beneficiaries, 72 Fed. Reg. 46649 (Aug. 21, 2007).

[21] *Id.* at 46649-50.

[22] Extension of the Designation of El Salvador for Temporary Protected Status, 73 Fed. Reg. 57128 (Oct. 1, 2008).

[23] *Id.* at 57129.

[24] Extension of the Designation of El Salvador for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Salvadoran TPS Beneficiaries, 75 Fed. Reg. 39556 (July 9, 2010).

67.     Secretary Napolitano based this extension on a finding that El Salvador continued to meet all of the requirements that that prompted its initial TPS designation.  She noted that: "El Salvador also continues to suffer a public security crisis that threatens to undermine sustained development and confidence in democratic governance." [25]  Secretary Napolitano also cited the rapidly "increasing levels of violent crime" as a basis for TPS extension.[26]

68.     On January 11, 2012, Secretary Napolitano extended El Salvador's TPS designation from March 9, 2012, to September 9, 2013.[27]

69.     Secretary Napolitano based this extension on a finding that El Salvador continued to meet all of the requirements that prompted its initial designation.  She noted continuing infrastructural deficiencies including "reports that only about 21 percent of rural households had continuous water services."[28]  She also noted that: "[r]ecovery has been slow and encumbered by Hurricanes Adrian and Stan in 2005, Hurricane Felix in 2007, Hurricane Ida in 2009, and most recently Tropical Storm Agatha in 2010."[29]

70.     On May 30, 2013, Secretary Napolitano extended El Salvador's TPS designation from September 10, 2013, to March 9, 2015.[30]

---

[25] *Id.* at 39558.

[26] *Id*.

[27] Extension of the Designation of El Salvador for Temporary Protected Status, and Automatic Extension of Employment Authorization Documentation for Salvadoran TPS Beneficiaries, 77 Fed. Reg. 1710 (Jan. 11, 2012).

[28] *Id.* at 1712.

[29] *Id.*

[30] Extension of the Designation of El Salvador for Temporary Protected Status, 78 Fed. Reg. 32418 (May 30, 2013).

71.     Secretary Napolitano based this extension on a finding that El Salvador continued to meet all of the requirements that prompted its initial designation.  She noted that: "recovery in the affected areas of El Salvador has been slow and disrupted by subsequent natural disasters."[31]

72.     On January 7, 2015, former DHS Secretary Jeh Charles Johnson extended El Salvador's designation from March 10, 2015, to September 9, 2016.[32]

73.     Secretary Johnson based this extension on a finding that El Salvador continued to meet all of the requirements that prompted its initial designation.  He noted that recent "environmental disasters" had substantially stalled recovery efforts.  He also noted that: "In June 2013, Tropical Storm Barry caused flooding in El Salvador, and in December 2013, the eruption of the Chaparrastique volcano . . . forced thousands of people . . . to evacuate their homes."[33] Against a backdrop of high unemployment rates and severe food insecurity, Secretary Johnson noted that: "a large influx of returning citizens at this time would overwhelm the labor market and the government's fiscal ability to extend basic services to its citizens."[34]

74.     On July 8, 2016, Secretary Johnson extended El Salvador's TPS designation from September 10, 2016, to March 9, 2018.[35]

75.     Secretary Johnson based this extension on a finding that El Salvador continued to meet all of the requirements that prompted its initial designation.  He noted a substantial rise in violence, crime, gangs, and general insecurity.  The United Nations Development Program

---

[31] *Id.* at 32419.

[32] Extension of the Designation of El Salvador for Temporary Protected Status, 80 Fed. Reg. 893 (Jan. 7, 2015).

[33] *Id.* at 894.

[34] *Id.*

[35] Extension of the Designation of El Salvador for Temporary Protected Status, 81 Fed. Reg. 44645 (July 8, 2016).

reported finding that in 2014, "Salvadoran citizens paid $756 million in extortion payments to gangs."[36]  Secretary Johnson also cited a weak judicial system, which created an "environment of impunity" for corruption, violent crimes, and gang activity.[37]

*Trump Administration Announces Termination of El Salvador's TPS*

76.     Despite extensions of the TPS program for El Salvador over the course of multiple administrations under both political parties, and despite the lingering effects of compounded environmental and humanitarian crises, on January 18, 2018, the Trump Administration terminated El Salvador's TPS designation effective September 9, 2019.[38]

77.     Defendant Nielsen's assertion, in announcing the Trump Administration's decision to terminate TPS for El Salvador, that country conditions have "stabilized" is pretext for invidious discrimination and belied by well-established facts.

78.     Defendant Nielsen's stated reasoning for the Trump Administration's termination of El Salvador's TPS designation represents a sharp departure from DHS's ordinary decision-making process, furthering the inference of invidious discrimination.

79.     Under 8 U.S.C. § 1254a, DHS is required to consider "the conditions in the foreign state . . . for which a designation is in effect under this subsection and . . . determine whether the conditions for such designation under this subsection continue to be met."

80.     Previously, consistent with that statutory mandate, the Attorney General and DHS Secretaries have conducted careful reviews to determine whether conditions in El Salvador

---

[36] *Id.* at 44647.

[37] *Id.*

[38] Termination of the Designation of El Salvador for Temporary Protected Status, 83 Fed. Reg. 2654 (Jan. 18, 2018); *see also* Press Release, Secretary of Homeland Security Kirstjen M. Nielson Announcement on Temporary Protected Status for El Salvador (Jan. 8, 2018), https://www.dhs.gov/news/2018/01/08/secretary-homeland-security-kirstjen-m-nielsen-announcement-temporary-protected.

continued to reflect problems with respect to housing, food, infrastructure, education, access to health care, and gang violence that have characterized El Salvador since the 2001 earthquake and that justified El Salvador's TPS designation.  In stark contrast to the extensions of El Salvador's TPS status in other Administrations, Defendants failed to assess country conditions that were documented over the course of nearly two decades.  In particular, Defendants failed to mention the numerous natural disasters that El Salvador recently experienced, the ongoing food scarcity, or the persistence of extreme gang violence, corruption and judicial inefficacy.

81.     Defendant Nielsen's flawed analysis of conditions in El Salvador conflicts sharply with the federal government's own reports and analysis released by the U.S. Department of State, which consistently reflect the conditions described in the Federal Register for El Salvador's prior TPS extensions.   For example, the U.S. Department of State has released numerous reports documenting that in El Salvador "violent crime, such as murder, assault, rape, and armed robbery is common.  Gang activity such as extortion [and] violent street crime . . . is widespread.  Local police may lack the resources to respond effectively . . . ."[39]

82.     Consistent with the determinations made by prior Administrations in extending TPS protections to El Salvador, the U.S. Department of State has frequently noted that El Salvador experiences "widespread corruption; weak rule of law, which contribute[s] to high levels of impunity and government abuse, including unlawful killings by security forces, discrimination . . . [and] violence against women and girls."[40]

---

[39] U.S. Dep't of State Travel Advisory on El Salvador (Jan. 10, 2018), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/el-salvador-travel-advisory.html.

[40] U.S. Dep't of State, El Salvador 2016 Human Rights Report (updated Apr. 12, 2017), https://www.state.gov/documents/organization/265798.pdf.

83.     Defendant Nielsen's reliance on El Salvador's increased GDP as a reason for termination also raises the inference of pretext.  As the World Bank recently noted, external factors were responsible for the increase including "remittances which increased by $306 million since 2015."[41]

84.     Defendant Nielsen's stated reasoning also gives no consideration to the ability of El Salvador to receive the thousands of TPS recipients currently living in the United States.  In fact, "if all the Salvadoreans in the TPS programme were to come back . . . the country's population would swell by 3%.  El Salvador is in no state to receive and reintegrate them."[42]

85.     Defendant Nielsen's purported analysis of country conditions in El Salvador also conflicts with DHS's own reports, released as recently as January 2018, documenting that El Salvador is one of the "leading countries of nationality for persons granted either affirmative or defensive asylum" based on credible and well-founded fear of persecution or torture.[43]  El Salvador's prevalence in asylum proceedings makes sense in light of the country conditions amply discussed in the Federal Register over the course of El Salvador's TPS designation.

---

[41] World Bank, "World Bank in El Salvador" Overview (Oct. 10, 2017), http://www.worldbank.org/en/country/elsalvador/overview.

[42] *See How Will El Salvador Cope With Deportees From America?*, The Economist (Jan. 11, 2018), https://www.economist.com/news/americas/21734477-united-states-wants-expel-up-200000-salvadoreans-both-they-and-their-home-country.

[43] U.S. Dep't of Homeland Security, Office of Immigration Statistics, Annual Flow Report (published Jan. 2018), https://www.dhs.gov/sites/default/files/publications/Refugees_Asylees_2016_0.pdf.

*Haiti's TPS Designation*

86.     TPS protection for Haiti was published in the Federal Register on January 21, 2010, pursuant to former Secretary of DHS Janet Napolitano's designation.  Haiti's initial TPS designation ran from January 21, 2010, to July 22, 2011.[44]

87.     Secretary Napolitano found that the requisite "extraordinary and temporary conditions" in Haiti warranted the TPS designation.   This determination was based on the following findings:

        a.      "On January 12, 2010 Haiti was struck by a 7.0-magnitude earthquake . . . its strongest earthquake in 200 years."[45]

        b.      The earthquake destroyed most of the capital city, Port-au-Prince.[46]

        c.      Reports indicated that "three million people -- one-third of Haiti's population -- had been affected by the earthquake."[47]

        d.      Hospitals, schools, and vital government buildings collapsed, or were severely damaged, and the country's infrastructure including electric, water, and telephone services were severely affected.[48]

88.     Haiti was re-designated for TPS and its TPS protection was extended in the Federal Register on May 19, 2011, by Secretary Napolitano.   The extension and new designation began on July 23, 2011, and continued until January 22, 2013.[49]

---

[44] Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3476 (Jan. 21, 2010).

[45] *Id*. at 3477.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] Extension of the Designation of Haiti Under the Temporary Protected Status Program, 76 Fed. Reg. 29000 (May 19, 2011).

89.     Secretary Napolitano based this re-designation and extension on a finding that Haiti still met all of the requirements for TPS designation, particularly because the earthquake exacerbated Haiti's position as "one of the poorest [countries] in the world."[50]   The earthquake substantially damaged all levels of infrastructure in the country including housing, roads, hospitals, and schools.   Secretary Napolitano noted that 80% of Haiti's population was living below the poverty line, that an estimated 230,000 people died in the earthquake, and that 1 million people had been made homeless.[51]   In support of the extension and re-designation Secretary Napolitano cited the 800,000 internally displaced children, the rise of gender-based violence, and the outbreak of a cholera epidemic in the country with nearly 200,000 reported cases at the time.[52]

90.     On October 1, 2012, Secretary Napolitano extended Haiti's TPS designation from January 23, 2013, to July 22, 2014.[53]

91.     Secretary Napolitano based this extension on a finding that Haiti continued to meet all of the requirements that prompted its initial designation, including crippling infrastructural problems, a high number of internally displaced persons, a rise in gender-based violence, and the deadly cholera outbreak.[54]

---

[50] *Id.* at 29001.

[51] *Id.*

[52] *Id.*

[53] Extension of the Designation of Haiti Under the Temporary Protected Status Program, 77 Fed. Reg. 59943 (Oct. 1, 2012).

[54] *See id.* at 59944.

92.     On March 3, 2014, former Secretary Johnson extended Haiti's TPS designation from July 23, 2014, to January 22, 2016.[55]

93.     Secretary Johnson based this extension on a finding that Haiti continued to meet all of the requirements that prompted its initial designation.  He particularly noted the heightened risks to human rights and security in the country.  He cited the slow pace of economic recovery, and new disasters such as Tropical Storm Isaac and Hurricane Sandy, which caused additional damage, displacement, and death.[56]

94.     On August 25, 2015, Secretary Johnson extended Haiti's TPS designation from January 23, 2016, to July 22, 2017.[57]

95.     Secretary Johnson based this extension on a finding that Haiti continued to meet all of the requirements that prompted its initial designation, particularly because of the lingering infrastructural damage, and high rates of food insecurity.  He noted that as of January 12, 2015, "Haiti was left without a functioning legislative branch or duly elected local authorities" and that the country continued to lack health, sanitation, and emergency services necessary to accept its nationals living in the United States with TPS.[58]

96.     On May 24, 2017, former DHS Secretary John Kelly extended Haiti's TPS designation for six months from July 23, 2017, to January 22, 2018.[59]

---

[55] Extension of the Designation of Haiti Under the Temporary Protected Status Program, 79 Fed. Reg. 11808 (Mar. 3, 2014).

[56] *Id.* at 11809-10.

[57] Extension of the Designation of Haiti Under the Temporary Protected Status Program, 80 Fed. Reg. 51582 (Aug. 25, 2015).

[58] *Id.* at 51584.

[59] Extension of the Designation of Haiti Under the Temporary Protected Status Program, 82 Fed. Reg. 23830 (May 24, 2017).

97.     Secretary Kelly based this extension on a finding that Haiti continued to meet the requirements that prompted its initial designation, and particularly because of the high number of internally displaced persons, high levels of gender-based violence, and the debilitating cholera epidemic.   He noted that recovery efforts were compromised by new disasters -- Hurricane Matthew, flooding, and landslides -- that struck Haiti killing, displacing, and starving its populace.[60]

*Trump Administration Announces Termination of TPS for Haiti*

98.     Despite extensions of the TPS program for Haiti over the course of almost a decade and the lingering effects of multiple environmental and humanitarian crises, on November 20, 2017, Defendant Duke abruptly announced the termination of Haiti's TPS designation effective July 22, 2019.[61]

99.     The termination of Haiti's TPS designation was recorded in the Federal Register on January 18, 2018.[62]   Defendants cited some improvements in the numbers of internally displaced persons as a purported justification for rescinding Haiti's TPS designation.[63]

100.    Defendant Duke's assertion, in announcing the Trump Administration's decision to terminate TPS for Haiti, that country conditions have made "progress" is pretext for invidious discrimination and belied by well-established facts.

---

[60] *Id.* at 23832.

[61] Termination of the Designation of Haiti Under the Temporary Protected Status Program, 83 Fed. Reg. 2648 (January 18, 2018).

[62] *Id.*

[63] *Id.* at 2650.

101.    Defendant Duke's stated reasoning for the Administration's termination of Haiti's TPS designation represents a sharp departure from DHS's ordinary decision-making process, furthering the inference of invidious discrimination.

102.    Under 8 U.S.C. § 1254a, DHS is required to consider "the conditions in the foreign state . . . for which a designation is in effect under this subsection and . . . determine whether the conditions for such designation under this subsection continue to be met."

103.    Previously, consistent with that statutory mandate, DHS conducted a careful review to determine whether conditions in Haiti continued to reflect the severe problems with respect to housing, food security, infrastructure, access to health care, and gender-based violence that have characterized Haiti since the 2010 earthquake and that justified Haiti's TPS designation.    Unlike the extensions of Haiti's TPS protection in other Administrations, Defendants failed to mention the numerous natural disasters Haiti recently experienced, the slow process of economic and infrastructural recovery described in recent extensions, the remaining food scarcity, or the persistent reports of gender-based violence.

104.    Defendants' analysis of the situation in Haiti also conflicts sharply with the federal government's own reports and analysis released by the Department of State which consistently reflect the conditions described in the Federal Register for Haiti's TPS extensions. For example, the Department of State has noted that in Haiti "violent crime such as armed robbery, is common.  Local police may lack resources to respond effectively to serious crimes or emergencies."[64]

105.    The U.S. Department of State has been clear that the situation in Haiti is destitute. The U.S. Department of State notes that gender-violence such as "rape . . . and societal

---

[64] U.S. Dep't of State, Travel Advisory on Haiti (last updated Aug. 2, 2017).

discrimination against women" remains a serious problem.  Haiti still contains a high number of internally displaced persons including "14,000 people displaced by Hurricane Matthew" and "several thousand street children" in Port-Au-Prince alone.[65]   Against this background, the country's reconstruction and development is far from complete and will take many years.

106.    Defendants' reliance on the withdrawal of United Nations forces from Haiti is not supported factually and, therefore, contributes to an inference of discrimination.  The presence of United Nations peace-keeping forces in Haiti has been the subject of significant controversy and scandal, and their departure cannot be fairly attributed to alleged progress in country conditions.[66]

*Termination of TPS Designations for El Salvador and Haiti is the*
*Result of Impermissible Racial, Ethnic and/or National Origin Discrimination*

107.    Defendant Trump has made numerous statements reflecting bias and prejudice against immigrants of color, particularly Latino and Haitian immigrants.  Evidence of this bias further supports an inference that Defendants' actions in terminating TPS for El Salvador and Haiti were motivated by racism and racial, ethnic, and/or national origin discrimination.

108.    When then-candidate Trump announced his presidential campaign, he equated Latino immigrants from Mexico with rapists, stating: "'When Mexico sends its people, they're not sending their best.  They're not sending you.  They're sending people that have lots of problems, and they're bringing those problems with us.  They're bringing drugs.  They're

---

[65] U.S. Dep't of State, Haiti 2016 Human Rights Report 1, 24 (2016).

[66] *See* Jonathan M. Katz, *U.N. Admits Role in Cholera Epidemic in Haiti*, N.Y. Times (Aug. 17, 2016), https://www.nytimes.com/2016/08/18/world/americas/united-nations-haiti-cholera.html; *see also AP Report Documents Child Sexual Abuse by U.N. Peacekeepers in Haiti*, NPR (Apr. 13, 2017 4:33PM), https://www.npr.org/2017/04/13/523804480/ap-report-documents-child-sexual-abuse-by-u-n-peacekeepers-in-haiti.

bringing crime. They're rapists. And some, I assume, are good people . . .  It's coming from more than Mexico.  It's coming from all over South and Latin America.'"[67]

109.   At the first Republican presidential debate, then-candidate Trump again reaffirmed his negative views of Latino immigrants: "'[T]he Mexican government is much smarter, much sharper, much more cunning. . . .  They send the bad ones over, because they don't want to pay for them, they don't want to take care of them.'"[68]

110.   After an incident on August 21, 2015, when two men urinated on a sleeping Latino man and beat him with a metal pole, the perpetrators stated: "Donald Trump was right; all these illegals need to be deported."  When interviewed about the racially motivated crime, then-candidate Trump stated that they were "passionate."  Specifically, he noted: "'[i]t would be a shame . . .  I will say that people who are following me are very passionate.  They love this country and they want this country to be great again.  They are passionate.'"[69]

111.   In October 2016, during a presidential debate, then-candidate Trump responded to a question about immigration policy by saying: "'We have some bad hombres here and we're going to get them out.'"[70]

---

[67] Washington Post Staff, *Full Text: Donald Trump announces a presidential bid* (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.80d503a2ff9a.

[68] Andrew O'Reilly, *At GOP debate, Trump says 'stupid' U.S. leaders are being duped by Mexico*, Fox News (Aug. 6, 2015), http://www.foxnews.com/politics/2015/08/06/at-republican-debate-trump-says-mexico-is-sending-criminals-because-us.html.

[69] Adrian Walker, *'Passionate' Trump fans behind homeless man's beating?*, Boston Globe (Aug. 21, 2015), https://www.bostonglobe.com/metro/2015/08/20/after-two-brothers-allegedly-beat-homeless-man-one-them-admiringly-quote-donald-trump-deporting-illegals/I4NXR3Dr7litLi2NB4f9TN/story.html.

[70] Katie Zezima, *Trump on immigration: There are 'bad hombres' in the United States*, Wash. Post (Oct. 19, 2016), https://www.washingtonpost.com/news/post-politics/wp/2016/10/19/trump-on-immigration-there-are-bad-hombres-in-the-united-states/?utm_term=.1ee17064298f.

112.    In December 2016, referring to an article about a crime wave on Long Island, President-Elect Trump said, "'They come from Central America.  They're tougher than any people you've ever met.  They're killing and raping everybody out there.  They're illegal.  And they are finished.'"[71]

113.    On August 25, 2017, President Trump pardoned former Maricopa County Sheriff Joe Arpaio,[72] who was to be sentenced for criminal contempt for failing to comply with a federal judge's order to stop racially profiling Latinos.[73]

114.    President Trump has made numerous similarly biased statements against Black immigrants.  He articulated his antipathy towards Haitians in particular in June 2017.  During a meeting in the Oval Office with then-Homeland Security Secretary Kelly and Secretary of State Tillerson, President Trump reportedly reacted to a document listing how many immigrants had received visas to enter the United States in 2017.  Upon learning that 15,000 Haitian people had received such visas, President Trump is reported to have stated they "all have AIDS."[74]

---

[71] Michael Scherer, *2016 Person of the Year Donald Trump*, Time (2016), http://time.com/time-person-of-the-year-2016-donald-trump.

[72] Julie Hirschfield Davis & Maggie Haberman, *Trump Pardons Joe Arpaio, Who Became Face of Crackdown on Illegal Immigration*, N.Y. Times (Aug. 25, 2017), https://www.nytimes.com/2017/08/25/us/politics/joe-arpaio-trump-pardon-sheriff-arizona.html.

[73] Arpaio had been detaining people ostensibly because they had violated the law. But in practice, his office detained huge numbers of individuals solely because they looked Latino, without any reasonable suspicion of illegal conduct.  *See generally* Findings of Fact & Conclusions of Law, *Melendres v. Arpaio*, No. 07-CV-02513, (D. Ariz. May 24, 2013, ECF No. 579.  After a federal court enjoined that practice in 2011, Arpaio continued his unlawful and discriminatory practices unabated, "announc[ing] to the world and to his subordinates that he was going to continue business as usual no matter who said otherwise."  Findings of Fact & Conclusions of Law, *United States v. Arpaio,* No. 16-CR-01012, (D. Ariz. July 31, 2017), ECF No. 210 at 13.  On July 31, 2017, a federal court held Arpaio in criminal contempt, holding that he had willfully acted in "flagrant disregard" of the injunction.  *Id*. at 13-14.

[74] Michael D. Shear & Julie Hirschfeld Davis*, Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html.  President Trump's

115.    In January 2018, a bipartisan group of six U.S. senators met to negotiate an immigration plan to present to Congress and the President.  On January 11, 2018, they reached an agreement in principle that addressed four immigration priorities of the White House:  border security, the diversity visa lottery, so-called "chain migration," and the Dream Act.[75]

116.    The diversity visa lottery program, established by the Immigration Act of 1990, makes available 50,000 immigrant visas per year to applicants from countries with low rates of immigration to the U.S.  INA § 203(c).  The visas are distributed among six regions:  (i) Africa; (ii) Asia; (iii) Europe; (iv) North America (other than Mexico); (v) Oceania; and (vi) South America, Mexico, Central America, and the Caribbean.  INA § 203(c)(1)(F).  The majority of diversity visa lottery recipients have been nationals of African countries.[76]

---

inflammatory and atavistic remark improperly demonizes and stigmatizes Haitians.  It perpetuates the discrimination experienced by the Haitian community at the height of the HIV/AIDS epidemic in the early 1980s.  At that time, the Centers of Disease Control (CDC) announced that they were purportedly at major risk for HIV. Wayne Biddle & Margot Slade, *A Wider Risk of AIDS Feared*, N.Y. Times (May 22, 1983), http://www.nytimes.com/1983/05/22/weekinreview/ideas-trends-a-wider-risk-of-aids-feared.html.  The Haitian community was the only group identified based on nationality rather than specific behavioral factors.  The CDC removed Haitians from the list in 1985, but the stigma of the classification remains and clearly continues to improperly influence President Trump's policymaking and legislative decisions.  *See* Edwidge Danticat, *Trump Reopens an Old Wound for Haitians*, The New Yorker (Dec. 29, 2017), https://www.newyorker.com/news/news-desk/trump-reopens-an-old-wound-for-haitians (President Trump's "remark about Haiti and AIDS cut deep, reopening a painful wound that goes back several decades" and "re-stigmatizes both Haitians and people living with H.I.V./AIDS by pegging them as undesirables.").

[75] Sen. Jeff Flake, *Bipartisan Senators Reach Agreement on Immigration*, Press Releases (Jan. 11, 2018), https://www.flake.senate.gov/public/index.cfm/2018/1/bipartisan-senators-reach-agreement-on-immigration.

[76] *See generally* U.S. Dep't of State, Diversity Visa Program Statistics, https://travel.state.gov/content/travel/en/us-visas/immigrate/diversity-visa-program-entry/diversity-visa-program-statistics.html.

117.    Under the proposed immigration plan, the senators sought to eliminate the diversity visa lottery and reallocate the 50,000 annual visas to individuals whose TPS would soon terminate.[77]

118.    After the agreement in principle was reached, Senators Durbin and Graham had phone calls with President Trump on the morning of January 11 and were invited to an in-person meeting in the Oval Office at noon that day.[78]  During the meeting, the senators presented the terms of the bipartisan agreement, including the plan to reallocate diversity visas to TPS recipients who would be affected by the upcoming termination -- *i.e.* individuals from Haiti, El Salvador, Nicaragua and Sudan.

119.    While being briefed on the proposal to reallocate visas to TPS recipients, President Trump is reported to have grown angry and incredulous at the terms of the proposed plan.  He specifically derided individuals from terminated TPS nations, asking: "Why are we having all these people from shithole countries come here?"

120.    Trump is reported to have expressed particular hostility towards Haitians, asking "Why do we need more Haitians?" and demanding that the senators "[t]ake them out" of the plan.[79]  The President then drew a direct contrast between the terminated TPS countries and

---

[77] Ryan Teague Beckwith & Maya Rhodan, *Here's the Plan Trump Was Attacking When He Said 'Shithole Countries'*, Time (Jan. 12, 2018), http://time.com/5101057/donald-trump-shithole-countries-tps-daca/.

[78] Josh Dawsey et al., *Inside the Tense, Profane White House Meeting on Immigration*, Wash. Post (Jan. 15, 2018), https://www.washingtonpost.com/politics/inside-the-tense-profane-white-house-meeting-on-immigration/2018/01/15/13e79fa4-fa1e-11e7-8f66-2df0b94bb98a_story.html.

[79] Josh Dawsey, *Trump Derides Protections For Immigrants From 'Shithole' Countries*, Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.1838b0734159.

predominantly white countries, stating that policies should encourage immigration from countries like Norway.[80]

121.    As Senators Durbin and Graham left the Oval Office meeting, they were shocked and speechless.  Senator Durbin recalled that "'it was silence in the car'" after they "'witnessed something that neither one of us ever expected.'"[81]  Later, Senator Durbin described how the President had "repeatedly" said "vile," "vulgar" and "hate-filled things" about terminated TPS nations and African nations.[82]  Senator Durbin praised his colleague Senator Graham for his courage in speaking up in response to the President's derisive comments.[83]

122.    The morning after the meeting in the Oval Office, President Trump denied reports about the obscene language he used during the meeting.  He tweeted that "language used by me at the DACA meeting was tough," but that he "never said anything derogatory about Haitians other than Haiti is, obviously, a very poor and troubled country."[84]

*Harms and Effects of Defendants' Discriminatorily Motivated Actions*

123.    If TPS rescission goes into effect, Plaintiffs, and other TPS beneficiaries will suffer immediate and irreparable injuries to their rights under the U.S. Constitution and federal law; to their proprietary interests; and to their dignity.

---

[80] *Id.*

[81] Carl Hulse, *Inside the Oval Office Immigration Meeting That Left a Senator Stunned*, N.Y. Times (Jan. 19, 2018), https://www.nytimes.com/2018/01/19/us/politics/trump-durbin-immigration-daca.html.

[82] Jacob Pramuk, *Trump repeatedly used 'S---hole' to describe African countries, Sen. Dick Durbin Says*, CNBC (Jan. 12, 2018), https://www.cnbc.com/2018/01/12/trump-used-s--hole-to-describe-african-countries-dick-durbin-says.html.

[83] Jacob Pramuk, *Sen. Lindsey Graham: 'I said my piece' to Trump following his immigration comments*, CNBC (Jan. 12, 2018), https://www.cnbc.com/2018/01/12/sen-lindsey-graham-i-said-my-piece-to-trump-during-immigration-meeting.html.

[84] @realDonaldTrump, Twitter (Jan. 12, 2018, 5:48AM), https://twitter.com/realdonaldtrump/status/951813216291708928?lang=e.

124.    If TPS rescission goes into effect, Plaintiffs and other TPS beneficiaries will be denied work, including workplace benefits and protections.  Without TPS, most beneficiaries will not have access to employment authorization which gives these immigrants (and their employers) an assurance that they may put their talents to use – something that benefits Massachusetts and the country as a whole.  Without employment, many TPS beneficiaries will also lose health benefits.

125.    If TPS rescission goes into effect, Plaintiffs and other TPS beneficiaries will have to prepare for imminent removal.  Plaintiffs will incur costs to ensure that their property rights, family relationships, and tax obligations are protected.  These financial burdens will decrease the overall resources available to TPS beneficiaries and their families.

126.    Because the Trump Administration's decision to terminate TPS for El Salvador and Haiti was infected by invidious discrimination, its rescission stigmatizes immigrants of color, as well as their children and families, and imposes a dignitary harm by denying them the dignity and respect they deserve under the U.S. Constitution and federal law.  TPS rescission triggers and fuels social stigma, harassment, discrimination, and even violence against immigrants of color.

127.    By labeling TPS beneficiaries from El Salvador and Haiti as undesirable and by contrasting them with immigrants from predominantly white countries such as Norway, the federal government ratifies and legitimizes the notion that immigrants of color -- particularly those deemed by President Trump to come from "shithole countries" -- are worthy of lesser social stature.  This compromises their well-being and encourages discrimination against immigrants of color.  In this manner, the Trump Administration's decision to terminate TPS for

these countries has caused, is causing, and will continue to cause dignitary harms and psychological injuries to families and children.

## CLAIMS

## COUNT 1

### Violation of Equal Protection – Fifth Amendment

128.   Plaintiffs incorporate by reference all allegations as stated above.

129.   The Due Process Clause of the Fifth Amendment incorporates the equal protection principles of the Fourteenth Amendment. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017) (involving gender discrimination in immigration context); *see also United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)).

130.   Defendants' decision to rescind TPS protections for Salvadoran and Haitian immigrants living in the United States violates the Fifth Amendment because it constitutes intentional discrimination against both groups on the basis of race, ethnicity, and/or national origin.

131.   The inference of race, ethnicity, and/or national origin discrimination is supported by the Trump Administration's departure from the normal decision-making process; the fact that the decision bears more heavily on one race than another; the sequence of events leading to the decision; the contemporaneous statements of decision-makers; and the historical background of the decision.   The Supreme Court has recognized these factors as probative of intentional discrimination. *See Vill. of Arlington Heights v. Metro. Hous. Development Corp.*, 429 U.S. 252, 266-68 (1977).

132.   The inference of race, ethnicity, and/or national origin discrimination is supported by the departure of Defendants' analysis from previous TPS determinations.   The consistent

practice of previous officials demonstrates the normal decision-making process for TPS decisions. Defendants sharply deviated from that normal decision-making process in deciding to terminate TPS status for El Salvador and Haiti.

133.    The inference of race, ethnicity, and/or national origin discrimination is also supported by Defendants' deviation from  INA §  244(b)(3)'s and 8 U.S.C. § 1254a's requirement that DHS undertake a genuine, good faith review of the conditions in a foreign country designated for TPS to determine whether the conditions for designation continue to be met.

134.    The inference of race, ethnicity, and/or national origin discrimination is also supported by President Trump's comments as listed in paragraphs 105-119 and which informed practice in executive agencies.

135.    As a direct and proximate result of the rescission of TPS by Defendants and/or their agents, Plaintiffs have been deprived of their rights under the Fifth Amendment to the U.S. Constitution.

## COUNT 2

### Violation of Due Process – Fifth Amendment

136.    Plaintiffs incorporate by reference all allegations as stated above.

137.    The Due Process Clause of the Fifth Amendment also prohibits irrational government action. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 532-33 (1973).

138.    Defendants have failed to carry out their duties consistent with the Due Process requirements of the Fifth Amendment to the U.S. Constitution.

139.    The Defendants' discriminatory decision to rescind TPS for Salvadorans and Haitians deprives Plaintiffs of the appropriate and non-discriminatory process due to them under the law.

## COUNT 3

### Mandamus 28 U.S.C. § 1361

140.     Plaintiffs incorporate by reference all allegations as stated above.

141.     Defendants have failed to carry out their mandatory and non-discretionary duties owed to Plaintiffs, including the duties established in 8 U.S.C. § 1254a(b)(3). 28 U.S.C. § 1361.

142.     Defendants' failure to carry out their mandatory and non-discretionary duties owed to Plaintiffs irrevocably harm Plaintiffs.

## COUNT 4

### Declaratory Judgment 28 U.S.C. § 2201

143.     Plaintiffs incorporate by reference all allegations as stated above.

144.     For the reasons stated above, Defendants have violated the U.S. Constitution and other laws.

145.     Plaintiffs seek a declaration to that effect.

146.     Defendants' illegal actions have injured and will continue to injure all Plaintiffs and those similarly situated in numerous ways including the dignitary harms that attach to the invidious discrimination visited upon them by Defendants.

### PRAYER FOR RELIEF

Wherefore the Plaintiffs respectfully request that the Court grant the following relief:

1.     Declaratory Relief.

        a.     Declare that Defendants' actions to terminate TPS designation for El Salvador violate the Fifth Amendment of the U.S. Constitution and the Administrative Procedures Act and are, therefore, void and without legal force or effect;

b.      Declare that Defendants' actions to terminate TPS designation for Haiti violate the Fifth Amendment of the U.S. Constitution and the Administrative Procedures Act and are, therefore, void and without legal force or effect;

2.      <u>Injunctive Relief</u>.

a.      Enjoin and restrain Defendants, their agents, servants, employees, attorneys and all persons in active concert with them from implementing or enforcing the termination of El Salvador's TPS status and from taking any further action to terminate El Salvador's TPS status in violation of the U.S. Constitution or other applicable laws.

b.      Enjoin and restrain Defendants, their agents, servants, employees, attorneys and all persons in active concert with them from implementing or enforcing the termination of Haiti's TPS status and from taking any further action to terminate Haiti's TPS status in violation of the U.S. Constitution or other applicable laws.

3.      <u>Mandamus</u>.   Plaintiffs ask this Court to issue a *writ of mandamus* compelling Defendants to carry out all nondiscretionary duties required by the U.S. Constitution, and applicable federal law with respect to the TPS program, its administration, and execution.

4.      Award Plaintiffs reasonable attorneys' fees and the cost of maintaining this action such as court costs, expert fees and other expenses.

5.      All other necessary and appropriate relief that justice may require.

Dated: February 22, 2018                    Respectfully submitted,


                                            */s/ Oren Sellstrom*
                                            Oren Sellstrom  (BBO# 569045)
                                            Oren Nimni  (BBO #691821)
                                            Iván Espinoza-Madrigal  (*Pro Hac Vice* To Be
                                            Filed)
                                            Lawyers' Committee for Civil Rights and
                                            Economic Justice
                                            61 Batterymarch Street, 5th Floor
                                            Boston, MA 02110
                                            (617) 988-0624

8534926v3