# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

CENTRO PRESENTE, a membership
organization; HAITIAN-AMERICANS
UNITED, INC., a membership organization;
JUAN CARLOS VIDAL; ANNE CHRISTINE
NICOLAS; CHRIS JEAN BAPTISTE;
MERCEDES MATA; CAROLINA MATA;
WILL ARIAS; JUAN AMAYA; MARIA
GUERRA; JOSUE DORFEUILLE; NATACHA
DORFEUILLE; YESY PATRICIA
CARBAJAL; JUAN GUERRERO; JAIME
YANES; and JOSE
OMAR RODRIGUEZ VARELA,

                Plaintiffs,

    v.

DONALD J. TRUMP, President of the United
States in his official capacity; UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY; KIRSTJEN NIELSEN, Secretary
of the Department of Homeland Security in her
official capacity; and ELAINE COSTANZO
DUKE, Deputy Secretary of the Department of
Homeland Security in her official capacity,

                Defendants.

CIVIL ACTION NO. 1:18-cv-10340-DJC

*Leave to File Granted on 6/25/18*

## BRIEF OF AMICI STATES MASSACHUSETTS, CALIFORNIA, THE DISTRICT OF COLUMBIA, CONNECTICUT, DELAWARE, IOWA, MAINE, MARYLAND, MINNESOTA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, AND WASHINGTON IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS

## TABLE OF CONTENTS

**INTRODUCTION AND INTEREST OF AMICI STATES** ...................................................... 1

**ARGUMENT** ...................................................................................................................... 2

    I.  This Court Has Jurisdiction to Review DHS's Actions. ...................................... 2

       A. Section 1254a Shows No Evidence of Congressional Intent to Foreclose
          Review of Constitutional Claims .................................................................. 2

       B. Plaintiffs' Claims Are Subject to Judicial Review Because They
          Challenge Practices and Policies, not Individual TPS Terminations. ............................ 5

    II. DHS's Policy Will Inflict Serious Harm on Individuals, Families,
      Communities, and the Amici States. ...................................................................... 8

       A. Families Will Be Torn Apart. ...................................................................... 8

       B. Amici States' Economies and Workforces Will Suffer. ................................. 11

       C. Vulnerable Residents Will Suffer from Disruptions in Care Provided by
          TPS Holders .............................................................................................. 12

       D. Public Health Will Suffer. .......................................................................... 14

       E. Public Safety Will Suffer ............................................................................ 15

    **CONCLUSION** ............................................................................................................ 15

# TABLE OF AUTHORITIES

## CASES

*Abbott Laboratories v. Gardner*,
    387 U.S. 136 (1967) ............................................................................................ 2

*Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*,
    458 U.S. 592 (1982) .......................................................................................... 19

*Bowen v. Michigan Acad. of Family Physicians*,
    476 U.S. 667 (1986) .................................................................................... 2, 3, 7

*Cho v. Gonzales*,
    404 F.3d 96 (1st Cir. 2005) ............................................................................... 8

*Demore v. Kim*,
    538 U.S. 510 (2003) ........................................................................................... 5

*Goncalves v. Reno*,
    144 F.3d 110 (1st Cir. 1998) ............................................................................. 3

*I.N.S. v. St. Cyr*,
    533 U.S. 289 (2001) ........................................................................................... 5

*Johnson v. Robison*,
    415 U.S. 361 (1974) ........................................................................................... 5

*Keene Corp. v. United States*,
    508 U.S. 200 (1993) ........................................................................................... 4

*Krua v. Dep't of Homeland Sec.*,
    729 F. Supp. 2d 452 (D. Mass. 2010) .............................................................. 4

*Lockerty v. Phillips*,
    319 U.S. 182 (1943) ........................................................................................... 3

*McCuin v. Sec'y of Health & Human Servs.*,
    817 F.2d 161 (1st Cir. 1987) ............................................................................. 2

*McNary v. Haitian Refugee Ctr., Inc.*,
    498 U.S. 479 (1991) .................................................................................... 4, 6, 9

*Reardon v. United States*,
    947 F.2d 1509 (1st Cir. 1991) ........................................................................... 5

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
    279 F. Supp. 3d 1011 (N.D. Cal. 2018) ........................................................... 8

*Rusk v. Cort*,
    369 U.S. 367 (1962) ...................................................................................... 2, 7

*St. Fort v. Ashcroft*,
    329 F.3d 191 (1st Cir. 2003) ............................................................................. 6

*Succar v. Ashcroft*,
    394 F.3d 8 (1st Cir. 2005) ............................................................................. 9

*U.S.* ex rel. *Heineman-Guta v. Guidant Corp.*,
    718 F.3d 28 (1st Cir. 2013) ........................................................................... 4

*United States v. Nourse*,
    34 U.S. 8 (1835) ............................................................................................ 2

*Webster v. Doe*,
    486 U.S. 592 (1988) ............................................................................. 3, 5, 6

*Weinberger v. Salfi*,
    422 U.S. 749 (1975) ..................................................................................... 3

## STATUTES

8 U.S.C. § 1252(b)(9) ............................................................................................ 4

8 U.S.C. § 1254a(b)(3)(A) .................................................................................. 7, 8

8 U.S.C. § 1254a(b)(5)(A) .............................................................................. 4, 8, 9

8 U.S.C. § 1255a(f)(1) ........................................................................................... 9

## FEDERAL REGISTER

75 Fed. Reg. 39,556 (July 9, 2010) ....................................................................... 7

## OTHER AUTHORITIES

Amanda Baran & Jose Magaña-Salgado, *Economic Contributions by Salvadoran,
    Honduran, and Haitian TPS Holders*, Immigrant Legal Resource Ctr., 7
    (Apr. 2017), https://tinyurl.com/TPSEcon ...................................................... 14

Cecilia Menjívar, *Temporary Protected Status in the United States: The
    Experiences of Honduran and Salvadoran Immigrants*, U. Kan. Ctr.
    Migration Research 14 (May 20, 2017),
    http://ipsr.ku.edu/migration/pdf/TPS_Report.pdf ............................................ 15

*Child Care and Health in America*, NPR, Robert Wood Johnson Found., Harv.
    T.H. Chan Sch. of Pub. Health (Oct. 2016),
    https://tinyurl.com/RWJchildcare ................................................................... 15

Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets of
    State and Local Governments*, 8 (Dec. 2007),
    https://tinyurl.com/CBOImm .......................................................................... 17

D.C. Council, Report on PR-22-448 at 9, 37, & 58 (Nov. 21, 2017) .......................... 14

Decl. of Anne McCleod, *Regents v. U.S. Department of Homeland Security*, 3:17-cv-05211-WHA ECF No. 118-1 (App. 789–90) (N.D. Cal. Nov. 1, 2017)..................... 17

Decl. of Jesse M. Caplan, *New York v. Trump*, 1:17-cv-05228-NGG-JO ECF No. 55-83 (E.D.N.Y. Oct. 4, 2017)........................................................................... 16

G. Thomas Kingsley, et al., *The Impacts of Foreclosures on Families and Communities*, The Urban Inst., 13 (May 2009), https://tinyurl.com/GTKUrban...................................................................... 15

*Health care for unauthorized immigrants*, Comm. Op. No. 627, Am. C. of Obstetricians & Gynecologists, 125 Obstet. Gynecol. 755 (2015), https://tinyurl.com/ACOG627 ........................................................................ 17

Heather Koball, et al., *Health and Social Services Needs of US-Citizen Children with Detained or Deported Immigrant Parents*, Migration Pol'y Inst., 5 (Sept. 2015), https://tinyurl.com/MIRFinal ............................................... 12

Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Young Children* 120–136 (2011)............................................................. 12

Jacob S. Rugh & Matthew Hall, *Deporting the American Dream: Immigration Enforcement and Latino Foreclosures*, 3 SOCIOLOGICAL SCIENCE 1053 (2016), https://www.sociologicalscience.com/articles-v3-46-1053/ ............................... 15

James Queally, *Fearing deportation, many domestic violence victims are steering clear of police and courts*, L.A. TIMES, Oct. 9, 2017, https://tinyurl.com/Queally ............................................................................. 18

Jayesh Rathod, et al., *Extending Temporary Protected Status for El Salvador: Country Conditions and U.S. Legal Requirements* (Am. U. Ctr. Latin Am. & Latino Stud., Working Paper No. 17, 2017), https://ssrn.com/abstract=3091249 .................................................................. 7

Jens Hainmueller, et al., *Protecting unauthorized immigrant mothers improves their children's mental health*, SCIENCE (Aug. 31, 2017), https://tinyurl.com/HainScience.................................................................... 12

K. Yun, et al., *Parental immigration status is associated with children's health care utilization: Findings from the 2003 new immigrant survey of US legal permanent residents*, 17 MATERN. CHILD HEALTH J. 1913–1921 (2013)........................ 17

Kim Slowey, *DACA Expiration, TPS Elimination Threaten 100K+ Construction Jobs*, ConstructionDive.com, Jan. 24, 2018, https://tinyurl.com/TPSConst.................... 14

Kristen Lee Gray, *Effects of Parent-Child Attachment on Social Adjustment and Friendship in Young Adulthood*, Cal. Polytechnic St. Univ., San Luis Obispo (June 2011), https://tinyurl.com/j3lgrno............................................... 12

Marva Serotkin & Tara Gregorio, *Nursing facilities, and their residents, will feel impact if Haitians' status ends*, BOSTON GLOBE, Dec. 4, 2017, https://tinyurl.com/Serotkin ........................................................................... 16

*Massachusetts Industry-Occupation Employment Matrix, 2014-2024*, Mass. Exec. Office of Labor & Workforce Dev., https://tinyurl.com/MALabMar .............................. 16

Melissa Bailey, *As Trump Targets Immigrants, Elderly Brace to Lose Caregivers*, Kaiser Health News (Mar. 26, 2018), https://tinyurl.com/KHNImmig ........................... 16

Meredith King Ledford, *Immigrants and the U.S. Health Care System: Five Myths that Misinform the American Public*, Ctr. for Am. Progress (June 2007), https://tinyurl.com/ImmHealth ........................................................................................ 17

New Amer. Economy Research Fund, *How Temporary Protected Status Holders Help Disaster Recovery and Preparedness* (Nov. 6, 2017), https://tinyurl.com/NewAmTPS ...................................................................................... 14

Nicholas Zill, *Better Prospects, Lower Cost: The Case for Increasing Foster Care Adoption*, Nat'l Council for Adoption (May 2011), https://tinyurl.com/ZillAdopt ........................................................................................... 13

Nicole Prhcal Svajlenka, et al., *TPS Members Are Integral Members of the U.S. Economy and Society*, Ctr. Am. Progress (Oct. 20, 2017), https://tinyurl.com/TPSCAP ........................................................................................ 10, 14

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Dep't of Urban Planning & Pol'y, Univ. of Ill. at Chi. (May 2013), https://tinyurl.com/InsecComm ................................................. 18

Press Release, U.S. Dep't of Homeland Sec., *Secretary of Homeland Security Kirstjen M. Nielsen Announcement on TPS for El Salvador* (Jan. 8, 2018), https://tinyurl.com/SalTPS ................................................................................................. 8

Randy Capps, et al., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature*, Migration Pol'y Inst. (Sept. 2015), https://tinyurl.com/CappsMPI ................................. 13

Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti*, 5 J. Migration & Hum. Security 573, 577–78, 591 (2017), https://tinyurl.com/WarKer ......................................................................... 11, 13, 14, 15

Seth Freed Wessler, *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System*, Applied Research Ctr. (Nov. 2011), https://tinyurl.com/ARCFam ............................................................................. 13

Wendy Cervantes, et al., *Our Children's Fear: Immigration Policy's Effects on Young Children*, Ctr. Law & Soc. Pol'y (Mar. 2018), https://tinyurl.com/ChildFears ...................................................................................... 11

## INTRODUCTION AND INTEREST OF AMICI STATES

The Amici States[1] are home to hundreds of thousands of people who hold Temporary Protected Status ("TPS")—a legal status provided to foreign nationals who are present in the United States when their countries of origin become unsafe and cannot handle their return. TPS holders are nurses, roofers, pastors, chefs, bus drivers, teachers, landscapers, and child care providers. They are homeowners, business owners, union members, class presidents, and civic leaders. They are our neighbors, co-workers, family members, and friends.

The Department of Homeland Security's ("DHS's") termination of TPS for El Salvador, Haiti, and Honduras, whose nationals comprise the vast majority of current TPS holders, would strip these community members of legal authorization to work and could result in their deportation to countries that are unsafe and unprepared to receive them. Many TPS holders would presumably be deported or otherwise have no choice but to leave; others would go into the shadows; all would lose the right to remain legally in the United States and support themselves and their families under the terms of TPS. The result would be harm to the welfare of TPS holders and their families, shuttered businesses, labor shortages, empty church pews, and greater strain on public and private social services.

TPS terminations are already hurting the economy and civil society, as the prospect of widespread deportation has left whole communities uncertain, confused, and afraid. The terminations will inflict greater damage in the months ahead if they are not enjoined. Judicial review of these terminations is legally sound, serves as a vital check on executive action, and

---

[1] The States are Massachusetts, California, Connecticut, Delaware, Iowa, Maine, Maryland, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Virginia, and Washington.  Though not a state, we include the District of Columbia as an "Amici State" for the purposes of this brief.

could alleviate unnecessary harms, including direct and indirect harms to the Amici States. Amici therefore have a strong interest in judicial review of DHS's actions. The executive branch's improper actions have already affected thousands of families across the Amici States and threaten to inflict further harm if left unchecked by the judiciary. The public interest, as well as settled law, weighs in favor of judicial review.

## ARGUMENT

### I.   This Court Has Jurisdiction to Review DHS's Actions.

For centuries, our courts have emphasized the "strong presumption" of judicial review of administrative action. *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967); *United States v. Nourse*, 34 U.S. 8, 28–29 (1835). Judicial review is particularly important in cases like this one, where plaintiffs allege that a constitutionally and legally flawed process has impacted multiple agency decisions and threatens to inflict harm on vulnerable populations and the public. As a result, agencies seeking to prevent judicial review of their actions must show "clear and convincing" evidence of congressional intent to bar such review. *Bowen*, 476 U.S. at 671; *see also Rusk v. Cort*, 369 U.S. 367, 379–80 (1962); *Abbott Laboratories*, 387 U.S. at 140–41 (citing *Rusk* for the "clear and convincing evidence" standard); *McCuin v. Sec'y of Health & Human Servs.*, 817 F.2d 161, 165 (1st Cir. 1987). DHS's arguments against review of plaintiffs' constitutional and statutory claims do not meet that high standard.

### A.   Section 1254a Shows No Evidence of Congressional Intent to Foreclose Review of Constitutional Claims.

Where agency action allegedly violates constitutional rights—of hundreds of thousands of people in this case—the presumption of judicial review is particularly strong. As the Supreme Court has noted, a "serious constitutional question [] would arise if a federal statute were

2

construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988); *see also Bowen*, 476 U.S. at 681 n.12; *Goncalves v. Reno*, 144 F.3d 110, 122 (1st Cir. 1998) (citing *Webster*, and finding no congressional intent to bar habeas review in Illegal Immigration Reform and Immigrant Responsibility Act). Thus, the Court has described arguments that Congress intended to bar judicial review of constitutional claims as "extreme," *Bowen*, 476 U.S. at 680, "extraordinary," *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975), and "not to be favored," *Lockerty v. Phillips*, 319 U.S. 182, 188 (1943).

The language at issue here does not come close to meeting the demanding "clear and convincing" standard of congressional intent to foreclose review of constitutional claims, and this Court therefore need not confront the "serious constitutional question" that would arise if it did.[2] The statute, which bars "judicial review of any determination of the [Secretary] with respect to the . . . termination . . . of a designation, of a foreign state," 8 U.S.C. § 1254a(b)(5)(A), is notably silent as to the reviewability of constitutional claims. This is in stark contrast to other provisions limiting jurisdiction in the Immigration and Nationality Act ("INA"), which do expressly address how constitutional claims should be reviewed, *e.g.* 8 U.S.C. § 1252(b)(9).[3] "Congress legislates with knowledge of our basic rules of statutory construction," including the Court's "well-settled presumption favoring interpretations of statutes that allow judicial review

---

[2] Defendants' lone citation in support of their argument that the language of 8 U.S.C. § 1254a(b)(5)(A) precludes constitutional claims is a decision of this Court, *Krua v. Dep't of Homeland Sec.*, 729 F. Supp. 2d 452 (D. Mass. 2010). However, Judge Gorton's ruling does not include analysis of the reviewability issue or mention the cases which apply the "clear and convincing" standard required to bar such review. This was understandable, since it does not appear that Krua—a pro se plaintiff—addressed jurisdictional issues in his briefing. Thus, this decision should not carry significant weight here.

[3] Where language is included in some statutory provisions and not others, "'it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *U.S.* ex rel. *Heineman-Guta v. Guidant Corp.*, 718 F.3d 28, 35 (1st Cir. 2013) (quoting *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993)).

of administrative action." *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991). The

statute's silence as to constitutional claims is thus enough to dispense with the argument that

"clear and convincing evidence" exists to bar review of constitutional claims. *See Johnson v.*

*Robison,* 415 U.S. 361, 367 (1974) ("Plainly, no explicit provision of § 211(a) bars judicial

consideration of appellee's constitutional claims."); *Demore v. Kim*, 538 U.S. 510, 517 (2003)

("Section 1226(e) contains no explicit provision barring habeas review . . . .");[4] *Webster,* 486

U.S. at 603–04 (holding that "only those determinations specifically identified by Congress"

were excluded from judicial review).

Perhaps understanding the gravity of suggesting that judicial review of constitutional

claims should be precluded, DHS suggests that it "may" be possible for individual plaintiffs to

raise "certain" constitutional claims during their removal proceedings (to the immigration court

and applicable court of appeals). Def. Br. at 14. This purported alternative is inadequate.  Even

putting aside DHS's obvious hedging as to whether this "alternative" actually exists, it would be

severely underinclusive, providing *no* forum for individuals who are never placed in removal

proceedings,[5] or for institutional or organizational plaintiffs to raise a claim of constitutional

---

[4] Defendants' efforts to distinguish *Demore*, Def. Br. at 14 n.7, fall flat. The critical issue for the *Demore* Court was that Kim was not challenging an individual detention decision. *Demore*, 538 U.S. at 516–17. Because his constitutional claim (like those of plaintiffs here) went beyond that individual decision, and because there was no clear congressional intent to preclude judicial review except with respect to individual decisions, the courts had jurisdiction to hear Kim's claim. The Court's description of Kim's challenge as being to the "statutory framework" does not logically limit its holding to that specific type of constitutional challenge. Indeed, the *Demore* Court cites a decision relating to immigration authorities' "statutory interpretation," *I.N.S. v. St. Cyr*, 533 U.S. 289, 298 (2001), in support of its holding. *Demore*, 538 U.S. at 517; *see also Reardon v. United States, 947 F.2d 1509, 1517 (1st Cir. 1991)* (treating "constitutional challenge to the statute itself" and "agency's execution of the statute" similarly for purposes of whether judicial review was barred).

[5] It bears noting that TPS holders will be harmed by the terminations even if they are not ultimately placed in removal proceedings. Most prominently, they will lose their immigration status and authorization to legally work in the United States, leading to significant hardship.

injury. As in *McNary*, this "alternative" would provide that individuals "can ensure themselves review in courts of appeals only if they voluntarily surrender themselves for deportation," an outcome "tantamount to a complete denial of judicial review." 498 U.S. at 496–97. DHS's similar "alternative" would "deny any judicial forum for a colorable constitutional claim" for many of those affected—exactly what the relevant cases prohibit. *See Webster*, 486 U.S. at 603; *St. Fort v. Ashcroft*, 329 F.3d 191, 201 (1st Cir. 2003). This hypothetical remedy is no remedy at all; it would allow irreversible damage to hundreds of thousands of people and numerous organizations like Centro Presente, which are already suffering collateral consequences.

### B. Plaintiffs' Claims Are Subject to Judicial Review Because They Challenge Practices and Policies, not Individual TPS Terminations.

Plaintiffs' constitutional and statutory claims arise not out of a determination for a single country, but rather out of "a group of decisions or a practice or procedure employed in making decisions," which they argue are unconstitutional and unlawful. *McNary*, 498 U.S. at 492. This Court can and should review the broad policy and practices that led DHS to terminate TPS for the three countries at issue in this case to determine whether they were premised on unconstitutional discrimination and whether they violated the Administrative Procedure Act.[6]

Under the TPS statute, DHS must undertake a periodic review of "the conditions in" any country currently designated for TPS and determine whether conditions for TPS designation "continue to be met." 8 U.S.C. § 1254a(b)(3)(A). For years, DHS met this statutory mandate by considering all relevant conditions on the ground when deciding whether TPS should be

---

[6] It is well established that "the [Supreme] Court will not hold that the broadly remedial provisions of the Administrative Procedure Act are unavailable to review administrative decisions under the [INA] in the absence of clear and convincing evidence that Congress so intended." *Rusk,* 369 U.S. at 379–80. *See also Bowen*, 476 U.S. at 681 ("We ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.").

extended as to any particular country. DHS's policy did not require that those conditions be related to the specific condition under which the country at issue was originally designated for TPS.[7] In recent months, however, DHS changed this longstanding policy, at least for the countries at issue in this case. For these countries, DHS made TPS termination decisions solely on the "conditions upon which the country's *original designation* was based," and conducted "an assessment of whether those *originating conditions* continue to exist,"[8] apparently based on the agency's new position that the statute *only* allows consideration of whether a country has made progress vis-à-vis the condition that prompted the original TPS designation. *Id.*

The plaintiffs allege that this new policy relies on an erroneous legal interpretation of the TPS statute and a pretextual justification for decision-making that was infected by invidious animus against persons of Latino and Haitian origin. DHS's new policy and associated practices, as applied to these three countries, warrants judicial scrutiny because the statute's bar to judicial review refers specifically to "any determination of the [Secretary] with respect to the . . . termination . . . of a designation[] of a foreign state," 8 U.S.C. § 1254a(b)(5)(A), *not* to broader

---

[7] For example, El Salvador was originally designated for TPS in 2001 due to a series of catastrophic earthquakes. Designation of El Salvador Under TPS Program, 66 Fed. Reg. 14,214 (Mar. 9, 2001). In the years that followed, El Salvador's TPS designation was extended eleven times, often for reasons far removed from the 2001 earthquakes. In its 2010 extension, for example, DHS cited destruction caused by Tropical Storm Stan and the Santa Ana volcano eruption, both occurring in 2005, as reasons to support extending TPS. Extension of the Designation of El Salvador for TPS, 75 Fed. Reg. 39,556 (July 9, 2010); *see generally* Jayesh Rathod, et al., *Extending Temporary Protected Status for El Salvador: Country Conditions and U.S. Legal Requirements* (Am. U. Ctr. Latin Am. & Latino Stud., Working Paper No. 17, 2017), https://ssrn.com/abstract=3091249 (describing the developing conditions in El Salvador that led to designation and extension of TPS for that country). This is consistent with DHS's practice for other countries as well, where events subsequent to TPS designation have consistently been considered in extension determinations.

[8] Press Release, U.S. Dep't of Homeland Sec., *Secretary of Homeland Security Kirstjen M. Nielsen Announcement on TPS for El Salvador* (Jan. 8, 2018), https://tinyurl.com/SalTPS (emphasis added).

policies and practices that inform such determinations, including embedded legal interpretations. *See, e.g., Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1030 (N.D. Cal. 2018) (citing federal defendants' concession that "where the agency's interpretation of a statute is embedded in a non-reviewable enforcement policy, the former may be reviewable as such.") (internal quotation marks omitted); *Cho v. Gonzales*, 404 F.3d 96, 100 (1st Cir. 2005) (interpreting jurisdiction-stripping provision relating to immigration decision "not to preclude judicial review of the legal question of interpretation of the statute") (quoting *Succar v. Ashcroft*, 394 F.3d 8, 19 (1st Cir. 2005)).

Reviewing a remarkably similar statute,[9] the Supreme Court held in *McNary* that "the reference to 'a determination' describes a single act, rather than a group of decisions or a practice or procedure employed in making decisions." 498 U.S. at 492. *McNary* went on to hold that such language cannot be read to "refer[] to general collateral challenges to unconstitutional practices and policies used by the agency." *Id.*; *see also id.* at 497 (rejecting "denial of judicial review of generic constitutional and statutory claims"). Likewise, plaintiffs here challenge practices and policies that they allege to be unconstitutional (in that they were motivated by animus) and unlawful (in that they misinterpreted the statute). This Court should review these claims because nothing in § 1254a is so "clear and convincing" as to overcome the strong presumption favoring judicial review of claims of the kind advanced here.

Judicial review is all the more important where, as here, an agency's policy will result in broad and systemic impact on the public. DHS's new policy has already resulted in the

---

[9] *Compare* 8 U.S.C. § 1255a(f)(1) ("There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection.") *with* § 1254a(b)(5)(A) ("There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.").

termination of TPS for six countries in the past year. As a result, hundreds of thousands of TPS holders will lose their legal status and be forced to choose between remaining in the United States without legal status or returning to countries that are unsafe and that cannot handle their return. In turn, the families, employers, and communities that rely on these individuals—including Amici States—will also suffer.

## II. DHS's Policy Will Inflict Serious Harm on Individuals, Families, Communities, and the Amici States.

DHS's decisions are already inflicting broad and systemic harm on the public. A majority of TPS holders have lived here for many years—in some instances, decades. For example, on average, Honduran TPS recipients have lived in the United States for 22 years, Salvadoran recipients for 21 years, and Haitian recipients for 13 years.[10] TPS holders from these three countries represent 90 percent of the total TPS population.[11] These individuals have built lives in the United States. They have started families, founded businesses, bought homes, joined churches, gotten degrees, and advanced in their careers. They contribute to our economy and civic life in countless ways, both quantifiable and intangible. Judicial review of the plaintiffs' legal claims could prevent needless harm not only to TPS holders, but to those who rely on them for care, friendship, family and community cohesion, and economic vitality.

### A. Families Will Be Torn Apart.

Having lived and worked legally in the United States for years, many TPS holders have gotten married, had children, and raised families in the Amici States. In fact, hundreds of thousands of children have been born to TPS holders in the United States, each of whom is a

---

[10] Nicole Prhcal Svajlenka, et al., *TPS Members Are Integral Members of the U.S. Economy and Society*, Ctr. Am. Progress (Oct. 20, 2017), https://tinyurl.com/TPSCAP.

[11] *Id.*

U.S. citizen by virtue of birth on U.S. soil.[12] As a result, hundreds of thousands of people live in "mixed-status" households, where one or both parents hold TPS, while some or all of the children (and, sometimes, a spouse) are U.S. citizens.

Terminating TPS guarantees that these "mixed-status" families will—at the very least—face agonizing choices. Faced with the loss of TPS, should a parent return to her country of origin, leaving her children behind? Or should she take them with her to a dangerous country that cannot ensure the safety of the TPS holder or her children? Or should she stay and retreat into the shadows, knowing she cannot work legally and could be deported at any time? These are choices no parent should have to face, yet DHS is forcing them on hundreds of thousands of families through its new policy.

In fact, just the prospect of confronting these choices is already harming children. Due to fears about family members' deportation, children across the country are experiencing serious mental health problems, including depression, anxiety, self-harm, and regression.[13] Studies show that children's concerns about their parents' immigration status can impair their socioemotional and cognitive development.[14] And perhaps unsurprisingly, children whose immigrant mothers are subject to deportation have higher incidence of adjustment and anxiety disorders.[15]

---

[12] TPS holders from El Salvador, Haiti, and Honduras—not even taking into account the other nations with TPS—have over 273,000 United States citizen children. Ten percent of Salvadoran, nine percent of Haitian, and six percent of Honduran TPS holders are married to a legal U.S. resident. Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti*, 5 J. MIGRATION & HUM. SECURITY 573, 577–78, 591 (2017), https://tinyurl.com/WarKer.

[13] Wendy Cervantes, et al., *Our Children's Fear: Immigration Policy's Effects on Young Children*, Ctr. Law & Soc. Pol'y (Mar. 2018), https://tinyurl.com/ChildFears.

[14] Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Young Children* 120–136 (2011).

[15] Jens Hainmueller, et al., *Protecting unauthorized immigrant mothers improves their children's mental health*, SCIENCE (Aug. 31, 2017), https://tinyurl.com/HainScience (concluding that

Of course, these harms are worsened when fears of forcible separation come true. In one study, children with deported parents refused to eat, pulled out their hair, had persistent stomachaches and headaches, engaged in substance abuse, lost interest in daily activities, and had trouble maintaining positive relationships with non-deported parents.[16] These traumatic childhood experiences also can inflict lasting harm, including severe impairments of a child's self-worth and ability to form close relationships later in life, increased anxiety, and depression.[17]

In addition to threatening children's health, deporting a family's financial breadwinner can lead to economic hardship and loss of housing for remaining family members, and can put the care of children, seniors, and disabled family members at serious risk.[18] As a result, many families will be forced to seek increased social services, stretching the limited resources of the Amici States. For example, as of 2011, more than 5,000 children nationally were estimated to be living in foster care due to their parents' detention or deportation.[19] With long-term foster care estimated to cost about $25,000 per child per year,[20] these immigration enforcement actions cost

---

"[p]arents' unauthorized status is [] a substantial barrier to normal child development and perpetuates health inequalities through the intergenerational transmission of disadvantage").

[16] Heather Koball, et al., *Health and Social Services Needs of US-Citizen Children with Detained or Deported Immigrant Parents*, Migration Pol'y Inst., 5 (Sept. 2015), https://tinyurl.com/MIRFinal.

[17] Kristen Lee Gray, *Effects of Parent-Child Attachment on Social Adjustment and Friendship in Young Adulthood*, Cal. Polytechnic St. Univ., San Luis Obispo (June 2011), https://tinyurl.com/j3lgrno.

[18] Randy Capps, et al., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature*, Migration Pol'y Inst. (Sept. 2015), https://tinyurl.com/CappsMPI.

[19] Seth Freed Wessler, *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System*, Applied Research Ctr. (Nov. 2011), https://tinyurl.com/ARCFam.

[20] Nicholas Zill, *Better Prospects, Lower Cost: The Case for Increasing Foster Care Adoption*, Nat'l Council for Adoption (May 2011), https://tinyurl.com/ZillAdopt.

states and local governments $125 billion dollars annually.[21] That burden could substantially increase if TPS holders lose status and are forced to separate from their families.

### B.  Amici States' Economies and Workforces Will Suffer.

State economies will also suffer if the TPS terminations are upheld. The labor force participation rate for TPS holders from El Salvador, Honduras, and Haiti ranges from 81 to 88 percent, significantly higher than the overall national rate (63 percent).[22] Over ten years, loss of legal status for these TPS holders is projected to cost $160 billion in GDP (due to lost earnings as well as decreased industry outputs),[23] $6.9 billion in Social Security and Medicare contributions,[24] and almost $1 billion in employers' turnover costs.[25]

This impact will be felt most acutely in particular fields where TPS holders are concentrated, including construction, hospitality, food service, landscaping, child care, and retail.[26] These jobs may prove difficult to fill, leading to a lack of needed services and economic strain. For example, an estimated 37,000-70,000 construction workers are TPS holders.[27] In the District of Columbia metropolitan area, almost one in three TPS holders (11,500 individuals)

---

[21] *See also* Section D, *infra*, for a discussion of increased public health care costs to states and their political subdivisions that would be required if TPS holders are left without legal status.

[22] Warren & Kerwin, *supra* note 12.

[23] Svajlenka, *supra* note 10.

[24] Amanda Baran & Jose Magaña-Salgado, *Economic Contributions by Salvadoran, Honduran, and Haitian TPS Holders*, Immigrant Legal Resource Ctr., 7 (Apr. 2017), https://tinyurl.com/TPSEcon.

[25] *Id.* at 8.

[26] Warren & Kerwin, *supra* note 12

[27] Kim Slowey, *DACA Expiration, TPS Elimination Threaten 100K+ Construction Jobs*, ConstructionDive.com, Jan. 24, 2018, https://tinyurl.com/TPSConst.

works in construction.[28] Construction companies in the area estimate that termination of TPS will cause them to lose 20 percent of their skilled workforce.[29] The loss of these workers would hurt the construction industry, which is already "having trouble hiring workers."[30] Among other things, this labor shortage could have specific impacts on infrastructure development, jeopardizing the Amici States' ability to prepare for natural disasters.[31]

The Amici States will also suffer by losing TPS holders as homeowners. Thirty percent of TPS holders from El Salvador, Honduras, and Haiti have mortgages,[32] an important measure of their economic contribution to the Amici States. The loss of status will likely result in more foreclosures.[33] In turn, foreclosures cause hardship for families and place greater strain on local resources spent to address the direct and indirect effects of foreclosure, including declining property values, abandoned homes, crime and social disorder.[34]

### C. Vulnerable Residents Will Suffer from Disruptions in Care Provided by TPS Holders.

Terminating TPS will also disrupt child care facilities, nursing homes, home healthcare companies, and hospitals, many of which rely on TPS holders in their workforce. Almost seven

---

[28] New Amer. Economy Research Fund, *How Temporary Protected Status Holders Help Disaster Recovery and Preparedness* (Nov. 6, 2017), https://tinyurl.com/NewAmTPS.

[29] D.C. Council, Report on PR-22-448 at 9, 37, & 58 (Nov. 21, 2017).

[30] Slowey, *supra* note 27.

[31] New Amer. Economy Research Fund, *supra* note 28.

[32] Warren & Kerwin, *supra* note 12.

[33] *See* Jacob S. Rugh & Matthew Hall, *Deporting the American Dream: Immigration Enforcement and Latino Foreclosures*, 3 SOCIOLOGICAL SCIENCE 1053 (2016), https://www.sociologicalscience.com/articles-v3-46-1053/.

[34] G. Thomas Kingsley, et al., *The Impacts of Foreclosures on Families and Communities*, The Urban Inst., 13 (May 2009), https://tinyurl.com/GTKUrban.

percent of female TPS holders work in child care,[35] including 10,000 TPS holders from El Salvador, Haiti, and Honduras alone.[36] Children rely on these providers for care and education, and parents require these services to maintain their own employment. Losing child care workers will be disruptive for the children and families they serve and for the economy, especially given how difficult it is for parents to find affordable, trustworthy, and convenient child care.[37]

Terminations of TPS will also hurt seniors and people with disabilities. Estimates show that 34,600 direct care workers across the country are non-U.S. citizens from Haiti, El Salvador, Nicaragua, and Honduras.[38] In Massachusetts alone, nursing facilities employ about 4,300 Haitians.[39] If TPS holders can no longer legally work in these jobs, vulnerable residents will lose the services of health care workers with whom they have established trusting relationships. This loss of care could cause a serious deterioration in their physical and mental health. Moreover, it may prove difficult for employers to fill the positions TPS holders are forced to leave. Workers in direct care fields generally receive low wages and no or minimal benefits, and the work is physically and emotionally demanding. As a result, turnover in the industry is high. In Massachusetts, one in seven certified nursing assistant positions is vacant, leaving a shortage of 3,000 workers.[40] Making matters worse, the demand for direct care assistance is increasing with

---

[35] Cecilia Menjívar, *Temporary Protected Status in the United States: The Experiences of Honduran and Salvadoran Immigrants*, U. Kan. Ctr. Migration Research 14 (May 20, 2017), http://ipsr.ku.edu/migration/pdf/TPS_Report.pdf.

[36] Warren & Kerwin, *supra* note 12.

[37] *Child Care and Health in America*, NPR, Robert Wood Johnson Found., Harv. T.H. Chan Sch. of Pub. Health (Oct. 2016), https://tinyurl.com/RWJchildcare.

[38] Melissa Bailey, *As Trump Targets Immigrants, Elderly Brace to Lose Caregivers*, Kaiser Health News (Mar. 26, 2018), https://tinyurl.com/KHNImmig.

[39] Marva Serotkin & Tara Gregorio, *Nursing facilities, and their residents, will feel impact if Haitians' status ends*, Boston Globe, Dec. 4, 2017, https://tinyurl.com/Serotkin.

[40] Bailey, *supra* note 38.

a growing elderly population.[41] If home care positions go unfilled, patients who would otherwise be able to stay in their homes may be forced to move to nursing facilities, incurring higher costs for them and the Amici States.

### D.  Public Health Will Suffer.

The TPS terminations will also harm public health and strain state resources. When TPS holders lose work authorization, many will lose employer-sponsored health insurance for themselves and their families, hindering their access to health care.[42] For example, studies show that children of undocumented immigrants are often sicker when seeking emergency room care and frequently miss their preventive annual exams.[43] In the same vein, undocumented women are less likely to get needed healthcare and preventive screenings than the general U.S. population.[44] This leads to significantly higher rates of adverse conditions, including cervical cancer and birth complications, neonatal morbidity, respiratory distress syndrome, and seizures for newborns.[45] All these individual health problems add up, creating public health consequences that could have been prevented if these patients had better access to preventive and routine care. Less employer-

---

[41] In Massachusetts, the position of home health aide is the fastest growing job, predicted to grow by 37.5% between 2014 and 2024. *Massachusetts Industry-Occupation Employment Matrix, 2014-2024*, Mass. Exec. Office of Labor & Workforce Dev., https://tinyurl.com/MALabMar.

[42] *See, e.g.*, Decl. of Jesse M. Caplan, *New York v. Trump*, 1:17-cv-05228-NGG-JO ECF No. 55-83 (E.D.N.Y. Oct. 4, 2017); Decl. of Anne McCleod, *Regents v. U.S. Department of Homeland Security*, 3:17-cv-05211-WHA ECF No. 118-1 (App. 789–90) (N.D. Cal. Nov. 1, 2017); Meredith King Ledford, *Immigrants and the U.S. Health Care System: Five Myths that Misinform the American Public*, Ctr. for Am. Progress (June 2007), https://tinyurl.com/ImmHealth.

[43] Ledford, *supra* note 42; K. Yun, et al., *Parental immigration status is associated with children's health care utilization: Findings from the 2003 new immigrant survey of US legal permanent residents*, 17 MATERN. CHILD HEALTH J. 1913–1921 (2013).

[44] *Health care for unauthorized immigrants*, Comm. Op. No. 627, Am. C. of Obstetricians & Gynecologists, 125 Obstet. Gynecol. 755 (2015), https://tinyurl.com/ACOG627.

[45] *Id.*

sponsored health insurance increases Amici States' costs to provide care to uninsured residents—including emergency health insurance, payments to hospitals and community health centers, and funding for public health programs that serve underinsured patients.[46]

### E.  Public Safety Will Suffer.

The signatories to this brief are Attorneys General, most of whom serve as the Amici States' chief law enforcement officers. In that role, the Attorneys General are dedicated to ensuring that police and prosecutors are able to do their jobs to protect public safety. Terminating TPS will make that job harder because TPS holders and their families will be less likely to report crime when they witness it, even if they are victims.[47] When law enforcement is unable to obtain evidence of crimes, public safety will suffer, and the Amici States will have more difficulty enforcing their criminal codes, a core aspect of state sovereignty. *See, e.g.*, *Alfred L. Snapp & Son, Inc. v. P.R.* ex rel. *Barez*, 458 U.S. 592, 601 (1982).

### CONCLUSION

The Government's motion to dismiss should be denied.

---

[46] *See, e.g.*, Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments*, 8 (Dec. 2007), https://tinyurl.com/CBOImm (stating that county governments that share a border with Mexico incurred almost $190 million in costs for providing uncompensated care to unauthorized immigrants in 2000, representing about one-quarter of all their uncompensated health costs); Decl. of Jesse M. Caplan, *supra* note 42 (discussing fiscal harms to Massachusetts when immigrants lose employer-sponsored health insurance).

[47] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Dep't of Urban Planning & Pol'y, Univ. of Ill. at Chi. (May 2013), https://tinyurl.com/InsecComm (70 percent of undocumented immigrants reporting they are less likely to contact law enforcement if they were victims of a crime "for fear they will ask me or other people I know about our immigration status"); James Queally, *Fearing deportation, many domestic violence victims are steering clear of police and courts*, L.A. TIMES, Oct. 9, 2017, https://tinyurl.com/Queally (Los Angeles law enforcement officials reporting precipitous drop in domestic violence reports in Latino community, which they attributed to victims' fear of deportation).

Dated:  June 22, 2018

Respectfully Submitted,

MAURA HEALEY
*Attorney General*
*Commonwealth of Massachusetts*

*/s/ Andrew J. Haile*_____
Andrew J. Haile (BBO #694182)
*Assistant Attorney General*
*One Ashburton Place*
*Boston, MA 02108*
*(617) 963-2816*
*Andrew.Haile@state.ma.us*

| | |
|---|---|
| XAVIER BECERRA<br>*Attorney General*<br>*State of California*<br>1300 I Street<br>Sacramento, CA  95814 | KARL A. RACINE<br>*Attorney General*<br>*District of Columbia*<br>441 4th Street, N.W.<br>Washington, D.C. 20001 |
| GEORGE JEPSEN<br>*Attorney General*<br>*State of Connecticut*<br>55 Elm Street<br>Hartford, CT  06106 | MATTHEW P. DENN<br>*Attorney General*<br>*State of Delaware*<br>Department of Justice<br>Carvel State Building, 6th Floor<br>820 North French Street<br>Wilmington, DE 19801 |
| TOM MILLER<br>*Attorney General*<br>*State of Iowa*<br>Hoover State Office Building<br>1305 E. Walnut Street<br>Des Moines IA 50319 | JANET T. MILLS<br>*Attorney General*<br>*State of Maine*<br>6 State House Station<br>Augusta, ME  04333-0006 |
| BRIAN E. FROSH<br>*Attorney General*<br>*State of Maryland*<br>200 St. Paul Place<br>Baltimore, MD 21202 | LORI SWANSON<br>*Attorney General*<br>*State of Minnesota*<br>102 State Capitol<br>75 Rev. Dr. Martin Luther King Jr. Blvd.<br>St. Paul, MN 55155 |
| GURBIR S. GREWAL<br>*Attorney General*<br>*State of New Jersey*<br>RJ Hughes Justice Complex<br>25 Market Street, Box 080<br>Trenton, NJ 08625-0080 | HECTOR BALDERAS<br>*Attorney General*<br>*State of New Mexico*<br>408 Galisteo St.<br>Santa Fe, NM 87501 |

16

BARBARA D. UNDERWOOD
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

PETER F. KILMARTIN
*Attorney General*
*State of Rhode Island*
150 S. Main St.
Providence, RI 02903

MARK R. HERRING
*Attorney General*
*Commonwealth of Virginia*
202 North Ninth Street
Richmond, VA 23219

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

THOMAS J. DONOVAN, JR.
*Attorney General*
*State of Vermont*
Office of the Attorney General
109 State Street
Montpelier, Vermont 05609-1001

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504-0100

17

**<u>Certificate of Service</u>**

I, Andrew J. Haile, hereby certify that a true copy of the above document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  June 22, 2018                    */s/ Andrew J. Haile*_____