**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **CENTRO PRESENTE, JUAN CARLOS** | ) | |
| **VIDAL, ANNE CHRISTINE NICOLAS,** | ) | |
| **CHRIS JEAN BAPTISTE, MERCEDES** | ) | |
| **MATA, CAROLINA MATA, WILL ARIAS,** | ) | |
| **JUAN AMAYA, MARIA GUERRA,** | ) | |
| **HAITIAN-AMERICANS UNITED, INC.,** | ) | |
| **JOSUE DORFEUILLE, NATACHA** | ) | |
| **DORFEUILLE, YESY PATRICIA CARBAJAL,** | ) | |
| **JUAN GUERRERO, JAIME YANES** | ) | |
| **and JOSE OMAR RODRIGUEZ VARELA,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 18-10340** |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **UNITED STATES DEPARTMENT OF** | ) | |
| **HOMELAND SECURITY, DONALD J.** | ) | |
| **TRUMP, KIRSTJEN NIELSEN and ELAINE** | ) | |
| **COSTANZO DUKE,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |
| | ) | |

_____)

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                      **July 23, 2018**

## I.   Introduction

Plaintiffs Centro Presente, Haitian-Americans United, Inc., Juan Carlos Vidal, Anne

Christine Nicolas, Chris Jean Baptiste, Mercedes Mata, Carolina Mata, Will Arias, Juan Amaya,

Maria Guerra, Josue Dorfeuille, Natacha Dorfeuille, Yesy Patricia Carbajal, Juan Guerrero, Jaime

Yanes and Jose Omar Rodriguez Varela (collectively, "Plaintiffs") have filed this lawsuit against

the United States Department of Homeland Security ("DHS"), President Donald J. Trump

("President Trump") in his official capacity, Secretary Kirstjen Nielsen ("Nielsen") in her official capacity and Deputy Secretary Elaine Costanzo Duke ("Duke") in her official capacity (collectively, "Defendants") regarding Defendants' decisions to terminate the designation of Haiti, El Salvador, and Honduras for temporary protected status ("TPS").  D. 21.  Defendants have moved to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim. D. 24.  For the following reasons, the Court ALLOWS Defendants' motion to dismiss with respect to the mandamus claim (Count V) and DENIES Defendants' motion to dismiss in all other respects.

## II.      Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Coll. Hill Properties, LLC v. City of Worcester, 821 F.3d 193, 195–96 (1st Cir. 2016) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.  "This standard is 'not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" Saldivar v. Racine, 818 F.3d 14, 18 (1st Cir. 2016) (quoting Iqbal, 556 U.S. at 678).  "[W]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  In re Ariad Pharm., Inc. Sec. Litig., 842 F.3d 744, 756 (1st Cir. 2016) (quoting Iqbal, 556 U.S. at 678).   In reviewing a motion to dismiss, the Court  "accept[s] as true all well-pled facts alleged in the complaint and draw all reasonable inferences in [the plaintiff's] favor." Miller v. Town of Wenham, 833 F.3d 46, 51 (1st Cir. 2016) (quoting Evergreen Partnering Grp., Inc. v. Pactiv Corp, 720 F.3d 33, 36 (1st Cir. 2013) (second alteration in original)).

"Where, as here, a dismissal for want of [subject matter] jurisdiction is based solely on the complaint, we accept 'the well-pleaded factual averments contained therein and indulg[e] all reasonable inferences in the [plaintiff's] favor.'"  Gordo-Gonzalez v. United States, 873 F.3d 32, 35 (1st Cir. 2017) (quoting Muñiz-Rivera v. United States, 326 F.3d 8, 11 (1st Cir. 2003)).

### III.   Factual Background

Unless otherwise noted, the following facts are drawn from the amended complaint, D. 21, and are accepted as true for the purposes of considering the motion to dismiss.

#### A.   The Parties

The fourteen individual plaintiffs are each recipients of TPS.  D. 21 ¶¶ 26, 29, 31, 33, 38, 41, 44, 47, 51, 54, 59, 62, 65.  Of the fourteen, six are immigrants from El Salvador, four are immigrants from Haiti and four are immigrants from Honduras.  Id.

Haitian-Americans United is a non-profit organization founded "to improve the quality of life for Haitians and Haitian-Americans through education, community empowerment, and cultural development."  D. 21 ¶ 18.  It has a number of members who are Haitian immigrants with TPS status.  D. 21 ¶ 20.  Centro Presente is a non-profit organization "dedicated to the self-determination and self-sufficiency of the Latin American immigrant community of Massachusetts."  D. 21 ¶ 12.  Centro Presente has a number of members who are immigrants from El Salvador and Honduras with TPS status.  D. 21 ¶ 14.

DHS is the administrative agency charged with administering certain immigration laws and policies, including the TPS program.  D. 21 ¶ 70.  Nielsen has been the DHS Secretary since December 6, 2017.  D. 21 ¶ 71.  Duke was the Acting DHS Secretary from July 31, 2017, to December 6, 2017, and thereafter served as Deputy DHS Secretary until her retirement on April

15, 2018.  D. 21 ¶ 72.  Both have served in the executive branch under President Trump.  D. 21 ¶ 69.

### B.     The Legislative Framework Regarding Temporary Protected Status

The Secretary may grant an individual TPS if two conditions are met:  first, the individual is a national of a foreign state that has been designated by the DHS Secretary; and second, the individual meets certain eligibility criteria.  8 U.S.C. § 1254a(a)(1).[1]  While an individual has TPS, the Secretary may not remove the individual from the United States and must authorize the individual to engage in employment in the United States.  Id.

The Secretary may designate a foreign state under the statute only if, "after consultation with appropriate agencies of the Government," the Secretary finds that at least one of three conditions is met:  first, that "there is an ongoing armed conflict within the state," such that returning aliens to that state "would pose a serious threat to their personal safety;" second, that "there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected," such that "the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state" and "the foreign state officially has requested designation;" or third, that "there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety," and "permitting the aliens to remain temporarily in the United States" would not be "contrary to the national interest of the United States."  8 U.S.C. § 1254a(b)(1).  The effective period of designation "is the period, specified by the [Secretary], of not less than 6 months and not more than 18 months."  Id. §

---

[1] Although the statute references the Attorney General as the decisionmaker for TPS designations, the authority to administer the TPS program was transferred from the Attorney General to the DHS Secretary in 2003.  See Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002); D. 21 at 18 n.13.

1254a(b)(2).  At least sixty days before the end of the effective period of designation, the Secretary, "after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state" to "determine whether the conditions for such designation . . . continue to be met." Id. § 1254a(b)(3)(A).  The Secretary must publish in the Federal Register "notice of each such determination[,] including the basis for the determination," and the length of any extension.  Id. An extension of designation may be for a period of six, twelve, or eighteen months.  Id. § 1254a(b)(3)(C).  The statute provides that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."  Id. § 1254a(b)(5)(A).

In addition to being a national of a foreign state that has been designated, a foreign national must also meet certain individual criteria to qualify for TPS.  Among other criteria, the foreign national must have been "continuously physically present in the United States since the effective date of the most recent designation" of the foreign state, id. § 1254a(c)(1)(A)(i); the foreign national must not have been convicted of certain categories of criminal offenses, id. § 1254a(c)(2)(A)(iii); and the foreign national must not be otherwise inadmissible in certain ways, including being present in the United States without being admitted or paroled into the United States, id. § 1254a(c)(1)(A)(iii); § 1254a(c)(2), § 1182(a)(6), or having been previously removed, id. § 1182(a)(9).  The criteria for an individual to qualify for TPS is not at issue in this case as the individual plaintiffs have already received TPS.  D. 21 ¶¶ 26, 29, 31, 33, 38, 41, 44, 47, 51, 54, 59, 62, 65.  Instead, Plaintiffs' claims concern Defendants' actions to change TPS designations for El Salvador, Haiti and Honduras.

C.      **The TPS Designations of El Salvador, Haiti and Honduras**

There are currently approximately 400,000 TPS recipients residing in the United States, including over 262,500 from El Salvador, approximately 58,550 from Haiti, and approximately 86,000 from Honduras.  D. 21 ¶ 7.

1.      *El Salvador*

On March 1, 2001, then Attorney General John Ashcroft ("Ashcroft") gave El Salvador TPS designation.  D. 21 ¶ 83.  That designation was based upon a determination that, due to three earthquakes earlier in the year that had resulted in the deaths of at least 1,100 people and the displacement of approximately 1.3 million people, El Salvador would be "unable, temporarily, to handle adequately the return of its nationals."  D. 21 ¶¶ 83-84.  On July 11, 2002, Ashcroft extended the designation, finding that the earthquakes had caused substantial damage to the country's infrastructure and that subsequent droughts had left farming families "destitute" and 200,000 people "threatened by food insecurity."  D. 21 ¶¶ 85-86.  On July 16, 2003, then DHS Secretary Tom Ridge ("Ridge") extended the designation, stating that the "economy of El Salvador [was] not yet stable enough to absorb returnees from the United States."  D. 21 ¶¶ 87-88.  Ridge again extended the designation on January 7, 2005, based on a determination that the economy of El Salvador had not yet recovered.  D. 21 ¶¶ 89-90.  On June 15, 2006, then DHS Secretary Michael Chertoff ("Chertoff") extended the designation for El Salvador, finding that new natural disasters, including a volcanic eruption and a hurricane that resulted in mudslides and flooding, had slowed rebuilding efforts.  D. 21 ¶¶ 91-92.  Chertoff again extended the designation on August 21, 2007, and October 1, 2008, citing his determination that El Salvador had "still not completed reconstruction of the infrastructure damaged by several severe 2001 earthquakes" and was therefore still limited in its ability to absorb potential returnees.  D. 21 ¶¶ 93-96.  On July 9, 2010,

6

then DHS Secretary Janet Napolitano ("Napolitano") extended the designation, stating that El Salvador continued to "suffer a public security crisis that threaten[ed] to undermine sustained development and confidence in democratic governance" and finding "increasing levels of violent crime." D. 21 ¶¶ 97-98.  On January 11, 2012 and May 30, 2013, Napolitano again extended the designation, based on findings of infrastructural deficiencies and subsequent natural disasters.  D. 21 ¶¶ 99-102.  On January 7, 2015, then DHS Secretary Jeh Johnson ("Johnson") extended El Salvador's designation, based on the recent eruption of a volcano and a recent tropical storm.  D. 21 ¶¶ 103-104.  On July 8, 2016, Johnson again extended El Salvador's designation.  D. 21 ¶ 105. The effective period for the extension was September 10, 2016 to March 9, 2018.  D. 21 ¶ 105. Johnson cited, in his extension decision, a substantial rise of violence and "an environment of impunity" for corruption, violent crimes, and gang activity.  D. 21 ¶ 106.

    2.    *Haiti*

On January 21, 2010, Napolitano gave Haiti TPS designation, finding that a recent earthquake there had "destroyed most of the capital city" and affected "one-third of Haiti's population."  D. 21 ¶¶ 107-108.  Napolitano re-designated Haiti with TPS on May 19, 2011, based on the earthquake's lasting damage to Haiti's infrastructure, the high numbers of displaced persons following the earthquake, the outbreak of a cholera epidemic and a rise in gender-based violence.[2] D. 21 ¶ 109-110.  Napolitano extended the designation on October 1, 2012, based on similar findings.  D. 21 ¶ 111-12.  On March 3, 2014, Johnson extended the designation, citing the slow

---

[2] It appears that re-designation differs, in at least one respect, from an extension of a designation.  If a country is re-designated, nationals of that country may qualify for TPS if they have been continuously present in the United States since the re-designation date, whereas if a country's designation is extended, nationals of that country may only qualify if they have been continuously present since the initial designation date.  See 8 U.S.C. § 1254a(c)(1)(A)(i); see also D. 25 at 15 (citing Extension of Designation and Redesignation of Liberia under TPS Program, 62 Fed. Reg. 16,608-01, 16,009 (April 7, 1997)).

pace of the economic recovery and new natural disasters, including Hurricane Sandy, which had caused additional displacement, damage and death.  D. 21 ¶¶ 113-14.  On August 25, 2015, Johnson again extended the designation.  D. 21 ¶ 115.  The effective period for the extension was January 23, 2016 to July 22, 2017.  D. 21 ¶ 115.  The extension was based on continued infrastructural damage, high rates of food insecurity, the lack of emergency services and the lack of a "functioning legislative branch or duly elected local authorities."  D. 21 ¶ 116.

3.     *Honduras*

On January 5, 1999, then Attorney General Janet Reno designated Honduras for TPS based on findings that Hurricane Mitch had rendered Honduras temporarily unable to handle the return of Honduran nationals.  D. 21 ¶¶ 117-18.  On May 11, 2000, Reno extended the designation for Honduras, determining that Honduras had made "little progress" in recovering from Hurricane Mitch and that the reconstruction had "not sufficiently countered the devastation" caused by the hurricane.  D. 21 ¶¶ 119-120.  On May 8, 2001, Ashcroft extended Honduras' designation based on findings that only a fraction of the necessary housing units had yet been constructed and that many Hondurans remained in shelters, notwithstanding some progress in the recovery efforts.  D. 21 ¶¶ 122-23.  On May 3, 2002, Ashcroft again extended Honduras' designation, noting that "[a]lthough there are strong indications of progress in recovery efforts, recent droughts as well as flooding from Hurricane Michelle in 2001 have added to the humanitarian, economic, and social problems initially brought on by Hurricane Mitch in 1998."  D. 21 ¶¶ 123-24.  On May 5, 2003, Ridge extended the designation, determining that prolonged drought and flooding after Hurricane Michelle had compromised food security and disrupted reconstruction efforts.  D. 21 ¶¶ 125-26.  On November 3, 2004, Ridge again extended the designation, finding that Honduras was still recovering from damage to its water and power supplies.  D. 21 ¶¶ 127-28.  On March 31, 2006,

Chertoff extended Honduras' designation, citing both continuing vulnerability after Hurricane Mitch and serious storms in 2005.  D. 21 ¶¶ 129-130.  On May 29, 2007, Chertoff again extended the designation, determining that there was continued social and economic stress caused by Hurricane Mitch, with ongoing challenges in the areas of health, infrastructure, and employment. D. 21 ¶¶ 131-32.  On October 1, 2008, Chertoff extended the designation for a third time, based on findings that much of the newly built housing lacked electricity and water, that more than 600,000 Hondurans lived in flood-prone areas and that much of the drinking water remained contaminated.   D. 21 ¶¶ 133-34.   On May 5, 2010, Napolitano extended Honduras' TPS designation, noting that "Honduras continue[d] to rely heavily on international assistance" and that recovery from Hurricane Mitch and subsequent disasters remained incomplete.  D. 21 ¶¶ 135-36. On November 4, 2011, Napolitano again extended the designation, based on a recent series of natural disasters in Honduras and the determination that Honduras' security situation was "critical," negatively affecting its ability to re-assimilate returning Hondurans.  D. 21 ¶¶ 137-38. On April 3, 2013, Napolitano extended Honduras' designation a third time, citing a drought in 2012 and a tropical storm in 2011 that had contributed to ongoing problems with water, infrastructure, and sanitation.  D. 21 ¶¶ 139-140.  On October 16, 2014, Johnson extended the designation, finding that Honduras suffered from both food insecurity caused by a drought in 2014 and ongoing problems stemming from Hurricane Mitch and subsequent natural disasters.  D. 21 ¶¶141-142.  On May 16, 2016, Johnson again extended Honduras' designation.  D. 21 ¶ 143.  The effective period for the extension was July 5, 2016 to January 5, 2018.  D. 21 ¶¶ 143.  Johnson based the extension on findings that Honduras still had a housing deficit of 1.1 million homes; that Honduras was one of the poorest countries in the Western Hemisphere; that Honduras suffered

damage caused by Tropical Storm Hanna in 2014; and that Honduras experienced an increase in mosquito-borne disease in 2014 and 2015.  D. 21 ¶ 144.

### D.    Allegations Regarding Defendants' Bias

Plaintiffs allege that President Trump, the head of the Executive Branch in which the DHS Secretary serves, has personally made "numerous statements reflecting bias and prejudice against immigrants of color, particularly Latino and Haitian immigrants."  D. 21 ¶ 148.  In support of this allegation, Plaintiffs cite several, alleged statements by President Trump.  On or about June 16, 2015, while then-candidate Trump announced his presidential campaign, he stated that "[w]hen Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems, and they're bringing those problems with us.  They're bringing drugs.  They're bringing crime.  They're rapists.  And some, I assume, are good people . . .  It's coming from more than Mexico.  It's coming from all over South and Latin America."  D. 21 ¶ 149.  A few months later, on or about August 6, 2015, then-candidate Trump declared during a debate that the Mexican government was "send[ing] the bad ones over, because they don't want to pay for them, they don't want to take care of them."  D. 21 ¶ 150.  On or about August 21, 2015, then-candidate Trump was asked about an incident in which two men beat and urinated on a sleeping Latino man and one, after his arrest, stated that "Donald Trump was right; all these illegals need to be deported."  D. 21 ¶ 151.  He allegedly responded by stating that "[i]t would be a shame . . .  I will say that the people who are following me are very passionate.  They love this country and they want this country to be great again.  They are passionate."  D. 21 ¶ 151.  During a presidential debate in October 2016, then-candidate Trump responded to a question on immigration policy by stating that "[w]e have some bad hombres here and we're going to get them out."  D. 21 ¶ 152.  In December 2016, after having been elected President, in referring to an article about a crime wave on Long Island,

President-elect Trump said, as alleged, "[t]hey come from Central America.  They're tougher than any people you've ever met.  They're killing and raping everybody out there.  They're illegal.  And they are finished."  D. 21 ¶ 153.

Plaintiffs also rely on certain actions and statements made by President Trump since he assumed office.  On August 25, 2017, the President pardoned former Maricopa County Sheriff Joe Arpaio, who was to be sentenced for criminal contempt for failing to comply with a federal court order to stop racially profiling Latinos.  D. 21 ¶ 154.  During a meeting in the Oval Office in June 2017, President Trump reportedly reacted to a report that 15,000 Haitians had received visas to enter the United States in 2017 by stating that Haitian immigrants "all have AIDS."  D. 21 ¶ 155. In January 2018, during a discussion at the White House of a legislative proposal to reallocate visas from other groups of foreign nationals to TPS recipients, President Trump allegedly said about TPS recipients "[w]hy are we having all these people from shithole countries come here?" D. 21 ¶¶ 157-160.  President Trump also allegedly asked "[w]hy do we need more Haitians?" and demanded that the Senators with whom he was meeting "[t]ake them out" of the plan.  D. 21 ¶ 161.  President Trump then reportedly stated that policies should encourage immigration from countries like Norway, a predominantly white country, D. 21 ¶¶ 161, while, as Plaintiffs note, El Salvador and Honduras are predominately Latino countries and Haiti is a predominately black country.  D. 21 ¶ 165.  President Trump later denied having made such comments, D. 21 ¶ 163, but others present at the meeting dispute this denial, D. 21 ¶ 162.

Plaintiffs also allege actions taken by DHS as evidence of bias on the part of Defendants. First, they allege that in April 2017, DHS officials sought evidence regarding criminal records and welfare use by Haitians living in the United States, which they allegedly sought to use to support a decision to rescind TPS status.  D. 21 ¶ 167.  Second, on February 14, 2018, DHS issued a press

release regarding a legislative proposal on immigration with the headline "[t]he McCain-Coons Proposal Would Increase Illegal Immigration, Surge Chain Migration, Continue Catch and Release, and Give a Pathway to Citizenship to Convicted Alien Felons." D. 21 ¶ 171. The release also characterized the legislative proposal as a "[m]ass [l]egalization [b]ill." D. 21 ¶ 171. Third, on February 15, 2018, DHS characterized a proposal to provide conditional permanent resident status for TPS recipients as part of "a [m]ass [a]mnesty [b]ill for [i]llegal [a]liens of [a]ll [a]ges." D. 21 ¶ 172.

### E. Termination of TPS Designations for El Salvador, Haiti and Honduras

#### 1. *El Salvador*

On January 18, 2018, Nielsen terminated El Salvador's TPS designation, effective September 9, 2019. D. 21 ¶ 173. In doing so, Nielsen stated that "the conditions supporting El Salvador's 2001 designation for TPS on the basis of environmental disaster due to the damage caused by the 2001 earthquakes are no longer met." D. 21 ¶ 174. Plaintiffs allege that Nielsen made clear a "new rule" that the Secretary "would not consider intervening country conditions" but rather would only consider whether the conditions supporting the initial TPS designation continue to be met. D. 21 ¶ 174. Plaintiffs also allege that El Salvador is still unable to accept returning nationals safely because the country "lacks viable infrastructure, is low on housing, [] suffers from pervasive and widespread violence," has a high underemployment and poverty rate, and has suffered several intervening natural disasters. D. 21 ¶ 175-78. Economic growth in El Salvador has been stagnant, with high levels of unemployment, and the economy depends heavily on remittances sent from Salvadoran nationals living here. D. 21 ¶¶ 179-181. An estimated 220,000 people were forced to flee violence from El Salvador in 2016 alone, due to the widespread

human rights abuses and violence, including high levels of gender-based violence.  D. 21 ¶¶ 182-186.

Plaintiffs allege that Nielsen's stated rationale was pretext for invidious discrimination, as evidenced by the adoption of a new rule focusing on the conditions that created the initial designation rather than the general state of the country and the current inability of El Salvador to accept returnees safely.  D. 21 ¶¶ 187-192.  Plaintiffs also allege that Nielsen's reliance on the recent increase in the GDP raises an inference of pretext, because the factors responsible for the increase in GDP included an increase in remittances, which overwhelmingly come from the United States.  D. 21 ¶¶ 181, 193.  Plaintiffs further point to internal DHS reports documenting that El Salvador is one of the "leading countries of nationality for persons granted either affirmative or defensive asylum."  D. 21 ¶ 195.  Finally, Plaintiffs contend that the statements by President Trump described above further support the inference of discriminatory animus.  D. 21 ¶¶ 239-242.

### 2. Haiti

On May 24, 2017, then DHS Secretary John Kelly extended Haiti's TPS designation for six months, effective from July 23, 2017 to January 22, 2018.  D. 21 ¶ 196.  This extension was based upon Kelly's finding of a high number of internally displaced persons in Haiti, high levels of gender-based violence and the continuing cholera epidemic.  D. 21 ¶ 197.  Kelly, however, only extended the designation for a six-month period, stating that it was "in the best interest of [Haitian] TPS beneficiaries to prepare for their return to Haiti."  D. 21 ¶ 198.  On June 6, 2017, while testifying before the Senate, Kelly stated that TPS designations are "for a specific event.  [In] Haiti, it was the earthquake.  Yes, Haiti had horrible conditions before the earthquake, and those conditions aren't much better after the earthquake.  But the earthquake was why TPS was [] granted and [] that's how I have to look at it."  D. 21 ¶ 244.  On January 16, 2018, after Nielsen became

the DHS Secretary, she similarly stated that "the law does not allow me to look at the country conditions of a country writ large.  It requires me to look very specifically as to whether the country conditions originating from the original designation continue to exist."  D. 21 ¶ 245.

On November 20, 2017, Duke announced the termination of Haiti's TPS designation, effective July 22, 2019.  D. 21 ¶ 199.  In doing so, Duke cited a decrease in the number of internally displaced persons.  D. 21 ¶ 200.  Plaintiffs allege that Duke "did not consider all country conditions that might justify TPS designation for Haiti, but rather focused only on the original basis for designation and whether those conditions continued to be met."  D. 21 ¶ 200.  Plaintiffs allege that Haiti is unable to support a safe return of Haitians currently holding TPS status.  D. 21 ¶ 201. Plaintiffs base this allegation on their claims that Haiti remains one of the poorest countries in the Western Hemisphere; that Haiti's GDP growth has slowed in recent years; that over 37,000 people in Haiti are located in internal displacement camps, with tens of thousands more displaced but not recorded; the settling of many Haitians in inadequate housing; a continued food shortage and severe malnutrition; the recent damage caused by Hurricane Matthew in October 2016; and Haiti's political instability.  D. 21 ¶¶ 201-205, 210-211.  On or about November 3, 2017, the United States Citizenship and Immigration Services ("USCIS"), a branch of DHS, authored a report stating that "[m]any of the conditions prompting the original January 2010 TPS designation persist, and the country remains vulnerable to external shocks and internal fragility.  Haiti . . . continues to be affected by a convergence of humanitarian needs, including food insecurity, internal displacement, an influx of returnees from the Dominican Republic, the persistence of cholera, and the lingering impact of various natural disasters."  D. 21 ¶ 220 & n.184.

Plaintiffs allege that Duke's stated reasoning for terminating Haiti's TPS designation is pretext for invidious discrimination.  D. 21 ¶¶ 213-214.  In support of this allegation, they contend

that Duke improperly failed to consider recent conditions in Haiti, including conditions as documented by the USCIS report and similar reports from the Department of State. D. 21 ¶¶ 217-218. Plaintiffs also allege that, in addition to President Trump's statements supporting an inference of discriminatory animus, D. 21 ¶¶ 239-42, Duke's reliance on the withdrawal of United Nations forces from Haiti also contributes to an inference of discrimination because such withdrawal cannot be attributed to progress in Haiti but rather a function of controversy related to that mission. D. 21 ¶ 219.

       *3.*    *Honduras*

On December 15, 2017, Duke extended Honduras' TPS designation, with an effective period from January 5, 2018 to July 5, 2018. D. 21 ¶ 221. This extension, however, was automatic because of Duke's failure to make a determination by the statutory deadline of November 6, 2017. D. 21 ¶ 222; 8 U.S.C. § 1254a(b)(3)(C). Plaintiffs allege that on or about November 6, 2017, Kelly, now White House Chief of Staff, and Tom Bossert, the White House Homeland Security Advisor, pressured Duke to terminate Haiti's TPS designation, notwithstanding that Duke had made no findings regarding whether the statutory requirements for terminating the designation had been satisfied. D. 21 ¶ 223.

On May 4, 2018, Nielsen terminated Honduras' TPS designation, effective January 5, 2020. D. 21 ¶ 224. Plaintiffs allege that the report in the Federal Register focused "only on the original basis for designation and whether those conditions continued to be met." D. 21 ¶ 224. Plaintiffs further allege that Honduras is not able to handle safely the return of Honduran TPS holders, due to several recent natural disasters, recent outbreaks of disease, periodic drought, high levels of entrenched poverty and rampant violent crime, including gang violence and gender-based violence. D. 221 ¶¶ 225-231. Finally, Plaintiffs allege that the termination of Honduras' TPS

designation was based on invidious discrimination, based upon President Trump's aforementioned statements, D. 21 ¶¶ 149-65, and upon Nielsen's departure from what they contend is DHS's ordinary decision-making process.  D. 21 ¶¶ 236-38.

### F.        Plaintiffs' Claims and Request for Relief

Plaintiffs assert the following claims against Defendants:  violation of the equal protection clause of the Fourteenth Amendment as incorporated through the Fifth Amendment, based upon unlawful discrimination by race, ethnicity, and/or national origin (Count I); violation of the due process clause, based upon "irrational government action" (Count II); violation of the Administrative Procedures Act ("APA") for arbitrarily and capriciously narrowing the scope of review for TPS designations (Count III); violation of the APA for failure to provide notice and comment (Count IV); a count for mandamus relief (Count V); and a count for a declaratory judgment that Defendants' actions are illegal and have caused injury to Plaintiffs and those similarly situated (Count VI).  D. 21 ¶¶ 257-286.  Plaintiffs further seek an injunction enjoining Defendants from implementing or enforcing the termination of the TPS designation as to the three subject countries.  D. 21 at 79.

## IV.    Procedural History

On February 22, 2018, Plaintiffs filed their complaint against Defendants.  D. 1.  On May 9, 2018, Plaintiffs filed an amended complaint.  D. 21.  On May 23, 2018, Defendants moved to dismiss.  D. 24.  On June 22, 2018, the Commonwealth of Massachusetts filed an amicus brief, joined by a number of other states and the District of Columbia.  D. 37.  On July 12, 2018, the Court heard argument on the motion and took the matter under advisement.  D. 44.

## V.       Subject Matter Jurisdiction

As an initial matter, Defendants contend that the Court lacks subject matter jurisdiction to hear any of Plaintiffs' claims.  D. 25 at 23-24.  The statute states that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A).  Defendants argue that this provision completely bars all judicial review, including any constitutional and statutory claims related to TPS designation decisions.  D. 25 at 23-24.

Plaintiffs respond that, notwithstanding this provision, the Court retains jurisdiction over both constitutional and statutory claims because Congress has not stated with the requisite clarity that the Court lacks subject matter jurisdiction.  D. 35 at 15-16.  As to the constitutional claims, Plaintiffs cite Webster v. Doe, 486 U.S. 592, 603 (1988).  D. 35 at 15.  In that case, the Supreme Court held that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear."  Id. at 603.  It required "this heightened showing in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claims."  Id. (quoting Bowen v. Michigan Acad. of Family Physicians, 476 U.S. 667, 681 n.12 (1986)); see Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 64 (1993) (stating that the court would only "find an intent to preclude" any "judicial review of administrative action" if "presented with clear and convincing evidence") (internal citation omitted); Johnson v. Robison, 415 U.S. 361, 366-67 (1974) (holding that, before interpreting a statute to strip federal courts of jurisdiction over constitutional challenges, which would "raise serious questions concerning the constitutionality" of that statute, the court would "first ascertain whether a construction of the statute is fairly possible by which the (constitutional) question(s) may be avoided").  With respect to the statutory claims, Plaintiffs rely upon Bowen v.

<u>Michigan Acad. of Family Physicians</u>, 476 U.S. 667, 670 (1986), in which the Supreme Court stated that there is a "strong presumption that Congress intends judicial review of administrative action." <u>Id.</u> at 670.  That presumption may be overcome by "specific language or specific legislative history that is a reliable indicator of congressional intent, or a specific congressional intent to preclude judicial review that is fairly discernible in the detail of the legislative scheme." <u>Id.</u> at 673 (citation omitted).

Defendants make two arguments in response.  First, they contend that these presumptions do not apply because individuals with TPS may obtain judicial review by bringing their claims in removal proceedings.  D. 25 at 24; <u>see</u> <u>Elgin v. Dep't of Treasury</u>, 567 U.S. 1, 9 (2012) (holding that "<u>Webster</u>'s heightened standard . . . does not apply where Congress simply channels judicial review of a constitutional claim to a particular court").  Second, they contend that Section 1254a(b)(5)(A) is written with the requisite clarity to preclude judicial review, even if that removal of jurisdiction would deprive Plaintiffs of the ability to bring their claims.  D. 25 at 23-24.

The Supreme Court's opinion in <u>McNary v. Haitian Refugee Ctr., Inc.</u>, 498 U.S. 479 (1991) speaks to both issues.  In <u>McNary</u>, the plaintiffs, a group of undocumented foreign nationals, alleged that the process by which the federal government granted special agricultural worker ("SAW") status violated their statutory and constitutional rights by failing to provide competent interpreters, failing to provide applicants with the opportunity to challenge adverse evidence, preventing applicants from presenting witnesses on their behalf and other procedural faults.  <u>Id.</u> at 487.  Like temporary protected status, SAW status provides work authorization and protection from removal.  8 U.S.C. § 1160(a)(1), (a)(4); <u>McNary</u>, 498 U.S. at 484.  There was a statutory provision that limited "judicial review of a determination respecting an application" for SAW status to the judicial review available in removal proceedings.  <u>Id.</u> at 485-86, 486 n.6; 8 U.S.C. §

1160(e).  The Supreme Court held that a federal district court had jurisdiction to hear the plaintiffs' challenges to the process by which the agency made decisions regarding applications for SAW status.  McNary, 489 U.S. at 483-84.  The court began by explaining that textually, a bar to review of "a determination respecting an application" did not bar review of challenges to the process by which the determinations were made, focusing on the use of the singular "a" and "an" in the statute.  Id. at 492.  The court also noted that Congress had used "broader statutory language" in limiting judicial review in other immigration statutes than it had used in the SAW statute.  Id. at 494.

The defendants in McNary challenged the distinction the plaintiffs attempted to draw between the challenge to an individual determination and the process by which determinations were made, citing Heckler v. Ringer, 466 U.S. 602 (1984).  McNary, 498 U.S. at 494.  In Heckler, the court held that a claim cast as a challenge to the procedure by which reimbursement decisions under the Medicare Act were made was, "at bottom," only a claim that the plaintiffs should have been reimbursed, and was, therefore, subject to a statutory jurisdictional bar.  McNary, 498 U.S. at 494 (quoting Heckler, 466 U.S. at 614).  The court in McNary rejected the comparison to Heckler for two reasons.  First, it stated that "[u]nlike [] in Heckler, the individual respondents in this action do not seek a substantive declaration that they are entitled to SAW status[, n]or would the fact that they prevail on their purportedly procedural objections have the effect of establishing their entitlement to SAW status."  Id. at 495.  Second, it stated that "[u]nlike in Heckler, if not allowed to pursue their claims in the District Court, respondents would not as a practical matter be able to obtain meaningful judicial review of their application denials or of their objections to INS procedures," notwithstanding the ability to seek judicial review in removal proceedings.  Id. at 496.

In support of its conclusion that removal proceedings would not offer meaningful judicial review, the Supreme Court explained in <u>McNary</u> that judicial review in removal proceedings is not available "unless the alien is [] apprehended and deportation proceedings are initiated," so "most aliens denied SAW status can ensure themselves review in courts of appeals only if they voluntarily surrender themselves for deportation.  Quite obviously, that price is tantamount to a complete denial of judicial review for most undocumented aliens." <u>Id.</u> at 496-97.  The court further noted that asserting the constitutional claims at issue would require bringing in "a substantial amount of evidence, most of which would have been irrelevant in the processing of a particular individual application," so "a court of appeals reviewing an individual SAW determination [would] therefore most likely not have an adequate record as to the pattern of [the agency's] allegedly unconstitutional practices" and "also lack the factfinding and record-developing capabilities of a federal district court." <u>Id.</u> at 497.  Moreover, the court recognized that, even aside from the risk of deportation, the work authorization that SAW status carried was a separate constitutional interest that required constitutionally fair procedures.  <u>Id.</u> at 491.

This case is like <u>McNary</u> in several important respects.  Plaintiffs, like the plaintiffs there, bring both constitutional and statutory claims that they frame as challenges to Defendants' process of adjudication rather than the content of any particular adjudication.  D. 21 ¶ 257-279; D. 35 at 30; <u>McNary</u>, 498 U.S. at 484, 495-96.  The jurisdiction-stripping provision here, like the jurisdiction-stripping provision at issue in <u>McNary</u>, is framed in the singular.  <u>Compare</u> 8 U.S.C. § 1254a(b)(5)(A) (barring judicial review of "any determination of the [Secretary] with respect to the designation, or termination or extension of a designation") <u>with</u> 8 U.S.C. § 1160(e)(1) (barring judicial review of "a determination respecting an application for adjustment of status under this section").

Moreover, in both cases, there are comparable examples of jurisdiction-stripping provisions in which Congress used broader language than it did in the provision at issue. In McNary, the Court pointed out that Congress used more expansive language, barring review of "all questions of law and fact," in a provision limiting judicial review of claims for veterans' benefits. McNary, 498 U.S. at 494 (citing 38 U.S.C. § 211(a) (1991)). Plaintiffs here point to the more expansive language Congress used to channel judicial review into removal proceedings. D. 35 at 16. That provision, 8 U.S.C. § 1252(b)(9), precludes "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions" outside of the specific process provided for in that statute. The language at issue in Section 1254a(b)(5)(A) in this case, barring review of "any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" is less explicitly broad than Section 1252(b)(9), because it lacks the specific language of "all questions of fact and law, including interpretation and application of constitutional and statutory provisions." "When Congress includes particular language in one section of a statute but omits it in another, this Court presumes that Congress intended a difference in meaning." Dig. Realty Tr., Inc. v. Somers, __ U.S. __, 138 S. Ct. 767, 777 (2018) (internal citation omitted). As a result, if the presumptions in favor of review outlined in Webster and Bowen apply, there are sound textual reasons to conclude that Congress has not spoken with the requisite clarity to bar all judicial review of challenges to the process by which TPS designation determinations are made.

Defendants contend that the presumptions in favor of review should not apply because, unlike in McNary, there remains an avenue for individual plaintiffs to bring their claims, namely, removal proceedings. D. 25 at 24. In support of this argument, they cite Elgin v. Dep't of the Treasury, 567 U.S. at 9, contending that the clear statement rule in Webster would not apply if

Congress merely channeled judicial review into a particular forum.  D. 24 at 24.  This argument is unavailing because here, as in McNary, there would be no meaningful opportunity for review of Plaintiffs' constitutional and statutory claims in removal proceedings.  Like the constitutional and statutory claims at issue in McNary, the assertion of the claims here would require developing a record that would not be possible or relevant in any one individual plaintiff's removal proceeding.  See, e.g., Aguilar v. U.S. Immigration & Customs Enf't Div. of Dep't of Homeland Sec., 510 F.3d 1, 11 (1st Cir. 2007) (explaining that "because removal proceedings are confined to determining whether a particular alien should be deported," there are "certain claims [which], by reason of the nature of the right asserted, cannot be raised efficaciously within" removal proceedings).  Moreover, the employment authorization that comes with TPS would stop being valid on the effective date of the termination, 8 C.F.R. § 244.12(a), but removal proceedings could occur some time after the effective date of the termination of a country's TPS designation, leaving Plaintiffs either unable to vindicate their asserted right to work authorization for a substantial period of time or forced to submit to removal proceedings voluntarily.

Defendants do not explain convincingly how individuals could successfully vindicate their claims in removal proceedings.  D. 25 at 24; D. 40 at 10.  Defendants contend instead that Elgin supports their claim that Webster's clear statement rule does not apply where Congress channels review into alternative forum, even a more limited one.  D. 40 at 10.  But in Elgin, the Supreme Court held that the alternative forum (there, review by the Federal Circuit of decisions by the Merit Systems Protection Board) had the "authority to consider and decide petitioners' constitutional claims," and "[t]o the extent such challenges require factual development, the [statute] equips" the administrative body with the "tools to create the necessary record."  Elgin, 567 U.S. at 20.  The court concluded that the "petitioners' constitutional claims can receive meaningful review within

the" alternative forum.  Id.  The same cannot be said here as to any statutory or constitutional claims regarding TPS designation in any one individual's removal proceedings.

Finally, Defendants contend that, even though Plaintiffs' claims are framed as a challenge to the criteria applied by the Secretary in making decisions regarding extensions of TPS designations, Plaintiffs' claims amount to a challenge to the TPS designation decisions themselves. D. 40 at 18.  It is true that Plaintiffs seek the relief of setting aside the decisions made by the Secretary pursuant to what they allege was the application of unlawful criteria.  D. 21 ¶¶ 274, 279. Plaintiffs, however, do not seek a substantive declaration from the Court that they are entitled to any particular new TPS determination by the Secretary – the relief that they seek is a declaration that the current termination decisions are "void and without legal force or effect," and an injunction restraining Defendants from "implementing or enforcing" those terminations or "taking any further action" to terminate designations "in violation of the U.S. Constitution or other applicable laws." D. 21 at 78-79.  If this Court were to grant Plaintiffs the relief they seek, the prior TPS determinations would be set aside and the Secretary would need to make new determinations, applying the allegedly lawful criteria, which could result in the same or different TPS determination as to each of the three countries.  This stands in contrast to the plaintiffs in Heckler, who sought "a 'substantive' declaration from [the Secretary] that [certain expenses] are reimbursable under the Medicare Act," notwithstanding the objections the plaintiffs offered to some of the procedures followed.  Heckler, 466 U.S. at 614.  Thus, seeking the remedy of setting aside the Secretary's earlier TPS decisions does not convert Plaintiffs' claim about unlawful process into a substantive challenge to each of the determinations at issue.

Defendants contended at the motion hearing that, even if Plaintiffs' claim for relief is cast as a redetermination rather than a particular substantive decision, the policy change challenged by

Plaintiffs is a mere change in the weighing of factors involved in a TPS designation determination, and such a challenge is in fact substantive, in contrast to the claims in <u>McNary</u> concerning the availability of interpreters.  D. 45.  As described below, however, Plaintiffs allege that the current administration adopted a new policy that TPS designation determinations are to be made solely on the basis of whether the conditions that created the initial designation persist rather than a broader view of whether the country is safely able to accept returning nationals.  The allegation is not that Defendants changed the relative weight given to the persistence of conditions justifying the initial designation versus intervening events or that Defendants changed the balancing of the various factors involved in making a determination of whether the country may safely accept returning nationals changed.  The allegation is rather that Defendants are giving no weight to any facts except those regarding whether the conditions that created the initial designation persist.  Thus, like the plaintiffs in <u>McNary</u>, Plaintiffs here allege that the decision is being made on the basis of an improperly narrow record.  The difference is that in <u>McNary</u>, the additions to the record – such as the evidence that the plaintiffs would have offered had they had the opportunity to present witnesses – were not available to the decisionmaker, whereas here, Plaintiffs allege that the additions to the record – that is, factfinding regarding intervening conditions – are allegedly being ignored by the Secretary despite being potentially available.  That distinction, however, does not change the collateral nature of Plaintiffs' challenge.  For all of the aforementioned reasons, the Court thus concludes that Plaintiffs' challenge is sufficiently collateral that the Court has jurisdiction over both the constitutional and statutory claims.

**VI.     Plausibility of Claims**

    **A.     <u>Counts I and II:  Constitutional Claims</u>**

        *1.     The Proper Standard of Review*

Plaintiffs allege that Defendants violated their rights under the equal protection clause of the Fourteenth Amendment and the due process clause of the Fifth Amendment by adopting an unreasoned change in policy regarding the applicable standard for TPS designations that was motivated by unlawful animus and applying that new standard to terminate the TPS designations of El Salvador, Haiti and Honduras.  D. 35 at 8-9.

Defendants first argue that the Secretary's decisions regarding TPS designations are subject to rational basis review.  D. 25 at 25.  In support of this contention, they cite a series of decisions holding that classifications based on foreign citizenship in the context of immigration policy are not suspect classifications and are, therefore, subject only to rational basis review.  D. 25 at 25-26; D. 40 at 15-16; <u>Vieira Garcia v. I.N.S.</u>, 239 F.3d 409, 414 (1st Cir. 2001) (explaining that rational-basis review applies to distinctions based on foreign national status); <u>Narenji v. Civiletti</u>, 617 F.2d 745, 747 (D.C. Cir. 1979) (holding that "[d]istinctions based on nationality may be drawn in the immigration field" and "must be sustained" unless "wholly irrational"); <u>Kandamar v. Gonzales</u>, 464 F.3d 65, 72 (1st Cir. 2006) (stating that "Congress may permissibly set immigration criteria based on an alien's nationality or place of origin"); <u>Bruns v. Mayhew</u>, 750 F.3d 61, 66 (1st Cir. 2014) (holding that "[b]ecause Congress acts with plenary authority when it legislates the rights and benefits to be afforded aliens present in this country, such congressional acts are appropriately afforded rational basis judicial review").  Plaintiffs, however, do not contend that the Secretary's decision to terminate TPS designations involves the suspect classification of national origin and is, therefore, subject to scrutiny more searching than rational basis review.  Plaintiffs instead

25

contend that the decision to alter the criteria by which TPS designation decisions were made was motivated by racial animus, and, therefore, is subject to heightened scrutiny even if that decision did not explicitly invoke a suspect classification.  D. 35 at 9.

In support of that contention, Plaintiffs cite Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977).  In that case, the Supreme Court reviewed the plaintiffs' claims that the city's decision to deny a rezoning request was motivated by racial animus in violation of the equal protection clause.  Id. at 258-59.  The court stated that most facially neutral decisions by legislators and administrators, including those that "result[] in a racially disproportionate impact," are subject only to judicial review to determine if the decision was "arbitrar[y] or irrational[]" – that is, rational basis review – "because legislators and administrators are properly concerned with balancing numerous competing considerations."  Id. at 264-65.  The Supreme Court explained, however, that "racial discrimination is not just another competing consideration," so "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified."  Id. at 265-66.  The court recognized that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," including "the impact of the official action;" "[t]he historical background of the decision;" "[t]he specific sequence of events leading up to the challenged decision;" any "[d]epartures from the normal procedural sequence;" any "[s]ubstantive departures . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached;" the "legislative or administrative history," including "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports;" and finally, in "extraordinary circumstances," testimony of members "concerning the purpose of the official action."  Id. at 266-68.

To challenge the constitutionality of the TPS designations, Defendants respond that Plaintiffs must meet not only the standard laid out by <u>Arlington Heights</u> but also must allege that the discrimination was "outrageous," citing <u>Reno v. Am.-Arab Anti-Discrimination Comm.</u>, 525 U.S. 471, 491 (1999) ("<u>AADC</u>").  D. 25 at 30-31.  In <u>AADC</u>, the Supreme Court reviewed a claim that a foreign national had been unlawfully targeted for deportation based on his political views. <u>Id.</u> at 488.  The court held that "[a]s a general matter . . . an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation."  <u>Id.</u>  The Supreme Court explained that "[e]ven in the criminal-law field, a selection prosecution claim is a *rara avis* [rare bird]," and the rationale for barring selective prosecution claims was magnified in the deportation context where delay would "permit and prolong a continuing violation of United States law."  <u>Id.</u> at 489-90.  The court then stated that it "need not rule out the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome."  <u>Id.</u> at 491.  The "outrageous" standard in <u>AADC</u> was thus confined to claims of selective prosecution, which Plaintiffs do not assert here.   <u>AADC</u> did not purport to set out a general rule with respect to all equal protection challenges in the immigration context.  In fact, the Supreme Court recently applied heightened scrutiny in the context of an equal protection challenge to a gender-based classification in the immigration context.  <u>Sessions v. Morales-Santana</u>, __ U.S. __, 137 S. Ct. 1678, 1686, 1690 (2017) (holding that statute that provided different rights to the children of unwed U.S. citizen mothers than the children of unwed U.S. citizen fathers violated the equal protection clause).

Defendants further contend that, notwithstanding <u>Arlington Heights</u>, the Supreme Court's recent decision in <u>Trump v. Hawaii</u>, __ U.S. __, 138 S. Ct. 2392 (2018) indicates that rational basis review should apply here.  That decision, however, does not challenge the foregoing analysis.

Hawaii concerned an Establishment Clause challenge to an executive order restricting entry to foreign nationals of particular countries.  Id. at 2403.  The court's decision to apply rational basis review was based on two considerations not at issue here:  first, the limited due process rights afforded to foreign nationals seeking entry into the United States, id. at 2418-20, and the particular deference accorded to the executive in making national security determinations, id.

As to the first factor, the foreign nationals here, the individual Plaintiffs, are already lawfully present in the United States and are accorded a higher level of due process than foreign nationals seeking admission to the country.  See Landon v. Plasencia, 459 U.S. 21, 32 (1982) (explaining that "once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly"); Zadvydas v. Davis, 533 U.S. 678, 693 (2001) (collecting cases).  The individual Plaintiffs have developed substantial ties with the United States.  Some have been in the United States since 1999 or 2001.  D. 21 ¶¶ 26, 33, 38, 41, 44, 47, 62, 65.  Several have U.S. citizen children.  D. 21 ¶¶ 27, 35, 39, 43, 46, 49, 53, 56, 64.  They work in a variety of fields.  D. 21 ¶¶ 28, 32, 34, 42, 45, 52, 60, 63, 66.  Some have obtained educational degrees in the United States.  D. 21 ¶¶ 30, 32.  They are active in their communities, through churches, community organizations and extended family networks.  D. 21 ¶¶ 36, 40, 50, 54, 57, 64.  The individual Plaintiffs thus have developed or begun to develop the ties of permanent residence in the United States and their constitutional status is therefore different from that of foreign nationals seeking admission.

As to the second factor, the determination at issue in this case does not concern national security.  The court in Hawaii emphasized the particular importance of deferential review in the context of the executive branch's role in the national security realm.  Hawaii, 138 S. Ct. at 2419-20. The determinations at issue here are the Secretary's determinations of whether "there has been

an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected," such that "the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state," 8 U.S.C. § 1254a(b)(1)(B), with respect to El Salvador and Honduras, see 66 Fed. Reg. 14214, 14214 (2001); 64 Fed. Reg. 524, 524 (1999), or whether there are "extraordinary and temporary conditions in the foreign state that prevent aliens . . . from returning to the state in safety, unless . . . permitting aliens to remain temporary in the United States is contrary to the national interest of the Unites States," 8 U.S.C. § 1254a(b)(1)(C), with respect to Haiti, 75 Fed. Reg. 3476, 3476 (2010). The statutory provision at issue with respect to the designations of El Salvador and Honduras involve no national security judgments, and while the statutory provision at issue with respect to Haiti makes an exception for where the Secretary determines designation would not be in the national interest, the 2018 termination decision with respect to Haiti stated "the conditions for Haiti's designation for TPS" were "no longer met," not that the Secretary determined that permitting aliens to remain would be contrary to the national interest of the United States. 83 Fed. Reg. 2648, 2650 (2018). Hawaii established a narrower proposition than Defendants contend, namely, that decisions by the government regarding admission of aliens, particularly in the context of the executive's authority to make national security judgments, are subject to rational basis review. See Hawaii, 138 S. Ct. at 2420.

Finally, Defendants argue that "it cannot be that a litigant could avoid deference in the immigration context by recasting a distinction drawn on the basis of alienage as one drawn alone racial lines," because such a tactic "would largely defeat the deference the Supreme Court and lower courts have reserved for the Executive in this sensitive arena." D. 40 at 16. Defendants thus argue that Arlington Heights is not applicable in the context of immigration decisions based upon

national origin.  Defendants, however, provide no support for this contention.  Applying review under Arlington Heights would not vitiate the deference that courts typically afford the other branches in immigration policy, but would only limit that deference upon a proper showing of unlawful animus on the basis of a protected category.  The Court thus concludes that Arlington Heights lays out the relevant standard.

2.    *Whether Plaintiffs Have Properly Alleged the Existence of a New Policy*

Before applying the Arlington Heights standard to the allegedly new policy adopted by the Secretary regarding the standard applicable to TPS designations, however, the Court must address an additional threshold question.  Defendants argue that there was no new policy at all, because, contrary to the allegations in the complaint, the decisions to terminate the TPS designations of El Salvador, Haiti and Honduras were accompanied by an examination of not just whether the conditions that led to the initial designation had been ameliorated but also a broader look at the country's capacity to accept returnees safely.  D. 40 at 19-20.  Although Defendants do so in the context of challenging Plaintiffs' claims under the APA, D. 40 at 20, the non-existence of a new policy would affect the viability of Plaintiffs' challenge under Arlington Heights.

Drawing all reasonable inferences in favor of Plaintiffs at this stage, as the Court must, see Miller, 833 F.3d at 51, there is a plausible inference to be drawn that there is a new policy.  Plaintiffs rely upon public statements by Kelly and Nielsen that they adopted the policy that extension is only warranted if the conditions causing the initial designation persist.  D. 21 ¶ 244 (alleging that Kelly stated that "the earthquake [in Haiti] is why TPS . . . was granted . . . and that's how I have to look at it"); D. 21 ¶ 245 (alleging that Nielsen stated that "[t]he law does not allow me to look at the country conditions of a country writ large.  It requires me to look very specifically as to whether the country conditions originating from the original designation continue to exist").

Given the reliance of earlier administrations on current country conditions writ large in making TPS designation decisions, D. 21 ¶¶ 92-144, these statements support the reasonable inference that Defendants have adopted a new policy with respect TPS designation decisions.

Defendants contend that prior administrations "terminated TPS for countries despite ongoing crises" and also "linked TPS extensions to the failure to recover adequately from the crises underlying the initial designation," and that, therefore, there is no "new policy" to challenge.  D. 40 at 20.  Defendants point to earlier decisions published in the Federal Register in support of this contention.  D. 40 at 20.  The publications in the Federal Register are susceptible to judicial notice and referenced in the complaint, so are properly considered by the Court in consideration of Defendants' motion to dismiss.  See Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012).

The termination determinations at issue are all based on findings that the conditions supporting the initial determination no longer persist.  Specifically, the rationale for the 2018 decision terminating the TPS designation for El Salvador begins by stating that "DHS has reviewed conditions in El Salvador.  Based on the review, including input received from other appropriate U.S. government agencies, . . . the Secretary . . . has determined that the conditions supporting El Salvador's 2001 designation for TPS on the basis of environmental disaster due to the damage caused by the 2001 earthquakes are no longer met."  83 Fed. Reg. 2654, 2656-57 (2018).  Similar language referencing the conditions supporting the initial determination appears in the decisions terminating the TPS designations for Haiti and Honduras.  83 Fed. Reg. 2648, 2650 (2018) (stating that "the Acting Secretary . . . determined . . . that the conditions for Haiti's designation for TPS – on the basis of 'extraordinary and temporary conditions' relating to the 2010 earthquake that prevented Haitian nationals from returning in safety – are no longer met"); 83 Fed. Reg. 26074,

26076 (stating that "the Secretary . . . has determined that the conditions supporting Honduras's 1999 designation for TPS on the basis of environmental disaster due to the damage caused by Hurricane Mitch in October 1998 are no longer met").  The rationales provided for the 2018 termination decisions for all three countries do also include some reference to current conditions beyond the reconstruction efforts from the natural disaster that caused the initial designation.  83 Fed. Reg. at 2656 (noting, as to El Salvador, the current GDP and unemployment rate); 83 Fed. Reg. at 2650 (noting, as to Haiti, the successful completion of a presidential election in 2017, recent GDP growth and progress in countering the recent cholera epidemic); 83 Fed. Reg. at 26076 (noting, as to Honduras, recent increase in coffee bean production, the abatement of drought conditions and recent increases in GDP).  But the critical determination made by the Secretary in each case – in the sentence that includes the phrase "the Secretary . . . determined" – is that the conditions supporting the initial designation are no longer met.  83 Fed. Reg. at 2655-56 (El Salvador); 83 Fed. Reg. at 2650 (Haiti); 83 Fed. Reg. at 26076 (Honduras).  The earlier TPS termination decisions cited by Defendants largely do not contain such language.  D. 40 at 20; see 65 Fed. Reg. 33356, 33356 (2000) (stating that "the Attorney General finds that conditions in the Kosovo Province no longer support a TPS designation"); 68 Fed. Reg. 3896, 3896 (2003) (stating that "the Attorney General finds that conditions in Angola no longer support a TPS designation"); 69 Fed. Reg. 40642, 40643-44 (2004) (stating that "the Secretary . . . finds that Montserrant no longer continues to meet the conditions for designation under the TPS program").  The one exception is the termination decision for Guinea.  81 Fed. Reg. 66064, 66065 (2016) (stating that "the Secretary has determined that the termination of the TPS designation of Guinea . . . is required because the extraordinary and temporary conditions that prompted Guinea's designation for TPS have substantially resolved and no longer prevent nationals of Guinea from returning in safety").

Nothing indicates, however, that there were any intervening conditions in Guinea for the Secretary to review, so the Secretary's failure to review intervening conditions in that case alone does not render the inference that there exists a new policy an implausible one.

It appears correct that prior administrations have based extension decisions on a country's failure to recover from the conditions causing the initial designation.  See, e.g., 81 Fed. Reg. 30331, 30333 (2016) (stating that "Secretary [Johnson] has determined that an 18-month extension is warranted because conditions in Honduras supporting its designation for TPS persist"); 68 Fed. Reg. 42071, 47072 (2003) (stating that Secretary Ridge "finds that the conditions that prompted designation of El Salvador . . . continue to be met").  Such facts, however, are not inconsistent with Plaintiffs' contention.  Prior administrations appear to have taken the position that if the conditions that caused the initial determination persist, then extension is warranted, but that extension may also be warranted if new conditions justify a finding that there has been, for example, a natural disaster rendering a foreign state unable to safely accept returnees, such that a termination decision may require more than a determination of solely whether the conditions causing the initial determination persist.  Plaintiffs have plausibly alleged that the current administration has adopted the policy that extension is only warranted if the conditions that caused the initial determination persist, which is a shift from the prior policy.

3.  *Review under Arlington Heights*

The Arlington Heights factors for determining whether a facially neutral action has been taken with a discriminatory motive may, as previously noted, include the "historical background of the decision;" the "specific sequence of events leading up to the challenged decision;" "[d]epartures from the normal procedural sequence;" "contemporary statements by members of the decisionmaking body," and "substantive departures . . . , particularly if the factors usually

33

considered important by the decisionmaker strongly favor a decision contrary to the one reached."
Arlington Heights, 429 U.S. at 267.  Plaintiffs contend that the complaint sufficiently alleges,
based on those factors, that a discriminatory purpose was the motivating factor in changing the
policy regarding the criteria for TPS determinations. D. 35 at 19-25.  As support for this argument,
Plaintiffs point to the adoption of the new policy that resulted in the termination of TPS
designations for Haiti, El Salvador, and Honduras, which will primarily affect Black and Latino
individuals, D. 21 ¶ 165; that the sequence of events leading up to the new policy involved
statements from President Trump demonstrating that he held the view that Latino immigrants and
Haitian immigrants should be made to leave the country because of discriminatory beliefs he held
about these groups, D. 21 ¶¶ 149-61, 165; and that the new policy was adopted without any
accompanying legal process or explanation, D. 21 ¶¶ 174, 244.

Defendants argue that the allegations regarding statements by Trump are irrelevant because
animus held by the President cannot be imputed to Duke or Nielsen, the two officials who
terminated the TPS designations at issue, notwithstanding allegations that the White House was
closely monitoring decisions regarding TPS designations.  D. 25 at 31-32; D. 21 ¶ 223.  The
Arlington Heights analysis considers, however, not only the "contemporary statements by
members of the decisionmaking body" but also more broadly "the historical background of the
decision" and "the specific sequence of events leading up to the challenged decision."  Arlington
Heights, 429 U.S. at 267.  Courts have repeatedly held, however, that "liability for discrimination
will lie when a biased individual manipulates a non-biased decision-maker into taking
discriminatory action."  Batalla Vidal v. Nielsen, 291 F. Supp. 3d 260, 279 (E.D.N.Y. 2018)
(collecting cases); see Staub v. Proctor Hosp., 562 U.S. 411, 420-22 (2011) (explaining that where
a biased supervisor performs an act motivated by animus that causes an employer to take an

adverse action, the employer will be liable even if the employer was not directly motivated by animus).[3]  The complaint alleges that the White House, acting through then-Homeland Security Advisor Kelly, pressured Duke specifically regarding the designation of Haiti, to the point of encouraging Duke to act unlawfully in terminating Haiti's TPS designation without any findings. D. 21 ¶ 223.  The complaint alleges that Kelly called Duke while he was travelling with President Trump in Japan and told her that extending the designation would prevent President Trump's administration's "wider strategic goal" on immigration.  D. 21 ¶ 223.  The fact that Duke did not ultimately take that unlawful action does not discredit the permissible inference that such animus played a role in the decision to terminate the TPS designations at issue.  Moreover, because the exact time that the new policy regarding the criteria for TPS designations was made and the exact participants involved in that decision are unclear, it would be premature to conclude that President Trump had nothing to do with that decision such that his statements would be irrelevant.

This Court finds that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision.  See Arce v. Douglas, 793 F.3d 968, 977–78 (9th Cir. 2015) (stating that "when relying on Arlington Heights to demonstrate that an action was motivated by a discriminatory purpose, a plaintiff need provide very little such evidence to raise a genuine issue of fact; any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder" (internal citation omitted)); Ríos-Colón v. Toledo-Dávila, 641 F.3d 1, 5 (1st Cir. 2011) (concluding that allegations that a supervisor who used "abusive and

---

[3] While Staub and other cases cited in Batalla Vidal arise in the employment discrimination context, nothing in the reasoning of those opinions makes them inapplicable in a constitutional context.

derogatory slurs expressing explicit anti-black bias" had recommended a less qualified white candidate over the black plaintiff were "sufficient to plead a cognizable claim under the Equal Protection Clause").

Under <u>Arlington Heights</u> review, once plaintiffs have made out a prima facie case that discrimination motivated a facially neutral law, the burden shifts to Defendants to show that the same decisions would have been made even without that motivation.  <u>Hunter v. Underwood</u>, 471 U.S. 222, 228 (1985) (holding that "[o]nce racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor").  As described above, Plaintiffs have successfully made out their prima facie case.  Consistent with Defendants' claim that there is no new policy, Defendants make no argument that the new policy would have been reached without the alleged unlawful animus.

### 4.    *Rational Basis Review*

Finally, even if rational basis review were to apply, Plaintiffs' claims, at this early stage of litigation, would still survive.  To prevail under rational basis review, Plaintiffs "are required to show that the governmental infringement is not rationally related to a legitimate government purpose." <u>Mulero-Carrillo v. Román-Hernández</u>, 790 F.3d 99, 107 (1st Cir. 2015).  Defendants contend that there is no new policy and do not alternatively set forth any legitimate governmental purpose to be advanced by the alleged new policy that decisions about extending a TPS designation must focus exclusively on whether the conditions creating the initial designation have abated.  D. 40 at 17-18.  Defendants contend that their actions pass rational basis review, citing the facts laid out in the termination decisions in the Federal Register.  D. 25 at 28-30.  Consistent with

Defendants' denial of the existence of the new policy, Defendants offer no justification of the new policy, plausibly alleged by Plaintiffs, to change to criteria by which TPS designations are made.

The Supreme Court's application of rational basis review in <u>Hawaii</u> is not to the contrary. In applying rational basis review, the court relied on the express statement of purpose in the executive order at issue and the extensive review process involved in its creation. <u>Hawaii</u>, 138 S. Ct. at 2422. In this case, by contrast, there is no justification, explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the initial designation had abated rather than a fuller evaluation of whether the country would be able to safely accept returnees. The complaint does not allege, and Defendants do not present, any rationale for such a focus or any explanation of the process by which the decision to shift focus in that manner was made. Thus, even under rational basis review, Plaintiffs have plausibly stated constitutional claims. For all of the foregoing reasons, Defendants' motion to dismiss Count I and Count II is DENIED.

## B.      Counts III and IV:  APA Claims

Plaintiffs assert claims under the APA, contending that Defendants' new policy changing the criteria for making TPS designation decisions was "arbitrary [and] capricious," 5 U.S.C. § 706(2)(A) and taken without "observance of procedure required by law," <u>id.</u> § 706(2)(D). Defendants move to dismiss both claims. First, Defendants contend that the claims are barred under the APA, which by its own terms does not apply "to the extent that . . . statutes preclude judicial review." 5 U.S.C. § 701(a)(1); D. 25 at 33. The Court has explained above why the statute at issue does not preclude judicial review, so this provision is not applicable. Second, Defendants contend that there is no new policy changing the criteria for making TPS designation decisions. D. 25 at 34. The Court has already rejected that argument as discussed above. Third, Defendants contend that to the extent there is a new policy, that new policy is not "in tension with [the] statute that vests TPS decision making in the judgment of the Secretary." D. 25 at 35. The Court need

not, however, resolve the issue of whether the new policy is in tension with the applicable statute. Even if the new policy is a permissible interpretation of the statute, it still may be an unjustified shift from earlier practice. The Supreme Court has made clear that an "unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." Encino Motorcars, LLC v. Navarro, __ U.S. __, 136 S. Ct. 2117, 2126 (2016) (internal citation omitted). To survive arbitrary and capricious review when changing policy, an agency must "at least display awareness that it is changing position," "show that there are good reasons for the new policy," and "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." Id. (citation omitted). The record, as it exists before this Court, shows none of these. Defendants' motion to dismiss Count III is, therefore, DENIED.

With respect to Count IV, regarding the procedure by which the new policy was made, Defendants contend that, to the extent a new policy exists, it would be merely an interpretive rule, interpreting the statutory provision regarding the criteria for TPS determinations, rather than a legislative rule, and therefore not subject to notice and comment procedures. D. 25 at 36. In support of this contention, they cite Perez v. Mortg. Bankers Ass'n, 135 S. Ct. 1199, 1206 (2015) (stating that "[b]ecause an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule"). Plaintiffs contend that the alleged new policy is a regulatory rule rather than an interpretive rule, and cite New Hampshire Hosp. Ass'n v. Azar, 887 F.3d 62, 71 (1st Cir. 2018) in support of that contention. D. 35 at 35. In that case, however, the First Circuit explained that where Congress does not provide a standard for making a decision, the agency's promulgation of a standard – even one contained in an informal document like a "Frequently Asked Questions"

document – is likely a legislative rule and thus subject to notice and comment.  Id. at 69, 70-71.

Here, by contrast, Congress articulated a standard for making TPS designation determinations.

The Court, however, need not resolve at this stage the issue of whether the alleged new policy is interpretive or legislative.  If the new policy is interpretive, even interpretive changes "must be addressed expressly, at least by the agency's articulate recognition that it is departing from its precedent."  Nat'l Labor Relations Bd. v. Lily Transportation Corp., 853 F.3d 31, 36 (1st Cir. 2017).  Defendants contend that Lily Transportation is not applicable because that case involved an express change in policy. D. 40 at 21.  As explained above, however, Plaintiffs have plausibly alleged that Defendants adopted a new policy which Secretary Nielsen and then Secretary Kelly communicated in testimony before Congress. D. 21 ¶¶ 244-245.  Thus, under the logic of Lily Transportation, even if the alleged new policy is interpretive, Defendants would be required to provide some rationale acknowledging the change in position to provide the "observance of procedure required by law," 5 U.S.C. § 706(2)(D), even though Defendants would not be required to go through a full notice-and-comment process.  As addressed above, Defendants have given no explanation at all – much less one acknowledging the change in position – for the new policy.  Thus, Defendants' motion to dismiss Count IV is DENIED.

**C.    Count V:  Mandamus Relief**

Plaintiffs allege in their complaint that they are entitled to mandamus relief because Defendants have failed in their mandatory and nondiscretionary duties set forth in 8 U.S.C. § 1254a(b)(3).  D. 21 ¶ 281.  Defendants contend that Plaintiffs' claims do not meet the narrow criteria for mandamus relief. D. 25 at 36-37.  Mandamus relief is "intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty."  Heckler, 466 U.S. at 616.  Here, the Plaintiffs assert

substantive claims for relief under the Constitution and the APA and seek injunctive relief for those claims.  D. 21 at 74-79.  Plaintiffs have thus not yet exhausted all other avenues of relief. Plaintiffs appear to recognize this when they state that because they "have direct causes of action by way of the Constitution and the APA," the Court "need not reach the cause of action for mandamus" at this juncture, but that the Plaintiffs "reserve the right to address the appropriate mechanisms for relief at the merits stage."  D. 35 at 35 n.7.  Plaintiffs have not stated a claim for mandamus relief in the complaint.  The Court thus ALLOWS Defendants' motion to dismiss Count V, for mandamus relief.

### D.        Count VI:  Declaratory Judgment

Plaintiffs seek a declaratory judgment that "Defendants have violated the U.S. Constitution and other laws."  D. 21 ¶ 284.  Defendants seek to dismiss this claim, on the grounds that Plaintiffs fail to state a claim under the Constitution or other laws.  D. 25 at 37.  As explained above, however, the Court finds that Plaintiffs have stated claims that Defendants have violated the Constitution and the APA.  Thus, the Court DENIES Defendants' motion to dismiss Count VI.

### E.        Motion to Dismiss President Trump as a Defendant

Finally, Defendants seek to dismiss President Trump as a defendant.  D. 25 at 37.  They cite Franklin v. Massachusetts, 505 U.S. 788 (1992), in which a plurality of the Supreme Court stated that a "grant of injunctive relief against the President himself is extraordinary, and should [raise] judicial eyebrows."  Id. at 802.  The plurality opinion explained that, in general, a federal court may not "enjoin the President in the performance of his official duties," but that the Supreme Court had "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty."  Id.  The plurality opinion then stated that it would not address the question of whether injunctive relief against the President was appropriate in that case because "the injury allegedly [was] likely to be redressed by declaratory

relief against the Secretary alone."  Id.  Defendants thus contend that equitable relief against the President is not warranted here and, therefore, that President Trump should be dismissed as a Defendant.  D. 25 at 37.  Plaintiffs respond that the issues raised by Defendants are properly considered by the Court if and when the Court fashions appropriate relief for Plaintiffs' alleged injuries.  D. 35 at 36-37.

Injunctive relief against the President is an "extraordinary" remedy, but one that may be available in limited circumstances.  Franklin, 505 U.S. at 802.  The factors to consider in determining whether such relief would be appropriate are whether injunctive relief against a lower official or declaratory relief would be an adequate remedy and the level of intrusion into the President's authority.  See Int'l Refugee Assistance Project v. Trump, 857 F.3d 554, 605 (4th Cir.), as amended (May 31, 2017), as amended (June 15, 2017) (reasoning that the President was not a proper defendant because "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive" (citation omitted), vacated and remanded on other grounds sub nom. Trump v. Int'l Refugee Assistance, __ U.S. __, 138 S. Ct. 353 (2017); Nixon v. Fitzgerald, 457 U.S. 731, 754 (1982) (stating that "a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch"); Knight First Amendment Inst. at Columbia Univ. v. Trump, 302 F. Supp. 3d 541, 579 (S.D.N.Y. 2018) (declining to issue an injunction against the President, even if such an injunction would be largely ministerial, where declaratory relief would suffice).  A record has not yet been developed regarding, for some examples, what relief would be appropriate if Plaintiffs prevailed on their claim or whether an injunction against lower officials or declaratory relief would be sufficient.  It is thus premature to determine whether this case has the potential to be the rare case in which such

an extraordinary remedy might be justified.  The Court thus DENIES Defendants' motion to dismiss with respect to Defendant President Trump.

## VII.    Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion to dismiss, D. 24, with respect only to Plaintiffs' mandamus claim (Count V), but DENIES Defendants' motion in all other respects.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge