**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| CENTRO PRESENTE, *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:18-cv-10340-DJC |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**TO COMPEL RESPONSES TO WHITE HOUSE DISCOVERY REQUESTS**

# **TABLE OF CONTENTS**

BACKGROUND ................................................................................................ 2

ARGUMENT .................................................................................................... 6

I.      DEFENDANTS' PRESIDENTIAL COMMUNICATIONS PRIVILEGE
        CLAIMS ARE UNFOUNDED AS A MATTER OF LAW BECAUSE THE TPS
        STATUTE DOES NOT CALL FOR DIRECT DECISIONMAKING BY THE
        PRESIDENT ........................................................................................ 7

II.     EVEN IF THE PRESIDENTIAL COMMUNICATIONS PRIVILEGE COULD
        APPLY, PLAINTIFFS' NEED FOR RESPONSIVE INFORMATION
        OVERCOMES DEFENDANTS' CLAIM OF PRIVILEGE .............................. 8

        A.      Discovery Pertaining to President Trump's Racial Animus, and its
                Effect on the TPS Decisionmaking Process, Is Directly Relevant to
                Plaintiffs' Constitutional Claims. ...................................................... 9

        B.      President Trump and the White House Were Involved in the TPS
                Decisions, and Discovery About Their Involvement Is Highly Relevant
                to Plaintiffs' Statutory Claims. ...................................................... 11

        C.      Discovery on These Issues Cannot Be Obtained Elsewhere. ........................... 13

III.    DEFENDANTS' GENERALIZED ASSERTIONS ARE NOT SUFFICIENT TO
        SUSTAIN THEIR CLAIMS OF DELIBERATIVE PROCESS PRIVILEGE ................ 14

        A.      The Deliberative Process Privilege Does Not Apply Where, as Here,
                Government Misconduct and Government Intent Are at Issue. ...................... 16

        B.      Even if the Deliberative Process Privilege Could Apply to This
                Discovery, Plaintiffs Have Shown that Their Need for the Information
                Sought Outweighs Defendants' Interest in Preventing Disclosure. ................ 18

IV.     DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT THE
        DISCOVERY REQUESTS CREATE AN UNDUE BURDEN ...................................... 19

CONCLUSION AND REQUEST FOR RELIEF ..................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACORN v. County of Nassau,*
 No. CV 05-2301 (JFB) (WDW), 2008 U.S. Dist. LEXIS 20266
 (E.D.N.Y. Mar. 14, 2008) ......................................................................................18

*Batalla Vidal v. Nielsen,*
 291 F. Supp. 3d 260 (E.D.N.Y. 2018) ...................................................................10

*Casa de Maryland, Inc. v. Trump,*
 No. GJH-18-845, 2018 U.S. Dist. LEXIS 201060 (D. Md. Nov. 28, 2018)............10

*Cheney v. U.S. Dist. Court,*
 542 U.S. 367 (2004)......................................................................................9, 19, 20

*Citizens to Preserve Overton Park v. Volpe,*
 401 U.S. 402 (1971) ...............................................................................................14

*Clinton v. Jones,*
 520 U.S. 681 (1997)............................................................................................7, 20

*Coastal States Gas Corp. v. Dep't of Energy,*
 617 F.2d 854 (D.C. Cir. 1980) ...............................................................................14

*Dairyland Power Coop. v. United States,*
 79 Fed. Cl. 659 (2007) .......................................................................................9, 13

*Dellums v. Powell,*
 561 F.2d 242 (D.C. Cir. 1977)......................................................................9, 10, 11

*Doe v. District of Columbia,*
 230 F.R.D. 47 (D.D.C. 2005)..................................................................................15

*Doe v. Mattis,*
 322 F. Supp. 3d 92 (D.D.C. 2018) ..........................................................................17

*In re Franklin Nat'l Bank Sec. Litig.,*
 478 F. Supp. 577 (E.D.N.Y. 1979) .............................................................15, 16, 18, 19

*FTC v. Warner Comm'n, Inc.,*
 742 F.2d 1156 (9th Cir. 1988) ................................................................................16

*Garcia v. E.J. Amusements of N.H., Inc.,*
 89 F. Supp. 3d 211 (D. Mass. 2015) .......................................................................20

*In re Grand Jury Proceedings*,
 5 F. Supp. 2d 21 (D.D.C. 1998) ...................................................................................9, 13

*Karnoski v. Trump*,
 328 F. Supp. 3d 1156 (W.D. Wash. 2018) ..............................................................................17

*Karnoski v. Trump*,
 No. C17-1297-MJP, 2018 U.S. Dist. LEXIS 140986
 (W.D. Wash. Aug. 20, 2018) ........................................................................................9

*Landry v. F.D.I.C.*,
 204 F.3d 1125 (D.C. Cir. 2000) ....................................................................................15

*Loving v. Dep't of Defense*,
 550 F.3d 32 (D.C. Cir 2008) .........................................................................................15

*In re McKesson*,
 264 F.R.D. 595 (N.D. Cal. 2009) ..................................................................................15

*Mont. Fish, Wildlife, & Parks Found., Inc. v. United States*,
 91 Fed. Cl. 434 (2010) .................................................................................................13

*N. Pacifica LLC v. City of Pacifica*,
 274 F. Supp. 2d 1118 (N.D. Cal. 2003) .........................................................................16

*Ramos v. Nielsen*,
 336 F. Supp. 3d 1075 (N.D. Cal. 2018) ................................................................. *passim*

*Ramos v. Nielsen*,
 No. 18-cv-01554-EMC (SK) (N.D. Cal. Aug. 10, 2018), ECF 63 .........................................16

*Schreiber v. Soc'y for Sav. Bancorp*,
 11 F.3d 217 (D.D.C. 1993) ...........................................................................................16

*In re Sealed Case*,
 121 F.3d 729 (D.C. Cir. 1997) ............................................................................. *passim*

*In re Subpoena Duces Tecum Served on Office of Comptroller of Currency*,
 145 F.3d 1422 (D.C. Cir. 1998),
 *aff'd on reh'g*, 156 F.3d 1279 (D.C. Cir. 1998) .........................................................17

*Sun Oil Co. v. United States*,
 514 F.2d 1020 (Ct. Cl. 1975) ................................................................................9, 11, 19

*Texaco P.R., Inc. v. Dep't of Consumer Affairs*,
 60 F.3d 867 (1st Cir. 1995) ................................................................................. *passim*

*Tri-State Hosp. Supply Corp. v. United States*,
226 F.R.D. 118 (D.D.C. 2005)..........................................................................16, 17

*U.S. Dep't of Treasury v. Black*,
719 F. App'x 1 (D.C. Cir. 2017).................................................................................9

*United States v. Lake Cty. Bd. of Comm'rs*,
233 F.R.D. 523 (N.D. Ind. 2005).............................................................................17

*United States v. Nixon*,
418 U.S. 683 (1974)...............................................................................................8, 9

*United States v. O'Neill*,
619 F.2d 222 (3d Cir. 1980)....................................................................................15

*United States v. Salemme*,
No. 94-10287-MLW, 1997 U.S. Dist. LEXIS 20987 (D. Mass. Dec. 29, 1997)....................15

*United States v. Zhen Zhou Wu*,
No. 08-10386-PBS, 2010 U.S. Dist. LEXIS 18405 (D. Mass. Mar. 2, 2010) .............15, 16, 19

*Velazquez v. City of Chicopee*,
226 F.R.D. 31 (D. Mass. 2004).................................................................................17

**Statutes**

8 U.S.C. § 1254a...............................................................................................................8

8 U.S.C. § 1254a(b).........................................................................................................12

**Other Authorities**

Fed. R. Civ. P. 30(b)(6)....................................................................................................4

Plaintiffs Centro Presente, *et al.* ("Plaintiffs") submit this Memorandum of Law in Support of their Motion to Compel Defendants United States Department of Homeland Security ("DHS"), Donald J. Trump, President of the United States in his official capacity ("President Trump"), DHS Secretary Kirstjen Nielsen ("Secretary Nielsen"), and DHS Deputy Secretary Elaine Costanzo Duke ("Deputy Secretary Duke," and together with DHS, President Trump, and Secretary Nielsen, the "Defendants"), to respond to Plaintiffs' discovery requests. In particular, Plaintiffs seek an order compelling President Trump and his agents within the White House to respond to document requests and a Rule 30(b)(6) deposition notice.

Plaintiffs allege that Defendants' terminations of Temporary Protected Status ("TPS") designations for El Salvador, Haiti, and Honduras violate the Administrative Procedure Act, the TPS statute, and the Equal Protection and Due Process guarantees in the Constitution. As this Court has recognized, the conduct of President Trump and other White House officials is at the center of each of these violations: "Plaintiffs allege that Defendants violated their rights . . . by adopting an unreasoned change in policy regarding the applicable standard for TPS designations that was motivated by unlawful animus . . . ." Mem. & Order 25, ECF 47; *see also* Am. Compl. ¶ 155, ECF 21 ("Upon learning that 15,000 Haitian people had received such visas, President Trump is reported to have stated they 'all have AIDS.'"); *id.* at ¶ 160 ("[President Trump] specifically derided individuals from terminated TPS nations, asking: 'Why are we having all these people from shithole countries come here?'").

Plaintiffs therefore have promulgated specific, targeted document requests and Rule 30(b)(6) deposition topics seeking information about the relevant communications by President Trump and certain other White House officials. These requests, which are copied below, seek discrete categories of documents and information concerning specific events leading up to and

concerning the TPS terminations, including: conversations between officials at the White House and officials at DHS charged with making TPS determinations; meetings at the White House where TPS was discussed; and directives and proposals issued by the White House concerning TPS. *See infra* at 3-4. This discovery is directly relevant to Plaintiffs' constitutional and statutory claims and not available from any other source. To date, however, Defendants have flatly rebuffed each request, asserting only generalized objections of presidential communications privilege, deliberative process privilege, and burden. Defendants have not searched for responsive documents and have stated that they will not do so in the future.

Defendants cannot be permitted to advance absolute and unsubstantiated privilege claims. Neither of the privileges (which have not even been formally asserted) apply in this context. Even if they do, Plaintiffs' need for the discovery and the public's interest in honest, effective government supersede any interest in withholding relevant information. Plaintiffs therefore respectfully request that the Court compel Defendants, in particular President Trump and his agents in the White House, to respond to Plaintiffs' discovery requests. Specifically, Defendants should, within fourteen days of the Court's order, (i) collect all responsive documents and information, (ii) produce all non-privileged documents, and (iii) log all withheld documents with specific references to the privilege(s) that purportedly apply to facilitate further evaluation of Defendants' assertions. In addition, Defendants' should identify their Rule 30(b)(6) designee(s) or lodge specific objections to the topics included in Plaintiffs' Rule 30(b)(6) notice.

## BACKGROUND

Plaintiffs initiated this Action on February 22, 2018 and filed the First Amended Complaint on May 9, 2018. Plaintiffs allege Defendants terminated TPS for each of El Salvador, Haiti, and Honduras in violation of the Equal Protection and Due Process guarantees of the

Constitution, the substantive and procedural requirements of the Administrative Procedure Act

(the "APA"), and the requirements of the TPS statute itself. Am. Compl. ¶¶ 257-286, ECF 21.

On July 23, 2018, the Court largely denied Defendants' motion to dismiss the Amended

Complaint, finding that Plaintiffs had pleaded plausible allegations that Defendants had adopted

a novel, restrictive policy to administer the TPS statute, and that discriminatory animus

represented by President Trump's statements may have motivated the TPS terminations. Mem. &

Order 30-35, ECF 47. The opinion noted in particular that it was plausible that President

Trump's statements "played a role" in the decisions, notwithstanding that Deputy Secretary

Duke and Secretary Nielsen were charged with the exclusive statutory authority to extend or

terminate TPS. *See id.* at 34-35.

On September 18, 2018, Plaintiffs served Defendants with their First Set of Requests for

Production of Documents. O'Keefe Decl., Ex. 1.[1]  These requests include the following:

> Request for Production No. 5: Any and all communications, including any notes to file or any written memorialization, since November 8, 2016, between or on behalf of, on the one hand, the secretary, deputy secretary, director, deputy director, commissioner, deputy commissioner, chief of staff, or director of legislative affairs (as to all such positions, whether acting or appointed) of DHS, U.S. Immigration & Customs Enforcement, U.S. Citizenship & Immigration Services, U.S. Custom[s] & Border Protection, and the U.S. Department of State, and, on the other hand, Defendant Trump, his chief of staff, members of the Office of White House Policy, or any other policy advisers (or representatives) regarding whether to extend or terminate the TPS designations for El Salvador, Haiti, and Honduras and the TPS program generally.

> Request for Production No. 13: All documents concerning White House Chief of Staff John Kelly and former White House Homeland Security Advisor Tom Bossert's communications with Former Acting Secretary Duke regarding extensions and/or terminations of TPS designations during the period from October 2017 through November 2017, including any notes to file or any written memorialization of such communications.

> Request for Production No. 22: Produce all documents pertaining to the January 11, 2018 meeting during which Defendant Trump [was] reported to have said "all these people

---

[1] Citations in the format "O'Keefe Decl. __" shall refer to the respectively numbered paragraphs in, or exhibits attached to, the Declaration of Kevin O'Keefe in Support of Plaintiffs' Motion to Compel, filed herewith.

from shithole countries" and "Why do we need more Haitians?" This request includes, but is not limited to, any memoranda, agendas, or reports prepared in anticipation of the meeting, as well as any memoranda or reports summarizing or memorializing the meeting.

Request for Production No. 23: Produce all documents pertaining to the June 2017 Oval Office meeting with Defendant Trump, then-Homeland Security Secretary Kelly and then-Secretary of State Tillerson, during which Defendant Trump is reported to have said "all [Haitians] have AIDS." This request includes, but is not limited to, any memoranda, agendas, or reports prepared in anticipation of the meeting, as well as any memoranda or reports summarizing or memorializing the meeting.

Request for Production No. 24: Produce any communication between Defendant Trump or personnel within the Office of White House Policy and Members of Congress or their staff regarding DHS' decision to extend or terminate TPS for El Salvador, Haiti, or Honduras.

Request for Production No. 27: Any and all communications, including any notes to files or any written memorialization of communications, since November 8, 2016, between or on behalf of, on the one hand, former-DHS Secretary and current-White House Chief of Staff, John Kelly (or his staff or representatives) and, on the other hand, Defendant Trump, his chief of staff, or his policy advisors (or representatives), regarding the TPS program.

Request for Production No. 30: Any and all communications concerning the proposal to simultaneously terminate the TPS designations for El Salvador, Haiti, Honduras, and Nicaragua discussed in the Principals Small Group Meeting on November 3, 2017.

Request for Production No. 31: Any and all reports, memoranda, or agendas, including interim drafts and communications related thereto, pertaining to the proposal to simultaneously terminate the TPS designations for El Salvador, Haiti, Honduras, and Nicaragua discussed in the Principals Small Group Meeting on November 3, 2017.

Additionally, on September 18, 2018, Plaintiffs served a notice pursuant to Fed. R. Civ. P. 30(b)(6) to depose a representative of President Trump's Office of White House Policy to testify about specified topics relating to the termination of TPS. O'Keefe Decl., Ex. 2.

Prior to issuing formal written responses, Defendants sent a letter outlining general and categorical objections to Plaintiffs' Discovery Requests on September 28, 2018. O'Keefe Decl., Ex. 3. On October 10, 2018, the parties engaged in a telephonic meet-and-confer in an attempt to address Defendants' concerns. O'Keefe Decl. ¶ 9(a). On October 11, 2018, Plaintiffs sent a letter indicating their willingness to avoid "unnecessary expense and undue burden" but noting that

there was "no legal or factual justification for a categorical exclusion of [President] Trump and

the White House from discovery." O'Keefe Decl., Ex. 4. On October 18, 2018, Defendants

provided formal objections to Plaintiffs' Discovery Requests, broadly objecting to the Requests

"insofar as Plaintiffs purport to seek discovery from President Trump or other White House

custodians" as "[a]ny such discovery is not proportional to the needs of this case, given that

Plaintiffs' claims challenge TPS determinations by the Secretary of Homeland Security, the

official who is statutorily charged with making such determination." O'Keefe Decl., Ex. 5.

Defendants have maintained at every step in this litigation that President Trump and personnel in

the White House had no material influence on the TPS terminations at issue. *See infra* Part I.

Defendants' lodged similar boilerplate objections to each of the Discovery Requests at

issue. Below is a quoted example:

Objections to Request for Production No. 5 (emphasis added):

1.     Defendants incorporate by reference the above General Objections.
Objections to Introductory Material, Objections to Definitions, and
Objections to Instructions.
2.     Defendants object to this RFP as overly broad, unduly burdensome,
and disproportional to the needs of this case, particularly taking into account
that challenges to administrative agency action are ordinarily reviewed in
light of the administrative record rather than a new record created in
litigation.
3.     Defendants object to this RFP, as it appears to seek paradigmatically
deliberative and thus privileged material.
4.     Defendants object to this RFP, as it appears to seek material protected
by the presidential communications privilege.
5.     Defendants object to this RFP to the extent it would require
Defendants to conduct searches of custodians at the White House or at
components of DHS that do not play a material role in the TPS
decisionmaking process (such as U.S. Customs and Border Protection or U.S.
Immigration and Customs Enforcement). Defendants further object to the
extent the RFP would require Defendants to conduct searches of records held
by custodians at the State Department, as the State Department is neither a
named defendant nor identified in Plaintiffs' Definitions and Instructions as a
responding entity.

6.      Defendants object to the use of the undefined phrase "the TPS program generally," as vague and ambiguous. Defendants specifically object to this language to the extent it could be read to request documents pertaining to TPS determinations that Plaintiffs have not challenged in this litigation.

7.      Defendants object to this RFP to the extent it seeks documents that postdate the May 4, 2018, announcement of the termination of TPS for Honduras, the latest-in-time TPS decision challenged in this lawsuit. Defendants will conduct an appropriate search for documents dated between November 8, 2016, and May 4, 2018.

8.      Subject to and without waiving any of the foregoing, Defendants expect to produce non-privileged material responsive to this RFP, on a rolling basis.[2]

Plaintiffs responded to Defendants' formal Responses and Objections on November 13, 2018, reiterating that any categorical exclusions were unjustified and requesting that Defendants advise whether they would undertake any collection efforts. O'Keefe Decl., Ex. 6. The parties engaged in a further telephonic conference on November 16, 2018. O'Keefe Decl. ¶ 9(b). On November 30, 2018, Plaintiffs reiterated their requests and provided further detail as to why each request was proportional, narrowly targeted, and did not implicate privilege concerns. O'Keefe Decl., Ex. 6. The parties engaged in a final meet-and-confer on February 7, 2019, after which Defendants indicated that no compromise could be reached. O'Keefe Decl., Ex 7.

## ARGUMENT

Plaintiffs allege that the TPS terminations for El Salvador, Haiti, and Honduras were procedurally invalid and were motivated by impermissible racial animus. The Complaint includes particularized allegations and seeks to vindicate important constitutional rights. In denying Defendants' motion to dismiss, the Court ruled that Plaintiffs have advanced sufficient factual allegations of unlawful motive. Plaintiffs are therefore entitled to seek discovery and should be permitted to ascertain (i) which federal officials participated in the conduct underlying Plaintiffs' claims, (ii) why they did so, and (iii) how. *See Clinton v. Jones*, 520 U.S. 681, 703

---

[2] Defendants' objections and responses to the Discovery Requests are set forth in full at O'Keefe Decl., Ex. 5.

(1997) ("[W]e have long held that when the President takes official action, the Court has the authority to determine whether he has acted within the law."). Defendants, however, have refused to engage in discovery with respect to President Trump, standing on general claims of presidential communications privilege, deliberative process privilege,[3] and undue burden. None of these assertions preclude the requested discovery from President Trump and his agents.

First, Defendants cannot assert that the information sought in the Discovery Requests is subject to the presidential communications privilege while simultaneously asserting that President Trump and his agents in the White House were not materially involved in the decisions at issue. Second, even if the presidential communications privilege applied, Plaintiffs have a substantial need for the discovery which is not available from other sources, therefore superseding any privilege claim. Third, the deliberative process privilege does not apply at all where, as here, Plaintiffs allege misconduct in the government's decisionmaking process. Finally, Defendants' rote invocation of undue burden is insufficient to sustain their objection.

I.    **DEFENDANTS' PRESIDENTIAL COMMUNICATIONS PRIVILEGE CLAIMS ARE UNFOUNDED AS A MATTER OF LAW BECAUSE THE TPS STATUTE DOES NOT CALL FOR DIRECT DECISIONMAKING BY THE PRESIDENT**

"The presidential communications privilege should never serve as a means of shielding information regarding **governmental operations that do not call ultimately for direct decisionmaking by the President**." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) (emphasis added). The sole purpose of this "rarely . . . invoked" privilege is to "guarantee the candor of presidential advisers and to provide a President 'and those who assist him . . . [with] freedom to explore alternatives in the process of shaping policies and making decisions and to do

---

[3] As discussed *infra*, the presidential communications privilege and the deliberative process privilege are "closely affiliated . . . [but] are distinct and have different scopes." *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997). "Both are executive privileges designed to protect executive branch decisionmaking, but one applies to decisionmaking of executive officials generally, the other specifically to decisionmaking of the President." *Id.*

so in a way many would be unwilling to express except privately.'" *Id.* at 738, 743 (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)). In order for the privilege to apply, the material at issue must: (i) "reflect presidential decisionmaking," and (ii) be "authored or solicited and received" by the President or members of his immediate White House staff.  *Id.* at 744, 752.

The exclusive statutory authority to extend or terminate TPS rests with Deputy Secretary Duke and Secretary Nielsen. *See* 8 U.S.C. § 1254a; *see also* Mem. & Order 4-5, ECF 47. Therefore the presidential communications privilege cannot apply.

Moreover, Defendants have asserted unequivocally throughout this litigation that President Trump and other White House officials were not involved in the decisions to terminate TPS. *See, e.g.,* Defs.' Mot. to Dismiss Br. 21, 27, ECF 25; Defs.' Reply in Support of Mot. to Dismiss 8, ECF 40; Answer ¶¶ 173, 224, ECF 49; O'Keefe Decl., Ex. 3 at 2-3, Ex. 5 at 3-4. If this were true, it would follow that the presidential communications privilege could not attach to materials responsive to the Discovery Requests. Defendants cannot have it both ways.[4]

## II.   EVEN IF THE PRESIDENTIAL COMMUNICATIONS PRIVILEGE COULD APPLY, PLAINTIFFS' NEED FOR RESPONSIVE INFORMATION OVERCOMES DEFENDANTS' CLAIM OF PRIVILEGE

The President may only invoke the presidential communications privilege when "asked to produce documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential."  *Sealed Case*, 121 F.3d at 744. This privilege is not absolute and cannot stand when the President asserts only a generalized interest in confidentiality. *See United States v. Nixon*, 418 U.S. 683, 706 (1974); *Dellums v. Powell*, 561 F.2d 242, 245 (D.C. Cir. 1977); *Sun Oil Co. v. United States*, 514 F.2d 1020, 1024 (Ct. Cl. 1975). Indeed, even a formal invocation of the privilege "has been consistently viewed as

---

[4] As set forth *infra* Part II.B, the discovery reviewed to date tends to refute Defendants' version of events. Nonetheless, given Defendants' litigation position with respect to President Trump's involvement, Defendants cannot sustain the assertion of privilege.

presumptive only." *Dellums*, 561 F.2d at 246 (citations omitted). Defendants have not yet

offered an affidavit formally invoking the presidential communications privilege.

The requesting party may overcome this presumption with a sufficient showing of need

for the materials. *See id.*; *see also Nixon*, 418 U.S. at 706; *Sealed Case*, 121 F.3d at 754. This

standard has two components. *Sealed Case*, 121 F.3d at 754. First, the requesting party must

show that the evidence sought is "directly relevant" to issues central to the case. *Id.* This is not an

exacting requirement. The court focuses solely on the relevance of the contested material at the

discovery stage, and not on the merits of claims or defenses asserted. *See In re Grand Jury*

*Proceedings*, 5 F. Supp. 2d 21, 28 (D.D.C. 1998) ("The information sought need not be critical

to an accurate judicial determination.") (internal quotation marks omitted).[5] Second, the court

must assess whether the evidence is available through other means. *See Sealed Case*, 121 F.3d at

754. "If a court believes an adequate showing of need has been demonstrated, it should then

proceed to review the documents *in camera* to excise non-relevant materials." *Id.* at 745.

### A.    Discovery Pertaining to President Trump's Racial Animus, and its Effect on the TPS Decisionmaking Process, Is Directly Relevant to Plaintiffs' Constitutional Claims.

Plaintiffs allege that President Trump's racial animus impermissibly permeated the TPS

decisionmaking process in violation of Plaintiffs' constitutional rights. Am. Compl. ¶¶ 1, 6, 239-

---

[5] Defendants assert that "exacting standards" of relevancy, admissibility, and specificity, as purportedly adopted in *Cheney v. U.S. Dist. Court*, 542 U.S. 367 (2004), must be met for a party to overcome the presidential communications privilege. O'Keefe Decl., Ex. 3 at 3. Defendants' reading of *Cheney* is incorrect. *Cheney* cautions against overly broad discovery requests propounded on the White House but does not otherwise alter the standard set forth in *Sealed Case* to evaluate the presidential communications privilege. Rather, the central issue in *Cheney* was "whether the Court of Appeals was correct to conclude it had no authority to exercise the extraordinary remedy of mandamus, on the ground that the Government could protect its rights by asserting executive privilege in the District Court." 542 U.S. at 380. Trial courts evaluating this exact issue have confirmed that "the Court in *Cheney* . . . did not adopt a particular test for use in civil case discovery disputes." *Dairyland Power Coop. v. United States*, 79 Fed. Cl. 659, 665 (2007); *accord Karnoski v. Trump*, No. C17-1297-MJP, 2018 U.S. Dist. LEXIS 140986, at *6-8 (W.D. Wash. Aug. 20, 2018). Instead, courts have employed the standard set forth in *Sealed Case. Id.* at *9-10; *see also Dairyland*, 79 Fed. Cl. at 667 ("After comparing *Nixon*, *Sealed Case*, and *Cheney* . . . , this Court concludes that the *Sealed Case* test comes closest to what the Supreme Court was concerned about in *Cheney*."); *accord U.S. Dep't of Treasury v. Black*, 719 F. App'x 1, 2-3 (D.C. Cir. 2017) (applying *Sealed Case* to evaluate privilege claim).

42, ECF 21. "Courts have repeatedly held . . . that 'liability for discrimination will lie when a biased individual manipulates a non-biased decision-maker into taking discriminatory action.'" Mem. & Order 34, ECF 47 (quoting *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 279 (E.D.N.Y. 2018)). Evidence as to whether President Trump harbored racial animus—and simultaneously exerted influence over DHS officials, either through his own actions or through White House personnel, to sway the TPS decisionmaking process—is therefore directly relevant. *Dellums*, 561 F.2d at 248 ("The Court can scarcely imagine what could be more relevant to the grave allegations in the present case than the actual words of those alleged to have [acted unlawfully].")). Courts have recognized this in parallel cases addressing terminations of TPS. *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1098 (N.D. Cal. 2018) (granting preliminary injunction where evidence supports merits of plaintiffs' Equal Protection and APA claims); *Casa de Maryland, Inc. v. Trump*, No. GJH-18-845, 2018 U.S. Dist. LEXIS 201060, at *33 (D. Md. Nov. 28, 2018) ("[Plaintiffs] allege that animus on the basis of race, color, and ethnicity was a motivating factor in the Secretary's decision to terminate El Salvador's TPS and have offered sufficient evidence to make their Equal Protection claims plausible." (internal citations omitted)).

This Court has already held that Plaintiffs' allegations, including those "statements of animus by people plausibly alleged to be involved in the decision-making process," were sufficient to state Equal Protection and Due Process claims under the *Arlington Heights* standard. Mem. & Order 35, ECF 47. In doing so, this Court specifically referenced several statements made by President Trump that plausibly demonstrated bias and prejudice against immigrants of color, and particularly Latino and Haitian immigrants. *Id.* at 10-11, 34-35 (summarizing President Trump's statements made on the campaign trail and after assuming office). In circumstances like these, courts recognize the "strong constitutional value" in disclosure of

material when the information sought may help to prove a substantial violation of fundamental constitutional rights, and there is sufficient evidence to preclude an inference of harassment of the defendant. *See Dellums*, 561 F.2d at 247. Plaintiffs' Discovery Requests are narrowly targeted to seek directly relevant testimony and documents concerning: (i) communications between the White House (on the one hand) and the agency officials who are charged with administering TPS (on the other hand); (ii) White House meetings in which TPS was discussed; and (iii) directives, proposals, and policies about TPS.

In a case presenting a similar claim of privilege, the court held that the defendants should produce documents concerning the plaintiffs' application for an oil drilling permit. Documents exchanged between presidential aides and the President were relevant because they could help "to prove that the President or someone on his White House staff turned their application down and did so for impermissible, extraneous, political, or other reasons . . . ." *Sun Oil*, 514 F.2d at 1025; *see id.* ("[A] generalized claim of privilege . . . cannot prevail against the plaintiffs' need to develop the facts by resort to discovery."). As in *Sun Oil*, Defendants' generalized assertions of privilege should not prevail over Plaintiffs' need to develop facts through discovery.

**B.      President Trump and the White House Were Involved in the TPS Decisions, and Discovery About Their Involvement Is Highly Relevant to Plaintiffs' Statutory Claims.**

Defendants have asserted from the outset of this action that, by law, "the decision whether to designate any foreign state for TPS is vested in the judgment of the Secretary" of DHS, not President Trump or other executive officials. Defs.' Mot. to Dismiss Br. 22, ECF 25. The law requires that TPS decisions be based solely on expressly enumerated factors relating to conditions in countries receiving TPS status, *see* 8 U.S.C. § 1254a(b), and not based on political objectives, or in furtherance of unconstitutional animus. Plaintiffs have advanced specific allegations that President Trump and other White House officials were involved in the TPS

decisions to advance a political agenda, in violation of the statute. *See* Mem. & Order 35, ECF 47. The discovery received to date has borne this out.

For example, contemporaneous correspondence appears to confirm Plaintiffs' allegations that, on November 6, 2017, White House Homeland Security Adviser Tom Bossert and Chief of Staff John Kelly made repeated phone calls to Deputy Secretary Duke to pressure her to terminate Honduras' TPS designation. Mem. & Order 35, ECF 47; Am. Compl. ¶ 223, ECF 21. On September 7, 2017, a member of President Trump's National Security Council, Scott Oudkrik, emailed DHS staff expressing surprise that Deputy Secretary Duke had terminated TPS for Sudan and extended TPS for South Sudan, noting that it was "counter to what we discussed a few weeks ago." O'Keefe Decl., Ex. 8. On October 10, 2017, a member of President Trump's Domestic Policy Council, John Zadrozny, pressed staff at DHS for a briefing on TPS and "upcoming decision points." O'Keefe Decl., Ex. 9. On January 4, 2018, Mr. Zadrozny sought confirmation from Secretary Nielsen's chief of staff that she would be making her TPS determination concerning El Salvador the following day. O'Keefe Decl., Ex. 10.

Most significantly, on November 3, 2017, members of President Trump's National Security Council convened a Principals Small Group Meeting at the White House—prior to the announcement of any of the TPS terminations at issue here—to discuss plans to terminate TPS designations for each of El Salvador, Honduras, Nicaragua, and Haiti. *See* O'Keefe Decl., Ex. 11. Attendees at the Small Group Meeting included President Trump's Chief of Staff and Press Secretary, Secretary Nielsen (at the time, President Trump's Principal Deputy Chief of Staff), representatives of DHS and the State Department, and other White House staff. *Id.*

At least one court has found, on a preliminary basis, that this evidence supports the conclusion that the White House influenced the TPS decisionmaking process to reach a pre-

ordained result. *See Ramos*, 336 F. Supp. 3d at 1080-81; *id.* at 1098-1100 (citing evidence of White House involvement). Evidence on this topic is directly relevant to Plaintiffs' allegations that Defendants broke with decades of practice to adopt a novel, and more restrictive, TPS enforcement policy in violation of the APA and the TPS statute itself.

### C.     Discovery on These Issues Cannot Be Obtained Elsewhere.

Presidential communications are not entitled to absolute immunity from disclosure. These documents should be produced where the plaintiffs demonstrate a need for them, and where they are not available from other sources. *See supra* at 9. Discovery produced to date and publicly available information confirm the White House was involved in the TPS process. The full extent of that involvement can be demonstrated only by taking discovery from the White House and the officials involved. *See, e.g.*, *Grand Jury*, 5 F. Supp. 2d at 29 (discovery not available from other sources where "the only sources of that testimony are those persons participating in the conversations"); *Dairyland*, 79 Fed. Cl. at 668, ("[I]t is the documents themselves, authored by Government officials, rather than only the factual information in the documents, that makes them uniquely important and certainly not obtainable elsewhere.").

Five of Plaintiffs' Discovery Requests specifically address in-person conversations that occurred at the White House or involved White House personnel. *See supra* at 3-4.[6] Discovery from these people will tend to prove Plaintiffs' allegations. The documents and testimony cannot be obtained elsewhere, and therefore should be produced by Defendants.

---

[6] Records of these in-person communications are not only discoverable; they should be included within the administrative record. *Mont. Fish, Wildlife, & Parks Found., Inc. v. United States*, 91 Fed. Cl. 434, 445-46 (2010) ("Information . . . acquired, even if by informal means such as oral conversations, which was available at the time the decision was made . . . , should be reflected in the administrative record.") (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)).

## III.   DEFENDANTS' GENERALIZED ASSERTIONS ARE NOT SUFFICIENT TO SUSTAIN THEIR CLAIMS OF DELIBERATIVE PROCESS PRIVILEGE

Defendants asserted both the presidential communications and the deliberative process privileges in response to the Discovery Requests. As discussed *supra* Part II, Plaintiffs' need supersedes any claim of presidential communications privilege, and therefore Plaintiffs' need also supersedes any claim of deliberative process privilege. *Sealed Case*, 121 F.3d at 746.

The First Circuit has explained the deliberative process privilege as follows:

> [T]he deliberative process privilege is a discretionary one. In deciding how to exercise its discretion, an inquiring court should consider, among other things, the interest of the litigants, society's interest in the accuracy and integrity of factfinding, and the public's interest in honest, effective government. Consequently, where the documents sought may shed light on alleged government malfeasance, the privilege is routinely denied.

*Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995) (internal quotations and citations omitted). Further, the deliberative process privilege is a qualified privilege that "is to be applied 'as narrowly as consistent with efficient Government operation.'" *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980) (describing scope of parallel exemption under Freedom of Information Act and emphasizing "the strong policy . . . that the public is entitled to know what its government is doing and why").

First, in order to state a proper assertion of the deliberative process privilege, Defendants carry the burden of establishing that the withheld inter- or intra- governmental communication is "(1) predecisional, that is, antecedent to the adoption of agency policy, and (2) deliberative, that is, actually related to the process by which policies are formulated." *Texaco P.R.*, 60 F.3d at 884-85 (internal quotations omitted). The privilege does not apply to communications that are purely factual, or merely set out agency policy. *United States v. Zhen Zhou Wu*, No. 08-10386-PBS, 2010 U.S. Dist. LEXIS 18405, at *4 (D. Mass. Mar. 2, 2010) ("Put another way, a document is

- 14 -

deliberative if it constitutes a statement of opinion regarding final policy rather than a description

of the ultimate policy itself."). Moreover, the privilege does not protect entire documents; "if the

government can segregate and disclose non-privileged factual information within a document, it

must." *Loving v. Dep't of Defense*, 550 F.3d 32, 38 (D.C. Cir 2008). For these fundamental

reasons, Defendants' generalized assertions do not suffice to assert the privilege.[7] *See In re*

*McKesson*, 264 F.R.D. 595, 599 (N.D. Cal. 2009) (finding "initial blanket assertion of the

deliberative process privilege was clearly insufficient"); *see also United States v. O'Neill*, 619

F.2d 222, 227 (3d Cir. 1980) ("The indiscriminate claim of privilege may in itself be sufficient

reason to deny it.").

Then, if the Government is able to establish (via a detailed log or *in camera* review) that

the withheld documents are both predecisional and deliberative, the court must balance whether

the interests of disclosure—namely, the litigants' interests in the present lawsuit and society's

interest in effective judicial factfinding and legitimate governance—outweigh the Government's

reasons for confidentiality. *Texaco P.R.*, 60 F.3d at 885. Courts consider, *inter alia*, the following

factors from *In re Franklin Nat'l Bank Sec. Litig.* when making this determination: "(i) the

relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the

'seriousness' of the litigation and the issues involved; (iv) the role of the government in the

litigation; and (v) the possibility of future timidity by government employees." 478 F. Supp. 577,

583 (E.D.N.Y. 1979); *see, e.g., Schreiber v. Soc'y for Sav. Bancorp*, 11 F.3d 217, 220-21

(D.D.C. 1993); *Zhen Zhou Wu*, 2010 U.S. Dist. LEXIS 18405 at *6. Plaintiffs here, like the TPS

---

[7] "Before the deliberative process privilege may be invoked, 'there must be a formal claim of privilege, lodged by the head of the department which has control over the matter after actual consideration by that officer.'" *United States v. Salemme*, No. 94-10287-MLW, 1997 U.S. Dist. LEXIS 20987, at *21 n.6 (D. Mass. Dec. 29, 1997) (internal quotations omitted); *see also Landry v. F.D.I.C.*, 204 F.3d 1125, 1135 (D.C. Cir. 2000); *Doe v. District of Columbia*, 230 F.R.D. 47, 51 (D.D.C. 2005) ("To properly assert the deliberative process privilege, defendant must establish a formal, considered, detailed claim of privilege.") (internal citations omitted). Defendants have yet to formally invoke the privilege on behalf of President Trump.

beneficiary-plaintiffs in the parallel litigation *Ramos v. Nielsen*, have shown that these factors

favor disclosure. Order re Jt. Ltr. Brief 3-4, *Ramos v. Nielsen*, No. 18-cv-01554-EMC (SK)

(N.D. Cal. Aug. 10, 2018), No. 18-cv-01554-EMC, ECF 63 ("*Ramos* Order")[8] (citing

comparable factors in *FTC v. Warner Comm'n, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1988) and *N.*

*Pacifica LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1122 (N.D. Cal. 2003)).

### A.    The Deliberative Process Privilege Does Not Apply Where, as Here, Government Misconduct and Government Intent Are at Issue.

The privilege does not apply at all where the withheld documents may shed light on

government misconduct. *Texaco P.R.,* 60 F.3d at 885. "Simply put, when there is reason to

believe that government misconduct has occurred, the deliberative process privilege

disappears[;] . . . there is no need to engage in a balancing test because the privilege does not

apply at all." *Tri-State Hosp. Supply Corp. v. United States*, 226 F.R.D. 118, 135 (D.D.C. 2005).

"[S]hielding internal government deliberations in this context does not serve the public's interest

in honest, effective government."  *Sealed Case*, 121 F.3d at 738 (citing *Texaco P.R.*, 60 F.3d at

885).

Plaintiffs have alleged a *prima facie* case of impermissible racial animus and of improper

influence by the White House in the decisions to terminate TPS. *See* Mem. & Order 34-35,

ECF 47. These allegations demonstrate egregious government misconduct, and the thrust of

Plaintiffs' Discovery Requests is to uncover evidence of such motivation that is likely to evade

an administrative record. *See, e.g.*, O'Keefe Decl., Ex. 1 at RFP 13 (seeking documents

concerning the call(s) in November 2017 when White House officers allegedly pressured Deputy

Secretary Duke to terminate TPS for Honduras). As discussed above, Plaintiffs have shown

through evidence of meetings and phone calls between the White House and DHS, as well as the

---

[8] The *Ramos* Order is attached as Exhibit 12 to the O'Keefe Declaration.

President's racially charged statements, that such direct evidence is likely to exist. *See supra* Part

II.A,B. In such cases, the deliberative process privilege does not apply. *Karnoski v. Trump*, 328

F. Supp. 3d 1156, 1161-62 (W.D. Wash. 2018) (overruling privilege in case challenging

improper motive to ban transgender military servicemembers); *Tri-State Hosp. Supply Corp.*,

226 F.R.D. at 135-36 (D.D.C. 2005) ("Since the government's alleged misconduct in making

these determinations is the basis of this lawsuit, the deliberative process privilege may yield.").

Nor does the privilege apply where the government's intent is at issue. *See, e.g., In re*

*Subpoena Duces Tecum Served on Office of Comptroller of Currency*, 145 F.3d 1422, 1424

(D.C. Cir. 1998), *aff'd on reh'g*, 156 F.3d 1279 (D.C. Cir. 1998). The government's

decisionmaking and intent are implicated here, and Plaintiffs have shown that the documents

sought are likely to shed light on Defendants' improper influence over and motive behind the

TPS terminations. *See supra* Part II; Mem. & Order 35-36, ECF 47. "[W]here, as here, the

'decision-making process itself is the subject of the litigation,' it is inappropriate to allow the

deliberative process privilege to preclude discovery . . . ." *Velazquez v. City of Chicopee*, 226

F.R.D. 31, 34 (D. Mass. 2004). Courts do not allow the government to use the privilege as a

"shield" when the government's decisionmaking is the fulcrum of the case. *See In re Subpoena*,

145 F.3d at 1424; *United States v. Lake Cty. Bd. of Comm'rs*, 233 F.R.D. 523, 526 (N.D. Ind.

2005) ("[T]he deliberative process privilege simply does not apply in civil rights cases in which

the defendant's intent to discriminate is at issue."); *see also Doe v. Mattis*, 322 F. Supp. 3d 92,

101 (D.D.C. 2018) ("This is not how civil litigation works. Defendants cannot prevent Plaintiffs

from obtaining the facts about a disputed issue and then expect to be granted summary judgment

. . . .").

**B.      Even if the Deliberative Process Privilege Could Apply to This Discovery, Plaintiffs Have Shown that Their Need for the Information Sought Outweighs Defendants' Interest in Preventing Disclosure.**

Plaintiffs' interests in favor of disclosure strongly outweigh any interest served by the deliberative process privilege. *See Texaco P.R.*, 60 F.3d at 885. Courts have weighed these considerations by applying the five factors set forth in *In re Franklin. See supra* at 15-16. "Applying these factors, courts have found that the deliberative process privilege must, at times, yield to the public interest in opening for scrutiny the government's decision-making process." *ACORN v. County of Nassau*, No. CV 05-2301 (JFB) (WDW), 2008 U.S. Dist. LEXIS 20266, at *11 (E.D.N.Y. Mar. 14, 2008). Indeed, one court addressing deliberative process privilege assertions arising out of similar TPS claims has held precisely that:

> Plaintiffs allege that Defendants provided one reason for rescinding TPS for the four countries but in fact relied upon other invalid reasons for their decision. Given this allegation, the materials Plaintiffs seek are relevant to the litigation. Second, Plaintiffs cannot obtain this evidence from any other source. By definition, only Defendants have information about their decisionmaking.

*Ramos* Order at 8.

Similarly, here, Plaintiffs have already established two of the five *Franklin* factors—first, the material sought in Plaintiffs' Discovery Requests is directly relevant; *see supra* Part II.A,B; and, second, Plaintiffs cannot obtain the information elsewhere, *see supra* Part II.C. The third and fourth factors cut the same direction. Courts have recognized the serious constitutional and civil rights issues implicated by the present litigation, namely, the constitutional rights of people who reside in the U.S. and the danger that they may be erroneously deported, which could be irreversible. *See supra* at 9-10; *Ramos* Order at 8. Additionally, "the government is a defendant in this litigation, and this factor weighs against applying the privilege here." *Ramos* Order at 7.

Thus, only one of the *Franklin* factors could possibly weigh against disclosure: that future frank discussion by government employees could potentially be chilled by disclosure. This one factor does not outweigh the other four in these circumstances, because, as the court in *Ramos* noted, the fifth factor "is a concern in every case." *Id.*; *see also Texaco P.R.*, 60 F.3d at 885 (denying privilege because plaintiff's "interest in due process and fairness outweighed [defendant's] interest in shielding its deliberations from public view"); *Zhen Shou Wu*, 2010 U.S. Dist. LEXIS 18405 at *9 ("After balancing the interests, the interest of the government in frank inter-agency and intra-agency discussion against the particularized needs of the defendants to defend themselves against serious charges, I find this information should be produced."). Here, as in *Ramos*, Defendants have not cited any evidence that the disclosure *of these documents* would tend to stifle frank discussion of lawful considerations within the executive branch. *Ramos* Order at 7. Therefore, the interests in this case weigh strongly in favor of disclosure.

## IV.   DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT THE DISCOVERY REQUESTS CREATE AN UNDUE BURDEN

Plaintiffs have advanced targeted requests that seek information regarding President Trump and the White House's participation in and policies concerning the TPS decisionmaking process. *Sun Oil*, 514 F.2d at 1025 ("[Plaintiffs] are entitled to try to show this, and a generalized claim of privilege . . . cannot prevail against the plaintiffs' need to develop the facts by resort to discovery."). Defendants responded with a generalized objection that these requests are unduly burdensome and would distract from executive responsibilities. O'Keefe Decl., Ex. 5 at 3; O'Keefe Decl., Ex. 3 at 3 (citing *Cheney*, 542 U.S. at 385).

This rote assertion of burden is not sufficient. As discussed *supra* at 9 n.5, *Cheney* does not stand for the proposition that *any* discovery directed towards President Trump or the White House is categorically overbroad and unduly burdensome. The Office of the President is afforded

respect during, not immunity from, judicial process. *See Clinton*, 520 U.S. at 705 (1997) ("[T]he Judiciary may severely burden the Executive Branch by reviewing the legality of the President's official conduct, and it may direct appropriate process to the President himself . . . .") (internal citations omitted). Further, to the extent that Defendants assert that the Discovery Requests impose undue burden because President Trump is not a proper party, the issue has already been presented to the Court and denied. Mem. & Order 41, ECF 47. Indeed, categorically excluding President Trump from discovery is contrary to the Court's instruction to develop a record to determine the appropriate relief if Plaintiffs prevail on their claims. *See id.*

Plaintiffs have repeatedly indicated their willingness to cooperate with Defendants to avoid undue burden with respect to the Discovery Requests. Defendants have not offered any compromise. *See, e.g.*, O'Keefe Decl., Ex. 4 at 3, Exs. 6, 7. Instead, Defendants categorically refused to search for documents and failed to meet their discovery obligations. *See Garcia v. E.J. Amusements of N.H., Inc.*, 89 F. Supp. 3d 211, 215-16 (D. Mass. 2015) ("conclusory statements regarding the burdens of producing a privilege log" will not support an undue burden objection).

## CONCLUSION AND REQUEST FOR RELIEF

Defendants have made no effort to comply with the Discovery Requests directed to President Trump. Plaintiffs request that the Court compel Defendants to respond within fourteen days of the resolution of this Motion by (i) producing the requested non-privileged discovery and designating a Rule 30(b)(6) deponent, and (ii) providing a specific log of allegedly privileged documents that are withheld, s*ee Sealed Case*, 121 F.3d at 745, and objections to the Rule 30(b)(6) deposition topics, if any. If and when Defendants log their privilege claims, Plaintiffs will seek guidance from the Court with respect to expedited review and evaluation of those privilege claims, in light of the current deadlines in the Scheduling Order.

Respectfully submitted,

CENTRO PRESENTE, *et al.*

*/s/ Allison S. Ercolano*

| | |
|---|---|
| Oren Sellstrom  (BBO# 569045) | Eric J. Marandett (BBO# 561730) |
| Oren Nimni (BBO #691821) | Carlos J. Perez-Albuerne (BBO# 640446) |
| Iván Espinoza-Madrigal (Admitted *Pro Hac Vice*) | Kevin P. O'Keefe (BBO# 697101) |
| LAWYERS FOR CIVIL RIGHTS | Xing-Yin Ni (BBO# 693876) |
| 61 Batterymarch Street, 5th Floor | Leah R. Milbauer (BBO# 703717) |
| Boston, Massachusetts  02110 | Margaret J. Burnside (BBO# 698763) |
| (617) 988-0624 | Allison S. Ercolano (BBO# 698601) |
| | Natalia Smychkovich (BBO# 699289) |
| | CHOATE, HALL & STEWART LLP |
| Dated: March 8, 2019 | Two International Place |
| | Boston, Massachusetts  02110 |
| | (617) 248-5000 |

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies

will be sent to those indicated as non-registered participants.

*/s/ Allison S. Ercolano*
Allison S. Ercolano (BBO# 698601)

Dated: March 8, 2019