# **EXHIBIT A**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CENTRO PRESENTE, *et al.*,<br><br>               Plaintiffs,<br><br>v.<br><br>TRUMP, *et al.*,<br><br>               Defendants. | No. 1:18-cv-10340-DJC<br><br>**LEAVE TO FILE REQUESTED**<br>**April 1, 2019** |

**PLAINTIFFS' [PROPOSED] REPLY MEMORANDUM**
**IN SUPPORT OF THEIR MOTION TO COMPEL**
**RESPONSES TO WHITE HOUSE DISCOVERY REQUESTS**

# TABLE OF CONTENTS

I.    THE BLANKET PRIVILEGES ASSERTED BY DEFENDANTS DO NOT APPLY, OR, AT A MINIMUM, MAY BE SUPERSEDED IN THESE CIRCUMSTANCES ................................................................................ 2

    A.    The Presidential Communications Privilege Does Not Apply. Defendants Have Conceded This Point ............................................................. 2

    B.    Defendants Do Not Dispute the Limited Scope of the Deliberative Process Privilege. It Is Not Applicable in These Circumstances ...................... 2

II.    *CHENEY* DOES NOT PRECLUDE DISCOVERY FROM PRESIDENT TRUMP AND HIS AGENTS IN THE WHITE HOUSE ................................................................ 4

III.    PLAINTIFFS HAVE DEMONSTRATED THAT THE REQUESTED DISCOVERY IS NOT AVAILABLE FROM ANY OTHER SOURCE .......................... 5

IV.    DEFENDANTS' CONCLUSORY ASSERTIONS OF BURDEN ARE UNAVAILING ................................................................................................ 8

V.    THE PUBLIC HAS A SUBSTANTIAL INTEREST IN THE PRODUCTION OF MATERIALS SOUGHT IN PLAINTIFFS' DISCOVERY REQUESTS ....................... 10

VI.    DEFENDANTS HAVE FORECAST THAT THEY WILL NOT COMPLY WITH A COURT ORDER DIRECTING PRODUCTION BY THE WHITE HOUSE ................................................................................................ 10

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cheney v. U.S. Dist. Court for the District of Columbia*,
542 U.S. 367 (2004).......................................................................................... *passim*

*Clinton v. Jones*,
520 U.S. 681 (1997)....................................................................................................8

*Dairyland Power Coop. v. United States*,
79 Fed. Cl. 659 (2007) ...............................................................................................4

*Dellums v. Powell*,
561 F.2d 242 (D.C. Cir. 1977)...............................................................................3, 10

*In re Franklin Nat'l Bank Sec. Litig.*,
478 F. Supp. 577 (E.D.N.Y. 1979) .............................................................................2

*Karnoski v. Trump*,
No. C17-1297-MJP, 2018 U.S. Dist. LEXIS 140986 (W.D. Wash. Aug. 20,
2018) .......................................................................................................................4, 5

*Lardner v. Dep't of Justice*,
No. 03-0180, 2005 U.S. Dist. LEXIS 5465 (D.D.C. Mar. 31, 2005) ........................5

*Loving v. Dep't of Def.*,
550 F.3d 32 (D.C. Cir. 2008)......................................................................................3

*Ramos v. Nielsen*,
336 F. Supp. 3d 1075 (N.D. Cal. 2018) ..........................................................1, 5, 6, 7

*Saget v. Trump*,
345 F. Supp. 3d 287 (E.D.N.Y. 2018) ........................................................................1

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) ...........................................................................2, 6, 10

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
498 F.2d 725 (D.C. Cir. 1974) ....................................................................................6

*Sun Oil Co. v. United States*,
514 F.2d 1020 (Fed. Cl. 1975)....................................................................................8

*Texaco P.R., Inc. v. Dep't of Consumer Affairs*,
60 F.3d 867 (1st Cir. 1995).........................................................................................2

*United States v. Nixon*,
   418 U.S. 683 (1974)...........................................................................................................10

**Statutes**

8 U.S.C. § 1254a .................................................................................................................2

**Other Authorities**

Office of the President, Remarks by President Trump at Law Enforcement
   Roundtable on MS-13 (Feb. 6, 2018), https://www.whitehouse.gov/briefings-
   statements/remarks-president-trump-lawenforcement-roundtable-ms-13/..............................5

Plaintiffs' Moving Brief, ECF 75 ("Mov. Br.") establishes two legal principles. First, the presidential communications privilege does not apply to Plaintiffs' Discovery Requests.[1] Mov. Br. 7-8. Second, to assert deliberative process privilege, Defendants must show that it is first applicable and then demonstrate that the balance of factors favors withholding discovery. *Id.* at 14-16. Defendants do not dispute the law and do not demonstrate the requisite showing to establish either privilege. Therefore, neither privilege applies.

Instead, Defendants rely on the dicta of one decision, *Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367 (2004), to advance the argument that President Trump and his agents in the White House need not respond to any validly issued discovery requests, much less make specific objections grounded on burden or privilege. *Cheney* does not suggest this, and no court applying *Cheney* has extended its dicta to this degree.

Defendants may dispute whether President Trump should be a Defendant, but this matter has been addressed. Mem. & Order 40-42, ECF 47. Defendants argue that Plaintiffs already have sufficient evidence to try their claims. *See* Opposition to Motion to Compel, ECF 77 ("Opp.") 3-5, 14 (citing *Ramos v. Nielsen*, 336 F. Supp. 3d 1075 (N.D. Cal. 2018) (entering preliminary injunction); Minute Entry 01/10/ 2019, *Saget v. Trump*, 345 F. Supp. 3d 287 (E.D.N.Y. 2018) (concluding bench trial)). However, this Action has unique elements, and, unlike in *Ramos* and *Saget*, it need not proceed on accelerated timelines that were imposed by Defendants' unlawful termination of the TPS protections. *Accord* Opp. 16 (citing absence of impending deadlines as reason to delay compliance with Discovery Requests).

Plaintiffs are entitled to seek discovery to prove disputed factual allegations, including, but not limited to, whether President Trump or his agents in the White House unduly influenced

---

[1] Unless otherwise indicated, capitalized terms shall have the same definitions as set forth in Plaintiffs' Memorandum of Law in Support of Motion to Compel Responses to White House Discovery Requests, ECF 75.

the decisions to terminate TPS. For the reasons set forth below and in Plaintiffs' Moving Brief,

the legal requirements for seeking discovery from the White House are met, and Defendants

must finally respond to the Discovery Requests.

I.      **THE BLANKET PRIVILEGES ASSERTED BY DEFENDANTS DO NOT APPLY, OR, AT A MINIMUM, MAY BE SUPERSEDED IN THESE CIRCUMSTANCES**

   A.      **The Presidential Communications Privilege Does Not Apply. Defendants Have Conceded This Point.**

Plaintiffs' Moving Brief demonstrated that the presidential communications privilege

does not apply. Mov. Br. 7-8. Defendants do not respond. Therefore the point is established.

The presidential communications privilege can only shield governmental action that

requires "direct decisionmaking" by the President. *In re Sealed Case*, 121 F.3d 729, 752 (D.C.

Cir. 1997); Mov. Br. 7-8. Congress explicitly charged the Secretary of DHS with the sole

authority to determine whether or not to extend or terminate TPS for individual countries based

on the enumerated statutory factors. *See* 8 U.S.C. § 1254a; Mem. & Order 4-5, ECF 47; Mov. Br.

8; *see also Sealed Case*, 121 F.3d at 752-53 ("In many instances, presidential powers and

responsibilities, for example the duty to take care that the laws are faithfully executed, can be

exercised or performed without the President's direct involvement, pursuant to . . . statutory

framework."). Therefore the presidential communications privilege does not apply in this case.

   B.      **Defendants Do Not Dispute the Limited Scope of the Deliberative Process Privilege. It Is Not Applicable in These Circumstances.**

The sole privilege question is therefore whether the deliberative process privilege applies.

Defendants do not contest the elements of the privilege that Plaintiffs outlined. Mov. Br. 14-15

(citing *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995); *In re

Franklin Nat'l Bank Sec. Litig.*, 478 F. Supp. 577, 583 (E.D.N.Y. 1979)). Defendants have not

shown that these elements are met, and therefore no executive privilege applies.

First, the deliberative process privilege can only apply to communications that are antecedent to the adoption of agency policy. Defendants do not dispute this requirement, and there is no privilege for communications made after the policy was decided. Second, the deliberative process privilege can only apply to communications that are actually related to the process by which policies are formulated. Defendants do not dispute this requirement, and there is no privilege for communications that merely state an order or request. Third, the non-privileged portions of documents must be produced. Mov. Br. 15 (citing *Loving v. Dep't of Def.*, 550 F.3d 32, 38 (D.C. Cir. 2008)). Defendants do not dispute this requirement either, and yet they have not gathered and redacted responsive White House documents.

If the Government is able to meet these three threshold requirements, only then does the court turn to balancing the interests of disclosure against the Government's arguments for confidentiality. Mov. Br. 15. The Discovery Requests at issue seek evidence that is directly relevant to Plaintiffs' claims. *See* Mov. Br. 9-13. This is undisputed. Plaintiffs seek to vindicate important constitutional rights. *Id.* at 6, 10-11.[2] This, too, is undisputed. Defendants do not dispute the Government's role in the litigation and do not claim that producing the responsive documents will cause Government employees to be timid in the future. *See id.* at 18-19.

Defendants only challenge whether the requested information is (a) available from other sources, (b) unduly burdensome, and (c) essential to the case, according to a rubric they purportedly derive from *Cheney*. *See* Opp. 11-15. As discussed *infra*, *Cheney* does not stand for the position that Defendants advance, and Plaintiffs have made the necessary showings in any event.

---

[2] Courts recognize a "strong constitutional value in the need for disclosure in order to provide the kind of enforcement of constitutional rights that is presented [when] . . . the action is tantamount to a charge of civil conspiracy among high officers of government to deny a class of citizens their constitutional rights and where there has been sufficient evidentiary substantiation to avoid the inference that the demand reflects mere harassment." *Dellums v. Powell*, 561 F.2d 242, 247 (D.C. Cir. 1977).

II.      *CHENEY* DOES NOT PRECLUDE DISCOVERY FROM PRESIDENT TRUMP
         AND HIS AGENTS IN THE WHITE HOUSE

Defendants rely almost entirely on one decision—*Cheney*. *Cheney* does not establish a

broad privilege rule, however, and does not hold that White House discovery is categorically

improper. On the contrary, "the central issue in the case [was] whether the Court of Appeals was

correct to conclude it had no authority to exercise the extraordinary remedy of mandamus, on the

ground that the Government could protect its rights by asserting executive privilege in the

District Court." *Cheney*, 542 U.S. at 380 (internal citations omitted). The Court remanded to

reevaluate the issue but did not direct the Appeals Court to issue a writ. *Id.* at 391-92. Writs of

mandamus are not at issue here.

The *Cheney* Court's comments about executive privilege do not expand the existing law

in any respect. They only admonish "that all courts should be mindful of the burdens imposed on

the Executive Branch in any future proceedings." *Id.* at 391. For example, *Cheney* explains, "the

courts should be sensitive to requests by the Government for interlocutory appeals." *Id.* at 392.

Courts subsequently applying *Cheney* to Presidential discovery have confirmed that the

Court "did not adopt a particular test for use in civil case discovery disputes." *Dairyland Power

Coop. v. United States*, 79 Fed. Cl. 659, 665 (2007); *accord Karnoski v. Trump*, No. C17-1297-

MJP, 2018 U.S. Dist. LEXIS 140986, at \*6-8 (W.D. Wash. Aug. 20, 2018); *see also* Mov. Br. 9

n.5 (citing authorities). *Karnoski*, which also involved a challenge to unconstitutional

presidential and executive acts, outlines precisely why Defendants' reading of *Cheney* is infirm:

> Defendants contend that discovery directed at President Trump is foreclosed by
> *Cheney*, such that Plaintiffs must "exhaust other sources of non-privileged
> discovery and establish a heightened, particularized need for the specific
> information or documents" before the President is required to assert the privilege
> or provide a privilege log. . . . The Court does not read *Cheney* to stand for the
> proposition claimed by Defendants. . . . *Cheney* does not purport to preclude all
> civil discovery directed at the President, nor to impose any of the threshold
> requirements suggested by Defendants. The Supreme Court explained that the

discovery requests at issue were "unacceptable" because they were "overly broad," "ask[ed] for everything under the sky," and sought "all the disclosure to which [plaintiffs] would be entitled in the event they prevail on the merits, and much more besides." The Court explained that the withheld information did not relate to a constitutional right or otherwise implicate a "constitutional dimension," nor would its withholding interfere with the court's "ability to fulfill its constitutional responsibility to resolve cases and controversies within its jurisdiction" or "hamper [its] ability to perform its 'essential functions.'" For these reasons, and "*in these circumstances*," the Court found that the otherwise well-settled requirement that the President "first assert privilege to resist disclosure" did not apply.

2018 U.S. Dist. LEXIS 140986 at *6-8 (citations to *Cheney* omitted). Defendants cite no authority to the contrary. *See* Opp. 10 (quoting dictum from *Lardner v. Dep't of Justice*, No. 03-0180, 2005 U.S. Dist. LEXIS 5465, at *30-31 (D.D.C. Mar. 31, 2005) which evaluates whether the President must *personally* invoke privilege in response to FOIA requests).[3]

## III.     PLAINTIFFS HAVE DEMONSTRATED THAT THE REQUESTED DISCOVERY IS NOT AVAILABLE FROM ANY OTHER SOURCE

Defendants appear to agree that White House discovery is appropriate where the information sought is not available through other means. Plaintiffs have offered specific examples of in-person and telephonic communications from the White House to DHS consistent with a Presidential directive to terminate TPS. Mov. Br. 12.[4] Discovery from DHS has not shed

---

[3] *See also Lardner*, 2005 U.S. Dist. LEXIS 5465 at *45 ("While this Court does not doubt that there will be many instances where communications among presidential staff (or other executive officials) would be admissible in litigation . . . , the Court is unconvinced that the showing would be so routine [as to categorically overrule executive privilege objections to FOIA requests for documents that are more than fifteen years old].").

[4] The *Ramos* preliminary injunction was grounded in part on the finding that a call from Tom Bossert, the President's then-White House Homeland Security Advisor, did influence Deputy Secretary Duke to accelerate the TPS termination for Nicaragua. *Ramos*, 336 F. Supp. 3d at 1099 & n.12.

In addition to derogatory comments directed towards immigrants, President Trump has criticized TPS specifically: "Temporary protected status — temporary — why is it that 16 years later someone would be in our country under something called, 'temporary protected status'? It proves that something is wrong with our immigration system." Office of the President, Remarks by President Trump at Law Enforcement Roundtable on MS-13 (Feb. 6, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-lawenforcement-roundtable-ms-13/.

light on these discussions, and Defendants state that they oppose depositions of any White House officers and high-ranking members of DHS.[5]

Where Plaintiffs' claims bear on "'the content of certain conversations, . . . [the] need for the most precise evidence, the exact text of oral statements . . . is undeniable,' . . . [and] [o]bviously this evidence is not available elsewhere . . . ." *Sealed Case*, 121 F.3d at 761 (quoting *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 732 (D.C. Cir. 1974)); *see id.* at 761-62 (holding that *in camera* review is warranted as to records of in-person communications between White House and former cabinet secretary). There is ample evidence of an improper and unlawful attempt by the White House to influence the Secretaries' decisions to extend or terminate TPS, particularly if that influence was orally communicated. Communications within the White House, made with zeal in a relatively unguarded environment, may illustrate what exactly was said and for what purpose. At a minimum, contemporaneous emails and memoranda from the White House will inform depositions concerning the extent to which the White House influenced TPS terminations. *See Sealed Case*, 121 F.3d at 761 (reasoning that discovery from White House is necessary if only to confirm that agency secretary's records of in-person communications are complete and accurate). As a matter of common sense, the records of DHS are not likely to be complete and are less likely to reflect the zeal behind these improper communications.

Moreover, the factual circumstances at issue here—where both former DHS Secretary Kelly and Secretary Nielsen rotated in and out of DHS and the White House during the period

---

[5] For example, Plaintiffs seek information concerning the November 2017 conversations between Deputy Secretary Duke, Chief of Staff Kelly, and White House Homeland Security Advisor Tom Bossert. Mov. Br. 12. Defendants have stated that they will oppose depositions of each of these individuals.

Relatedly, in consideration of preserving judicial and executive resources, Plaintiffs and Defendants are negotiating a limited extension on the deadline to complete deposition discovery while the appeal of the *Ramos* preliminary injunction is pending. The parties' proposed stipulation will otherwise allow them to proceed with other discovery and resolution of related disputes. Plaintiffs expect to submit a joint motion to the Court addressing this matter soon.

leading up to the terminations—demonstrate that potentially important evidence will not be available elsewhere. General Kelly served as DHS Secretary at the beginning of the Administration before he transitioned to White House Chief of Staff at the end of July 2017. Secretary Nielsen in turn served as chief of staff to General Kelly during his tenure as DHS Secretary and as White House Chief of Staff before she was appointed DHS Secretary in December 2017. Discovery produced to date and public records demonstrate that General Kelly sought to influence the TPS decisionmaking process while he served as Chief of Staff. *See, e.g.*, Mov. Br. 12 (citing examples). In addition, both General Kelly and Secretary Nielsen, who was Principal Deputy Chief of Staff at the time, appear to have attended the November 2017 White House meeting where the simultaneous termination of TPS for four countries was discussed. *See* O'Keefe Decl., Ex. 11. Secretary Nielsen issued the decision to terminate El Salvador's TPS shortly after her transition from the White House back to DHS, and likewise terminated Honduras's TPS at the next available opportunity. *See Ramos*, 336 F. Supp. 3d at 1099 ("Acting Secretary Duke essentially indicated to White House Chief of Staff Kelly [on November 6, 2017] that Honduras's TPS designation would eventually be terminated as well . . . .").

Defendants' assurances that General Kelly's and Secretary Nielsen's email files are being reviewed, *see* Opp. 14, therefore ring hollow. Defendants have refused to undertake any search for documents within the White House. This means that General Kelly's records beginning in August 2017 and Secretary Nielsen's records from September 2017 through December 2017 are being withheld from discovery, notwithstanding their direct, personal involvement in the conduct at issue. This conduct includes, but is not limited to, their attendance at a November 2017 White House meeting to discuss TPS terminations, General Kelly's November 2017 calls to Former Secretary Duke encouraging her to terminate TPS for Honduras, and repeated inquiries from

other White House staff to DHS staff regarding TPS decisionmaking. *See* O'Keefe Decl., Exs. 8-11. These materials, and the other information sought, will bear on whether the White House influenced the TPS terminations, and whether the TPS terminations were made for "impermissible, extraneous, [or] political . . . reasons." *Sun Oil Co. v. United States*, 514 F.2d 1020, 1025 (Fed. Cl. 1975); *see also id.* at 1024-25 (ordering *in camera* review of memoranda directed to the President where the President allegedly refused a contract that, by law, should have been evaluated by the Secretary of the Interior).

**IV.      DEFENDANTS' CONCLUSORY ASSERTIONS OF BURDEN ARE UNAVAILING**

Defendants also contend that White House discovery is improper because it is unduly burdensome, but this contention is conclusory and unsubstantiated. Defendants have refused to make any effort to collect documents from the White House, and therefore Defendants cannot offer any particularized support for this objection. Defendants rely upon broad pronouncements concerning executive authority and the separation of powers. But, the President and his agents within the White House are not beyond the scope of civil discovery. *See Clinton v. Jones*, 520 U.S. 681, 703 (1997) ("Despite the serious impact of that decision on the ability of the Executive Branch to accomplish its assigned mission, and the substantial time that the President must necessarily have devoted to the matter as a result of judicial involvement, we exercised our Article III jurisdiction to decide whether his official conduct conformed to the law.").

Defendants claim that the White House was not materially involved in the TPS terminations. *See* Mov. Br. 8 (citing examples); *accord* Opp. 7-8 (describing White House Discovery Requests as "extraordinary" because DHS has sole legal discretion for TPS). To the extent these claims are true, there should be only a small set of documents for Defendants to gather, review, and produce or log. *See supra* pt. I; Mov. Br. pts. II-III.

Having failed to substantiate their burden claims, Defendants criticize the scope of the Discovery Requests, describing them as seeking "everything under the sky." Opp. 12 (quoting *Cheney*, 542 U.S. at 387-88). But Plaintiffs have offered multiple opportunities, over six months, for Defendants to identify which requests are overbroad; they have declined to do so. *See generally* O'Keefe Decl. ¶¶ 4-5, 7-9 & Exs. 3-4, 6-7 (summarizing conferrals). The Discovery Requests on their face do not implicate the same concerns as in *Cheney*, where the Court found the requests overly broad. For example, the *Cheney* requests sought, *inter alia*, "[a]ll documents identifying or referring to" staff and consultants of a governmental task force and of a related "sub-group," and "all documents concerning any communication relating to the activities" of the task force. *Id.* at 387. In contrast, Plaintiffs have set forth targeted requests, identifying specific meetings and discrete topics. *See, e.g.*, Mov. Br. 3-4 (quoting RFPs 5, 13, 22-24, 27, 30-31). Plaintiffs' other requests are limited to the specific decisions to terminate TPS, and they should not implicate any significant burden if Defendants' assertions that the White House was not involved are accurate. On the other hand, if there are a large number of documents at the White House that fall within this category, then the existence of these documents would tend to prove that the White House did engage in improper influence, as Plaintiffs allege.

Defendants recite that they have produced 9,500 documents (75,000 pages) to date and purport to have logged thousands of privileged documents.[6] These figures are not convincing. Defendants first produced copies of the same documents (gathered from DHS) that they had already produced in other TPS litigations, and only recently have they produced some additional documents in response to Plaintiffs' requests. Plaintiffs have reviewed each of the documents

---

[6] Defendants claim of logging thousands of privileged documents is somewhat misleading. To date, Defendants have produced three brief logs pertaining to the administrative records for the three TPS terminations. Beyond that, Defendants have delivered privilege logs from other TPS litigations, some of which are in draft form.

from Defendants' custodians over the prior six months. The record remains incomplete. *See* Mov. Br. 11-13.

## V.       THE PUBLIC HAS A SUBSTANTIAL INTEREST IN THE PRODUCTION OF MATERIALS SOUGHT IN PLAINTIFFS' DISCOVERY REQUESTS

Defendants repeatedly reference the separation of powers, without explaining how the doctrine applies in these circumstances. Opp. 8-11. Where executive privileges are asserted in this manner, "a confrontation with other values arises." *United States v. Nixon*, 418 U.S. 683, 706 (1974). These other values include the public's interest in the effective functioning of government and the enforcement of constitutional rights. *Dellums v. Powell*, 561 F.2d 242, 247 (D.C. Cir. 1977). "The very reason that presidential communications deserve special protection, namely the President's unique powers and profound responsibilities, is simultaneously the very reason why securing as much public knowledge of presidential actions as is consistent with the needs of governing is of paramount importance." *Sealed Case*, 121 F.3d at 749. The effective functioning of government favors disclosure when governmental misconduct is at issue. Mov. Br. 16-17. Defendants offer no response to the contrary.

## VI.      DEFENDANTS HAVE FORECAST THAT THEY WILL NOT COMPLY WITH A COURT ORDER DIRECTING PRODUCTION BY THE WHITE HOUSE

Defendants conclude their argument by requesting that, if the Court requires President Trump and the White House to respond to the Discovery Requests, any such order should be stayed for thirty days "to give Defendants sufficient time to explore its [*sic*] appellate options." Opp. 16. Defendants are not proposing that they will start to comply within thirty days. Rather, Defendants are forecasting that they will not comply if an order from this Court grants Plaintiffs' Motion to Compel. To guard against a refusal to comply, this Court should set a fixed deadline for Defendants to gather documents responsive to Plaintiffs' Discovery Requests and to serve a privilege log.

Respectfully submitted,

CENTRO PRESENTE, *et al.*

*/s/*
_____
Oren Sellstrom  (BBO# 569045)
Oren Nimni (BBO #691821)
Iván Espinoza-Madrigal (Admitted *Pro Hac Vice*)
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, 5th Floor
Boston, Massachusetts  02110
(617) 988-0624


Dated: _____

Eric J. Marandett (BBO# 561730)
Carlos J. Perez-Alburne (BBO# 640446)
Kevin P. O'Keefe (BBO# 697101)
Xing-Yin Ni (BBO# 693876)
Leah R. Milbauer (BBO# 703717)
Margaret J. Burnside (BBO# 698763)
Allison S. Ercolano (BBO# 698601)
Natalia Smychkovich (BBO# 699289)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts  02110
(617) 248-5000


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies

will be sent to those indicated as non-registered participants.


*/s/*
_____
Allison S. Ercolano (BBO# 698601)

Dated: _____