1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS

2

3  _____

4  CENTRO PRESENTE, et al.,

5                      Plaintiffs,        Civil Action
                                          No. 18-10340-DJC
6  V.
                                          April 23, 2019
7  DONALD J. TRUMP, et al.,               2:59 p.m.

8                      Defendants.
   _____

9

10

11              TRANSCRIPT OF MOTION HEARING

12          BEFORE THE HONORABLE DENISE J. CASPER

13              UNITED STATES DISTRICT COURT

14           JOHN J. MOAKLEY U.S. COURTHOUSE

15                  1 COURTHOUSE WAY

16                 BOSTON, MA  02210

17

18

19

20
                DEBRA M. JOYCE, RMR, CRR, FCRR
21                 Official Court Reporter
                John J. Moakley U.S. Courthouse
22              1 Courthouse Way, Room 5204
                    Boston, MA  02210
23                 joycedebra@gmail.com

24

25

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS:

 3
      CARLOS J. PEREZ-ALBUERNE, ESQ.
 4    ALLISON S. ERCOLANO, ESQ.
      ANNA SHIPLEY ROY, ESQ.
 5    ERIC J. MARANDETT, ESQ.
      Choate, Hall & Stewart
 6    Two International Place
      100-150 Oliver Street
 7    Boston, MA 02110
      617-248-4025
 8
      OREN N. NIMNI, ESQ.
 9    61 Batterymarch Street 5th Floor
      Boston, MA 02110
10    206-200-9088

11
      FOR THE DEFENDANTS:
12
      ADAM KIRSCHNER, ESQ.
13    U.S. Department of Justice
      1100 L Street, NW
14    Washington, DC 20530
      202-353-9265
15
      RAYFORD A. FARQUHAR, ESQ.
16    United States Attorney's Office
      John Joseph Moakley Federal Courthouse
17    1 Courthouse Way
      Suite 9200
18    Boston, MA 02210
      617-748-3100
19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S

 2                  (The following proceedings were held in open

 3      court before the Honorable Denise J. Casper, United States

 4      District Judge, United States District Court, District of

 5      Massachusetts, at the John J. Moakley United States Courthouse,

 6      1 Courthouse Way, Boston, Massachusetts, on April 23, 2019.)

 7                  THE CLERK:  Civil action 18-10340, Centro Presente v.

 8      Trump.

 9                  Would counsel please state your name for the record.

10                  MR. PEREZ-ALBUERNE:  Carlos Perez for the plaintiffs.

11                  THE COURT:  Good afternoon.

12                  MS. ERCOLANO:  Allison Ercolano for the plaintiffs.

13                  THE COURT:  Good afternoon.

14                  MR. MARANDETT:  Eric Marandett for the plaintiffs.

15                  MS. ROY:  Anna Roy for the plaintiffs.

16                  MR. NIMNI:  Oren Nimni for the plaintiffs.

17                  THE COURT:  Good afternoon to you all.

18                  MR. KIRSCHNER:  Adam Kirschner for the defendants.

19                  THE COURT:  Good afternoon.

20                  MR. FARQUHAR:  Good afternoon, your Honor.  Ray

21      Farquhar for the defendants.

22                  THE COURT:  Good afternoon.

23                  Counsel, I know we're here on the plaintiffs' motion

24      to compel.  I've had a chance to review the motion papers,

25      opposition, and reply.
```

 1          Counsel, I'm prepared to hear argument.  Just to let

 2   you know what I'm focused on, I'm certainly prepared to hear

 3   you on the substance, I also wanted to hear you on the timing

 4   of continued discovery.  I know that I had signed off on a

 5   motion to stay depositions.  I understand that there is a

 6   motion to stay in regards to this and other related cases based

 7   on the Ramos appeal pending.  So I'd like to hear from you both

 8   on the substance and timing from both perspectives.

 9          Counsel?

10          MR. PEREZ-ALBUERNE:  Good afternoon, your Honor.

11          THE COURT:  Good afternoon.

12          MR. PEREZ-ALBUERNE:  Let me start with the last topic,

13   your Honor mentioned that you were interested in.

14          On the timing of it, not sure exactly what facet of

15   that you'd like us to address, but in terms of -- if the

16   question is, is this motion ripe given the fact that we've got

17   the stay for depositions in this case for some period of time

18   linked to the Ramos decision and that there are generally stays

19   in other cases pending the 9th Circuit decision in Ramos.  Do I

20   have that right, your Honor?  Is that what you'd --

21          THE COURT:  Yes, and I suppose the other question is,

22   it wasn't clear to me from the papers where the parties are in

23   terms of discovery.  Meaning, I know the government makes

24   reference to productions of the DHS files.  I wasn't sure if

25   that is complete, substantially complete; is there a 30(b)(6)

1    deposition that you're contemplating from DHS, and if so, has

2    that happened, is it scheduled to happen or is that part of

3    what I've now stayed?  So, counsel, just sort of overall where

4    are you in that regard.

5            MR. PEREZ-ALBUERNE:  In terms of where we are overall,

6    the government has, in fact, produced documents from DHS' files

7    responsive to our document request.  I believe we don't have

8    confirmation that's complete; I think it's not complete

9    according to the government.  I'm not sure we've got a date

10   certain.  I just don't know if we have a date certain yet about

11   when that's going to be completed, but we don't have all the

12   documents yet that they choose to produce.

13           And then with respect to -- relevant to the issue of

14   privilege, we've had the government produce I believe it's only

15   two small privilege logs that were actually generated for this

16   case and those address items that would have been in the

17   administrative record absent an asserted privilege.  The

18   government's also produced a series of privilege logs that came

19   from the other litigations.  First, we haven't had those

20   designated as covering the production in this case, in fact, I

21   think the government has warned us that there may be gaps in

22   those logs versus the production.  So we don't have a privilege

23   log which we can look at and say this matches up with the

24   production that we've made to you to date or this is our

25   complete production.

1          Some of those privilege logs are also in draft form.

2     Some of them seem like -- well, they're insufficient in the

3     sense that there's one that has a slew of documents that are

4     clearly dated long after these decisions were made and

5     deliberative process privileges asserted for those documents.

6     We think that's an error, just a clerical error, again, it's

7     hard to tell.

8          In terms of depositions, we've noticed the 30(b)(6)

9     deposition that's at issue in this motion to the White House.

10    We haven't noticed other depositions yet.  We've been in

11    discussions with the government regarding individual

12    depositions.  We've talked specifically about individual

13    depositions of lower-level administrative officers within DHS.

14    There seems to be an ability or some initial agreement as to

15    what that will look like.  Again, with respect to White House

16    personnel, the government has taken the position that they're

17    not going to produce anyone in response to the 30(b)(6) or I

18    think as individuals as well.

19          I think that's sort of the status of where we are

20    right now.

21          Your Honor, the order that we submitted that you

22    blessed was -- stayed all deposition discovery contingent on

23    the Ramos injunction and what happens with the Ramos injunction

24    in front of the 9th Circuit.

25          THE COURT:  But other than the White House deposition

1    notice, there aren't any others that you've issued even if they

2    would be stayed now.

3            MR. PEREZ-ALBUERNE:  Exactly.  Well, there are none

4    that we've issued yet, we'll issue some when the stay is

5    lifted.

6            THE COURT:  Okay.

7            Thank you, counsel.

8            MR. PEREZ-ALBUERNE:  You're welcome.

9            THE COURT:  Why don't we move on to the substance, and

10    if I think any more about the timing, questions I have as to

11    the timing I'll come back to.

12            MR. PEREZ-ALBUERNE:  Sure, your Honor.

13            Is there a particular area of the substance you'd like

14    me to focus on?

15            THE COURT:  Counsel, you can address both privilege

16    and undue burden as you see fit.

17            MR. PEREZ-ALBUERNE:  Let me begin, your Honor, by

18    acknowledging that we recognize that this is not a typical

19    discovery request in a civil litigation; that is, it is

20    directed at senior members, the most senior members of the

21    executive branch.  So we acknowledge that's not a typical

22    situation.  But coincident to that, this is not an ordinary

23    case.  This is a case where, as your Honor held in your opinion

24    on the motion to dismiss, we've made a *prima facie* showing that

25    a decision made by the government which will deport hundreds of

1    thousands of individuals and impact hundreds of thousands of

2    families was tainted by racial animus.  And so while this is

3    not a typical request, it's justified under these circumstances

4    in the larger sense because this is not a typical case.

5         With respect to the dispute, again, what we're at

6    loggerheads over is whether the government needs to search the

7    files of the White House, produce non-privileged documents that

8    are responsive, and produce a privilege log for ones they

9    believe to be responsive.  And likewise, whether they need to

10   produce a 30(b)(6) witness in response to our subpoena.

11        And the government has categorically taken the

12   position that they're not going to -- essentially, they're not

13   going to allow any direct discovery on the White House.

14        The government has produced documents with the White

15   House personnel on them, e-mail chains and things like that,

16   that were found -- as I understand it, were found in the files

17   of DHS, but they have not searched the files and have refused

18   to search the files of the White House.

19        The basis for their -- as we understand it, the basis

20   for their refusal to do so is a reading they have of the

21   Supreme Court's case in Cheney, which they believe provides

22   that they need not make any kind of particularized showing --

23   need not search and make a particularized showing that the

24   presidential communication privilege applies in a case like

25   ours.

1          We think that's incorrect, your Honor.  We don't think

2     that's what Cheney says.  But the net of that is they refuse to

3     even search for these documents or produce a privilege log.

4          So we've tried to negotiate with them a few times on

5     this.  The net of all that is there seems to be no appetite on

6     their end for any discussion about a compromise when it comes

7     to the White House.  So we're before your Honor.

8          And what we're seeking here, just to be clear, is

9     we're seeking an order that compels the government to search

10    the White House files for responsive documents.  If they

11    withhold any on the basis of privilege to produce -- to produce

12    a privilege log, an adequate privilege log, so we can -- we and

13    the Court, if necessary -- can evaluate those claims of

14    privilege for those specific documents, and then to produce a

15    30(b)(6) witness or witnesses on the topics we've designated,

16    or to the extent they're going to object to those, give us some

17    particularized objections to those 30(b)(6) topics, and we can

18    discuss those.

19         On the substance of the privileges, your Honor, I

20    guess I'll begin with the presidential communication privilege.

21         Let me make a caveat here by saying it's not clear to

22    me whether the government is still joining the issue of the

23    deliberative process privilege.  It wasn't really briefed at

24    all.  I don't know if that's just the government has decided

25    not to pursue that line of argument.  As your Honor knows, the

1    brief is concentrated on the presidential communication

2    privilege.

3              THE COURT:  Okay.  Why don't we start there.

4              MR. PEREZ-ALBUERNE:  Excuse me?

5              THE COURT:  We can start there, counsel.

6              MR. PEREZ-ALBUERNE:  And so, your Honor, what the

7    government says is that Cheney established some sort of

8    standard in which there's a predicate showing that has to be

9    made by the defendant before the government has to search for

10   and make particularized objections to particular documents when

11   the presidential communication privilege is in play.  And we

12   disagree with that reading of Cheney, but we also disagree that

13   where the Cheney and the presidential communication privileges

14   are even implicated by our requests, and that's an important

15   threshold issue.

16             The decision at issue in this case is a decision that

17   everyone, the government, we, all the parties, agree was made

18   by the Acting Secretary or the Secretary of DHS.  No one is

19   alleging that that was a decision made by the President.  And

20   the presidential communication privilege applies only in

21   instances when the decision being made is one that is being

22   made by the President.  It's there to protect the President's

23   ability as a constitutional officer to get good advice and

24   candid advice when a President makes decisions.

25             The remainder of the executives officers, when they

1    are making decisions, can, if appropriate, avail themselves of

2    the deliberative process privilege, but they're not entitled to

3    invoke the presidential -- I want to make a distinction here

4    between invoking and applying -- they can't apply the

5    presidential communication privilege to their independent

6    decision making.

7          THE COURT:  Counsel, was that a distinction, though,

8    that the Court made in Cheney?  Meaning, wasn't that discovery

9    related to a decision -- meaning, was that related to

10   presidential decision making in the way that you're defining it

11   now?

12         MR. PEREZ-ALBUERNE:  Yes, your Honor, it was.  In that

13   case, the issue was the plaintiffs sought to get, essentially,

14   a bunch of open meeting disclosures with respect to a council

15   the President assembled, chaired by the vice president, that

16   was to advise the President on the subjects of energy policy.

17   And so that was the purpose of the council.  So it did directly

18   implicate a presidential decision on policy and advice to the

19   President.

20         THE COURT:  But I guess, counsel, what I'm saying is

21   does that as a matter of law, does the distinction you're

22   making hold up under the analysis in Cheney, meaning would that

23   have made a difference in your mind as to the ruling in Cheney?

24         MR. PEREZ-ALBUERNE:  I certainly think it would have

25   made a significant difference, because I think that the

1    privilege isn't even at issue in cases where you're talking

2    about, for example, the Secretary of Department of Homeland

3    Security making a decision.  The appropriate -- if there is a

4    protection for those deliberations, it's the deliberative

5    process privilege.

6         THE COURT:  Even if discovery you're seeking might

7    reflect communications between the President and his advisers

8    on positions he would take even if it was bearing upon the

9    decision being made by the Secretary of the Department of

10   Homeland Security?

11        MR. PEREZ-ALBUERNE:  Yes, your Honor.  Again, because

12   the underpinnings which are constitutional of the presidential

13   communication privilege are that the President needs to get

14   candid advice from his advisers that's not subject to

15   disclosure.  It's about protecting the presidential decision

16   making because of the President's unique position in the

17   constitutional structure.  It's not about protecting the

18   decision making of other lesser officers of the executive.

19        THE COURT:  But is the key whether or not it's

20   decision making or is the key whether or not it's communication

21   between the President and advisers about policy decisions?

22        MR. PEREZ-ALBUERNE:  Your Honor, the key is that it's

23   decision making by the President, because that's what the

24   privilege is intended to protect and to enhance.

25        In the absence of that kind of limitation, your Honor,

1    then, you know, there could always be an argument that some

2    lower-level executive officer's decision is somehow related to

3    a presidential policy, and therefore, subject -- deliberations

4    for that decision are subject to the presidential communication

5    privilege.  That's another failing and an opposite reading of

6    that.

7         THE COURT:  And so, counsel, what do you say to the

8    government's argument which I recognize is based largely on

9    Cheney that as a preliminary matter there should be a showing

10   that you can't get this discovery from any other source?

11        MR. PEREZ-ALBUERNE:  Well, I think, your Honor, that

12   what -- I think they're wrong about the reading in Cheney.  I

13   think the issue in Cheney has to do with under the

14   circumstances of that case, which are quite different from this

15   case, whether there has to be some preliminary showing before

16   the government's put through to even to go look for documents

17   that might be responsive.  Because, again, that's the

18   government's position here.  It's not about whether they have

19   looked for documents or are asserting privilege over some

20   documents and the fight is about those particular documents.

21   Here it is they don't think that they should have even have to

22   go look and assert the privilege specifically without some sort

23   of preliminary showing.

24        And so, you know, our answer to that is, as I

25   mentioned -- as we just discussed, first, Cheney is not

1    implicated, none of this is implicated because it's not the

2    President making a decision here.  And moreover, what Cheney

3    stands for is the idea that in that kind of a case -- and let

4    me make the distinction here -- Cheney is like the FOIA cases

5    in that what the plaintiff in Cheney was trying to do was to

6    enforce a statutory requirement of disclosure of the

7    committee's deliberations and inputs.  So there is no

8    underlying cause of action for which there is a need for that

9    discovery.  It is disclosure for the sake of statutory

10   disclosure, just like the FOIA cases.  So in those instances --

11   and even the cases that's cited by the defendant here, Lardner

12   in particular, talks about how there's a significant

13   distinction with respect to this privilege when there is this

14   kind of simple statutory requirement trying to be enforced

15   versus some other more weighty purpose.  And in the case of --

16   in some cases it's that it's a criminal prosecution, in other

17   cases it's a civil-rights-based suit like this one.

18        But this is distinct in the sense that here what we're

19   trying to do, there's an underlying cause of action, it's about

20   racial animus in one of the very important decisions by the

21   government and animus at the highest levels of the government.

22   And in that situation the Court is, in the words I believe of

23   several of the cases, back to performing one of its core

24   functions here, which is to ensure that the government doesn't

25   discriminate against individuals on the basis of race.

1           So it is not like the FOIA cases, it's not like
2  Cheney, and that's context, your Honor.
3           Moreover, Cheney doesn't announce a test.  Cheney
4  reaches the conclusion it reaches in the context of the
5  mandamus petition there and the Circuit Court's decision that
6  they should just stop the analysis because mandamus is
7  inappropriate because there's an alternative specific assertion
8  of privilege.  That's what the holding in the case is.  To the
9  extent that the burden falls into that or scope of the document
10 requests fall into that, I think what the court is saying is
11 that in the context of very broad document requests, the like
12 of which were at issue there, document requests, your Honor, by
13 the way, that the Court recognized would be more disclosure
14 than is necessary under the statute they're trying to enforce
15 for disclosure.  So in that context, before the government has
16 to go off and make a search and -- and some kind of privilege
17 log, there needs to be some showing that -- there needs to be
18 some showing that the claim has merit.  So that's what we think
19 Cheney stands for.
20           THE COURT:  But what about the government's
21 interpretation of Cheney that at least here there should be a
22 showing that you can't get the discovery from any other source?
23 And the reason I'm focused on this is, counsel, if it is the
24 case that as things stand now you haven't gotten full
25 production from DHS and there were some documents in the DHS

1    files that apparently reflected some communications with the

2    White House, shouldn't I allow that discovery to play out, to

3    see whether or not there's been a preliminary showing of need?

4         MR. PEREZ-ALBUERNE:  Well, your Honor, I think a

5    couple of responses to that.

6         We think that in the first instance there has been

7    whatever preliminary showing of need is required, even if any

8    of these tests apply, and that is, as your Honor has held,

9    we've made a *prima facie* case of racial animus coming out of

10   the White House that impacted the DHS decision to terminate the

11   TPS status of the countries at issue in this case.  And that,

12   your Honor, is a sufficient showing as long as the requests are

13   targeted and important issues in that -- with respect to those

14   claims.  And here they very much are, your Honor.  They're

15   targeted at what the -- what influence the White House had on

16   the DHS decision and then, importantly, the basis for the White

17   House's decision and to exert that influence.

18        And that gets me to the second point, which is, we

19   need evidence, your Honor, not only that the White House

20   influenced the decision of DHS, but that that influence was

21   driven by unconstitutional racial bias.  And the reason the

22   White House decided to exert that influence, your Honor, is not

23   going to be in the DHS files.  That's going to be in the White

24   House's files and in meetings that people at the White House

25   had about how they're going to communicate with DHS.  So it's

1    very unlikely the communications between the White House and

2    DHS are going to expose the White House's internal rationale

3    for exerting that influence, rationale which we have alleged

4    plausibly is driven by racial animus.  So that's a second

5    issue, your Honor, here.

6          So, in essence, we can't get the discovery we need

7    from other sources because by definition the discovery we need

8    is in the hands of the White House, at least some of the

9    discovery we need.

10          I want to make sure I answered your Honor's question.

11          THE COURT:  You did.

12          MR. PEREZ-ALBUERNE:  Thank you.

13          So, your Honor, again, preliminarily we don't think

14    the privilege applies at all.  To the extent your Honor

15    disagrees with us and the privilege is at least theoretically

16    applicable here, we think we've met the test for that -- for

17    the privilege to be set aside.  And that test, your Honor, is

18    the test in In Re Sealed Case.  You know, Cheney did not

19    overrule that case, and as other courts have, Dairyland in

20    particular, have held the test in In Re Sealed Case addresses

21    the very concerns that the Supreme Court raised in Cheney.  And

22    so the test there being that we've shown that the stuff we're

23    looking for, the documents and the testimony, is directly

24    relevant to a central issue in the case in the first instance;

25    and second of all, that that evidence isn't available from

1  other sources.

2       And so we just discussed why the evidence isn't

3  available from other sources.  But in terms of being central to

4  the case, again, we've alleged racial animus on the part of

5  White House personnel here in this case, plausibly alleged it

6  in your Honor's words.  Under those circumstances, that's a

7  critical issue in the case.  What thinking drove the White

8  House to exert the influence it did to terminate these statuses

9  is a critical part of this case for us to show animus.  And so

10  it couldn't get any more central.  So we meet the test, even if

11  it does apply, your Honor, and for the privilege to be set

12  aside.

13       Again, there's a process that's been established in

14  the cases for that, it is production of a privilege log.  If we

15  identify things we disagree with, your Honor can examine them

16  in camera see if, in fact, they do meet the case law's criteria

17  for disclosure; and if they do, they're disclosed, and if they

18  don't, they're not.  So there's a process for that.  We think

19  we have to start engaging in this process and the very first

20  phase of that is that the government go search for documents,

21  and if they're going to withhold anything, produce a privilege

22  log.

23       And let me also make another comment about the sort of

24  categorical refusal of the government, your Honor.

25       Their refusal has stretched to even documents that

1    are -- that we request which are facially not subject to the

2    presidential communication privilege, and specifically we have

3    a document request that asks for documents regarding

4    communications between the White House and Congress with

5    respect to the TPS program and TPS termination for these

6    countries.  The President's communications privilege applies to

7    the executive branch, it doesn't apply to interbranch

8    communications with Congress.  And so that's an example of how

9    we haven't even had them search for that in the White House

10   files.

11        I don't know if your Honor needs anything else from me

12   on the presidential communication privilege.

13        THE COURT:  Well, I think to the extent that the

14   government also presses an undue burden argument in regards to

15   complying with these requests, what do you say to that, if

16   anything, you want to add to your papers.

17        MR. PEREZ-ALBUERNE:  Sure, your Honor.

18        First of all, if the government's allegations in this

19   case are correct, that is, if the White House was not involved

20   in the TPS decision-making process, then there shouldn't be

21   very many documents responsive to our request.  And so if

22   they're correct, then I don't see where the burden comes from,

23   the volume of documents should be quite small.

24        If, on the other hand, they're incorrect and, in fact,

25   there is a large volume of documents, there are really two

responses:  In the first instance, that's important, that means

there are critical discussions which we should have discovery

of about the government's influence and reason for that

influence on the TPS termination decisions.  And second of all,

we are more than happy to work with the government if these

kinds of searches turn up a huge number of documents to try to

narrow them to reduce the burden on the government.  But we

can't even engage in that dialogue, your Honor, without the

preliminary steps of searching for the documents and making the

unprivileged productions.

THE COURT:  Thank you.

MR. PEREZ-ALBUERNE:  You're welcome.

THE COURT:  Counsel?

MR. KIRSCHNER:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. KIRSCHNER:  I'm happy to address any of the timing

questions you had at the beginning, or I'm happy to go into the

substance.

THE COURT:  Counsel, why don't I have you go into the

substance and we'll turn back to the timing.

MR. KIRSCHNER:  Okay.  Just, for example, there was an

update by the 9th Circuit yesterday in the Ramos proceedings,

and I'm happy to --

THE COURT:  Oh, sure, you can give me that.

MR. KIRSCHNER:  It's just that the 9th Circuit has

1    moved the calendar date for prudential oral argument.  Before

2    it was June, July or August, now it's August, September or

3    October.  So the 9th Circuit is not even going to hear the

4    Ramos appeal until August at the earliest.

5           So, your Honor, the issue before you is not an issue

6    of privilege.  We have not waived the presidential

7    communications privilege, we have not waived the deliberative

8    process privilege.  Cheney is not a question of privilege, it's

9    a question of burden on the White House in the matter of civil

10   discovery.

11          In its concurrence, Justice John Paul Stevens talked

12   about the burden being on plaintiffs given the serious issues

13   for seeking discovery on the White House.  And the discussion

14   in Cheney talks significantly about the significant burdens on

15   the White House and how other options have to be fully explored

16   before even entertaining the question of discovery on the White

17   House.

18          The presidential -- just as an aside, the presidential

19   communication privilege can come up in a whole host of ways

20   once reviewing the materials.  It could be that there could be

21   discussion of potential legislation related to TPS that might

22   be distinct from the decision to terminate but could be tied up

23   in plaintiffs' request.  My point of just using that one

24   illustration is that there's no reason to believe that the

25   presidential communications privilege wouldn't apply to the

1    plaintiffs' requests.  In fact, the nature of their requests

2    suggests directly that it would be implicated.

3           Same with the deliberative process privilege; they're

4    asking for internal government deliberations.  And in the In Re

5    Grand Jury (Mr. S.) case that we cited in our briefs, the 1st

6    Circuit said that questions of privilege are -- it's a fact

7    intensive document-by-document question.

8           In the recently concluded trial in Saget, the judge

9    reviewed thousands of documents in camera and only a handful of

10   them did he overrule the deliberative -- he found -- he

11   admitted not withstanding the deliberative process privilege

12   that we asserted, with the suggestion that thousands of other

13   documents he upheld the privilege.

14          So I just want to make that point very clear that we

15   are not waiving the presidential communications privilege, nor

16   are we waiving the deliberative process privilege.

17          Rather, the question in Cheney is the burden on the

18   White House, and where privilege comes into play is that it

19   automatically implicates these serious questions of privilege

20   that raises serious separation of powers concerns.

21          Our position --

22          THE COURT:  Counsel, doesn't the burden have to be

23   weighed case by case here?  What do you say to your brother's

24   argument that given the government's position in this

25   litigation so far that the White House was not the ultimate

1    decision maker, what is there that you point to to say that

2    just by the nature of the request it's a burden, as opposed to

3    giving the Court some sense of what scope of documents we're

4    talking about?

5           MR. KIRSCHNER:  Well, a couple of things, your Honor.

6           The majority decision in Cheney only looked at the

7    nature of the requests.  It said that requests on their face

8    were asking for everything under the sky, and that's --

9           THE COURT:  Counsel, I do have the document requests

10   that the plaintiff -- first set of requests, 76-1, and I've had

11   a chance to look at it.  Counsel, I'm not going to go through

12   them line by line.  I should also say that I've gotten -- I

13   have 76-5 in front of me, which is the responses.  But many of

14   these requests are limited to, for instance, a single meeting.

15   Meaning, it doesn't hit me on its face that they're as broad as

16   the requests in Cheney.

17          MR. KIRSCHNER:  Well, I'm glad you mentioned that.  I

18   want to use request number 30 to just show that it really is

19   everything under the sky.

20          THE COURT:  Okay.

21          MR. KIRSCHNER:  The only way to do this response, a

22   review for request number 30, is to seek -- to do a search for

23   everything related to TPS.

24          It talks about a meeting on November 3rd.  This is

25   important for two reasons, because I'm going to use this

1    meeting to illustrate how much material we have produced from

2    DHS' files related to this meeting.  It also shows that the

3    nature of the request would require something like Cheney of

4    everything under the sky.

5         It says that there was a proposal provided at this

6    meeting.  We have produced that recommendation from the

7    National Security Council.  They have that document.  But

8    notwithstanding that, the request asks for any and all

9    communications concerning the proposal.  The only way to do a

10   review of that is to look at everything related to TPS in the

11   White House and to review those materials line by line to see

12   if it relates to a proposal to -- that was formulated for this

13   meeting.

14        So that that request by its very nature, there's no --

15   the only way to do a review of this response to this request is

16   to search for everything related to Temporary Protected Status

17   at the White House with -- amongst the relevant custodians.

18        But this is also important to show that going back to

19   Cheney about exploring other options.  They have, plaintiffs

20   have, a recommendation from the National Security Council.

21   They have handwritten notes from the Acting Secretary of

22   Homeland Security for that meeting.  It's a principals

23   committee meeting.  A principals committee meeting is a meeting

24   convened of senior White House officials and the relevant

25   cabinet level officials.  This is something that's been across

1    administrations, it's a system in place.

2            We have produced, it was over our objections, but we

3    have produced to plaintiffs, because it was produced in the

4    other litigation, handwritten notes from Acting Secretary Duke

5    at that meeting.  We've also produced an internal memorandum

6    from Acting Secretary Duke that refers to recommendations from

7    the White House, as well as other e-mail correspondence between

8    Acting Secretary Duke and the Chief of Staff of the White

9    House, John Kelly; other e-mail correspondence between Acting

10   Secretary Duke and other senior White House officials; other

11   senior DHS officials and White House officials.  They have a

12   robust record of material from DHS, from DHS' files.  And going

13   to your Honor's question about the White House not being

14   involved, that's not what we've said in this case.

15           I'll point you to page 21 of our motion to dismiss the

16   amended complaint.  In that motion, this is from the beginning,

17   just -- one second, your Honor --

18           THE COURT:  Sure.

19           MR. KIRSCHNER:  I want to get this language right.

20           (Pause.)

21           MR. KIRSCHNER:  This is in consideration that Acting

22   Secretary Duke rejected the recommendation by the White House

23   of the decision to terminate Honduras.  She decided not to

24   terminate Honduras.  Now, it was later terminated when it was

25   up again by Secretary Nielsen, but Acting Secretary Duke

1   rejected the White House recommendation.  So this goes to two

2   things, one that is ultimately a decision by the Secretary, but

3   it also goes to the fact that we have always acknowledged that

4   any serious policy matter such as this one would involve, in

5   any administration you would expect, the White House.

6           What we say here on page 21, Docket 25, Although it

7   should be considered unremarkable that White House -- I'll

8   start over.

9           Although it should be considered unremarkable that

10  White House advisers would provide input to the Secretary of

11  Homeland Security on a sensitive matter of this nature, Acting

12  Secretary Duke chose not to terminate Honduran TPS at that time

13  triggering an automatic six-month extension.

14          Well, my point of bringing this up, your Honor, is

15  their claim in this case when it comes to the White House is

16  that the White House exerted influence but it's really that

17  they exerted undue influence on the Secretary in making her

18  decisions, or the Acting Secretary.  The best source for that

19  information, to the extent it exists, would be within DHS'

20  files.

21          We have turned over no -- we've turned over every

22  stone at DHS --

23          THE COURT:  I guess that leads me to one question

24  which is your brother represented he wasn't sure that that

25  production was complete from DHS.  What is the status from your

1  standpoint?

2        MR. KIRSCHNER:  So the status -- the short answer is

3  we expect it to be complete in early May, but I want to give

4  some more context to this.

5        Plaintiffs' counsel also made this representation that

6  we've produced material from other cases.  There's been six

7  lawsuits related to TPS.  We've been doing document review

8  concurrent, and so we haven't really -- because -- we've

9  provided them our search terms and so forth, and so to the

10  extent that sometimes it might have a different case Bates

11  stamp, that's not how we're doing the document review.  The

12  document review is that everything that's under the sun when it

13  comes to DHS' files, that it can be considered by any of these

14  cases we're reviewing those materials.  And in fact, meet and

15  confer has worked in this case.  And many times we've expanded

16  our search terms in light of conversations in this case.  We've

17  had at least one custodian, I believe, I know we did -- in

18  other cases we added additional custodians upon meet and

19  conferral.  And so the review and responsiveness from DHS has

20  been expansive.

21        THE COURT:  I don't think -- I didn't hear your

22  brother contesting that.  I certainly didn't perceive that from

23  the motion papers.  I guess the question is to the extent --

24  and I know the government disagrees with my decision of letting

25  the case proceed, including with the White House still being

1    part of the lawsuit -- I guess with the focus on the White

2    House, what is -- what is the burden of identifying what the

3    realm of documents are if I conclude that the requests

4    themselves are not overbroad and are relevant to the claims

5    that the plaintiffs are asserting?  Meaning, I understood there

6    was some reference to privilege logs, but am I correct that

7    those don't apply to this case as to any White House

8    production?

9         MR. KIRSCHNER:  So we're objecting to the discovery on

10   the White House, and that is because under Cheney the breadth

11   of what is available in terms of DHS and the nature of this

12   litigation, that plaintiffs have not come even close to meeting

13   their burden.

14        They're asking for a 30(b)(6) deposition on a policy

15   matter.  I am not aware of a single type of that deposition.

16   It just shows the breadth of what they're seeking.  That

17   request number 30 requires review on its face, just like

18   Cheney, of everything related to this topic.  And so it's by

19   the very nature of these requests and the 30(b)(6)

20   deposition --

21        THE COURT:  Well, I understand the argument.  I guess

22   what I'm trying to get at is what is the harm in identifying

23   what would actually be responsive?

24        MR. KIRSCHNER:  Well, it's -- because to identify what

25   is responsive requires in-depth review, talking to custodians

1    to figure out potential documents, taking from their time.  It

2    requires a line-by-line review to identify responsiveness.

3          What Cheney -- it -- it inherently requires privilege

4    considerations, that's exactly what Cheney was objecting to,

5    the Supreme Court was objecting that the D.C. Circuit ordered.

6          THE COURT:  But subject to identifying what documents

7    would be responsive, you wouldn't be waiving any privilege,

8    which presumably would be recounted in a privilege log.

9          MR. KIRSCHNER:  So if it's just the question of

10    responsiveness, it still requires a substantial burden to pull

11    these documents, to review these documents, and to identify the

12    nature of these documents.

13          Again, I point you to the language in Cheney about

14    this being everything under the sky, I believe is the language,

15    and I really -- that request number 30 kind of shows their hand

16    of what -- of the fact that that is written in a way that on

17    first blush looks very discrete because it looks like it's

18    about one meeting, but to actually identify responsive material

19    requires -- there's no way -- I can't think of a way how you

20    would set up a search that doesn't require an across-the-board

21    search to respond to that request.

22          The other thing I want to bring up, your Honor, is the

23    Batalla Vidal case.  That was a case that concerned the

24    rescission of DACA, the Deferred Action for Childhood Arrivals.

25    And in that case the magistrate ordered discovery on the White

1    House, and the District Court, who ultimately enjoined the

2    decision of DACA, cited <u>Cheney</u> and overruled the magistrate's

3    order on the White House and limited it to the government

4    agencies' files, and specifically cited <u>Cheney</u> for that

5    proposition.

6          The 2nd Circuit in considering the discovery dispute

7    also cited <u>Cheney</u> and agreed with the District Court.  And it

8    just shows that of a similar claim to the one at issue here,

9    and the 2nd Circuit felt it was a bridge too far.

10          The other case I'd site to you is the <u>Saget</u> case.

11   There have been two preliminary injunctions so far in this TPS

12   litigation, <u>Ramos</u> and <u>Saget</u>.  Neither of them ordered discovery

13   on the White House.  In <u>Saget</u>, plaintiffs served discovery on

14   the White House, and we objected.

15          THE COURT:  Is that the Washington case?

16          MR. KIRSCHNER:  No, sorry.  <u>Saget</u> is the Brooklyn,

17   Eastern District of New York case that went to trial.

18          So in that case, the plaintiffs asked for discovery on

19   the White House, and we objected, and in that case we moved for

20   a protective order.  And the case went to trial and prior to

21   resting their case for trial, the plaintiffs asked for a ruling

22   on the motion for discovery on the White House, and the judge

23   said, No, you should rest your case, you know, I know that

24   motion is pending but rest your case.  It was a four-day bench

25   trial.  The judge had reserved actually ten days for trial, but

1    it was four days.

2        The judge just issued on April 11th -- in terms of a

3    slip opinion, it was 145 pages, it's already available on West

4    Law, I think it's 68 pages or something or 86 pages, I might

5    have my numbers reversed, but substantial.  It does not rule on

6    the motion for protective order vis-a-vis White House

7    discovery.  But, notwithstanding that, the judge, in footnote

8    24 in the context of a different matter, said -- referred to

9    the record as comprehensive in that case.  And throughout the

10   opinion it talks about the White House being -- the White House

11   communications that were from DHS' files and enjoined the

12   President in the preliminary injunction opinion that was quite

13   extensive, doing all the things that plaintiffs are asking here

14   without ordering discovery on the White House.

15       We think that the illustration of the Batalla Vidal

16   case, the Saget, the Ramos case, and the direction of Cheney

17   and the extensive materials that we have already produced and

18   we are continuing to produce and review for plaintiffs meets

19   the standard of Cheney of exploring other avenues and that is

20   the avenue of the DHS files.

21       As Justice Stevens said in his concurrence and as is

22   discussed at length in the majority opinion by Justice Kennedy,

23   plaintiffs do not come close to meeting their burden for asking

24   for what is unwieldy and in many cases seem unprecedented

25   discovery on the White House that --

1           So, your Honor, I mean, again, this is a question of

2    burden, it's not a question of privilege.  The privilege that

3    gets implicated is the fact the nature of their cases implicate

4    core constitutional questions.

5           If I have a moment, I would like to discuss the

6    question of timing, unless you have more on the substance.

7           THE COURT:  No, I mean, I -- I don't know that I have

8    another question in the sense that I understand how the

9    parties' positions diverge on how I should read Cheney and the

10   other cases.  I understand your point about this recent case in

11   New York, although I'm not sure that answers sort of the legal

12   question that's before me.  But I took at a minimum -- even if

13   I weren't to adopt your ultimate position, the government's

14   view is at a minimum I should wait for the DHS discovery to be

15   complete.

16          MR. KIRSCHNER:  Well, we think that we have already --

17   given how much we've already produced from DHS' files has

18   already answered the question that plaintiffs can't meet the

19   burden, that that -- I mean, to the extent that plaintiffs

20   would have to show that there was something that was beyond

21   what was in DHS' files -- again, plaintiffs' claim is there was

22   improper influence on DHS.  We've produced substantial

23   materials, some we've claimed privilege on, but we've produced

24   a lot of materials for which they have in unredacted form.  I

25   gave a few illustrations today.  They in their own motion to

1    compel cite examples themselves, which were in addition to the

2    ones that I cited.

3        I would also say the timing also matters.  This is

4    where the timing gets into the substance.

5        Every TPS termination that has been done in the last

6    couple of years, I mean every administration has terminated TPS

7    at some point, but I'm referring to just the terminations at

8    issue here, are either enjoined or stayed, every single one of

9    them, and that includes the three countries here.

10        The Ramos --

11        THE COURT:  As I understand it, that's by agreement of

12    the parties in light of Ramos is pending.

13        MR. KIRSCHNER:  As entered by the Court.

14        THE COURT:  As entered by the Court, okay.

15        MR. KIRSCHNER:  So there's two cases that are of

16    relevance, Ramos and Bhattarai, which is also in the Northern

17    District of California.

18        So Ramos addressed Nicaragua, Sudan, El Salvador, and

19    Haiti.  So Haiti and El Salvador are at issue today.

20        There the judge entered the preliminary injunction,

21    and in Saget, the preliminary injunction refers to Haiti as

22    well.  And that is briefed but it's not going to be argued

23    until August at the earliest in the 9th Circuit.  By agreement,

24    the effective date of a termination could not go into effect

25    prior to 120 days from issuance of the district mandate to the

1    District Court, which, given the local rules in the 9th

2    Circuit, it would take about 52 days in the normal course for a

3    mandate to issue from an adverse decision.  That's assuming

4    that the mandate doesn't even get stayed and also certainly

5    doesn't assume plaintiffs don't prevail in the 9th Circuit.

6    It's the earliest it can happen.

7         THE COURT:  I understand.

8         MR. KIRSCHNER:  Okay.  So Bhattarai extends that to

9    Honduras and Nepal.  In Bhattarai we entered the agreement

10   where we stayed that District Court litigation and tied the

11   agreement in Ramos to Honduras and Nepal.

12        And so, again, we think that we should prevail on the

13   merits of this motion, but where this gets into -- where the

14   timing comes into play is what we said at the end of our motion

15   is that we would ask that if there's any -- even if you granted

16   in part plaintiffs' motion, we'd ask you to stay your order for

17   consideration of our appellate options, which is expressly

18   contemplated by Cheney, that's exactly what Cheney was doing,

19   it was overruling the D.C.'s circuit denial of the dismissal of

20   the writ of *mandamus*.  That's also what's happened in a

21   discovery dispute that you referred to in Washington that you

22   referred to where the 9th Circuit stayed that order.

23        Again, we don't think it should come to that, but I

24   just wanted to cover all of our bases today to make sure I

25   addressed that point.

1          THE COURT:  Thank you.

2          Counsel, I'll let you respond briefly.

3          MR. PEREZ-ALBUERNE:  Sure, your Honor, thank you.  A

4    couple of points.

5          Let me begin with the government's arguments based on

6    Saget and Ramos.  A few points here to make.

7          This whole argument, as we understand it, it turns the

8    entire analysis on its head.  What they want your Honor to do

9    is to create some new standard by which there is enough

10   evidence for us to meet some kind of heightened need, but

11   there's not too much evidence because then we don't need these

12   additional documents.  There's some sort of Goldilocks zone in

13   there that every plaintiff has to land into.  And what that

14   means is that in a case like this, where we already have

15   evidence there was influence from the White House, where we

16   have some evidence that that influence was driven by, for

17   example, non-statutory factors, which goes to our APA claim,

18   that when we have some evidence of that, we're entitled to less

19   discovery, not more discovery.  And that turns the entire

20   concept on its head.  So it makes no sense, this argument.

21         And second of all, as a matter of fact, what happened

22   in Saget was that the court, first of all, was making a

23   decision on both -- both courts were making decisions on

24   preliminary injunctions where the standard of proof is not the

25   same as at trial; and second of all, the court in Saget, they

1    had submitted documents for in-camera review on a privilege

2    log.  It ended up citing some of those documents as the basis

3    for its opinion.  It proves that it's important for the court

4    to be able to assess these claims of privilege on a

5    document-by-document basis.  So, if anything, it supports our

6    position here.

7            And -- so that whole concept that somehow <u>Saget</u> and

8    <u>Ramos</u> direct -- are guidance for the Court to give us less

9    discovery makes no sense, your Honor.

10           With respect to the issue of timing, that was the last

11   thing that counsel said.  The problem, your Honor, is the

12   government's made perfectly clear that they plan to appeal any

13   adverse ruling with respect to this motion.  And so depending

14   when the court issues an opinion and how their appellate

15   process is scheduled, we could easily envision a situation

16   where we chew up all the time we have until there's a decision

17   out of the 9th Circuit.  And so leaving this to some later

18   point in the case runs a real serious risk that we'll be in

19   sort of the impossible position of having this issue pending

20   and having to litigate the case on very short time frame either

21   because we've agreed to it or because the terminations are

22   going to occur.

23           So while it seems like there's a lot of time in this

24   case before now and when some substantive action is going to

25   happen, it's not all that much, especially if the Court has

1    some adverse -- some holding here adverse to the government.

2    So I just want to make sure that that's clear when the Court's

3    thinking about timing.

4            THE COURT:  Counsel, the staying of the depositions

5    was tied to Ramos as well?

6            MR. PEREZ-ALBUERNE:  Yes, your Honor.  But included in

7    that agreement is an agreement that we will conclude the

8    depositions within 45 days of when we have to crank up after

9    Ramos.  So what the parties have contemplated now is an

10   accelerated path of discovery if the Ramos injunction is

11   lifted.  And so that's why we're concerned that if we don't use

12   the time we have available now, that we'll be in an impossible

13   position when it comes to finishing discovery in the case and

14   trying the case.

15           THE COURT:  Understood.

16           MR. PEREZ-ALBUERNE:  Finally, your Honor, a point

17   about the government's characterization of our claim.  It's

18   incorrect.  So the government makes it seem like what we're

19   claiming is the fact that the White House was involved in the

20   DHS decision-making process is undue influence, or maybe the

21   volume of it is undue or something like that.  That is not what

22   our claim is.

23           Your Honor was correct in interpreting our claim in

24   respect to the motion to dismiss.  The claim is that the

25   influence the White House asserted was asserted because of an

 1   improper motive, in the case of the constitutional claims

 2   because of the racial animus, in the case of one of the APA

 3   claims not because of the statutory enumerated factors which

 4   Congress has said is what should be considered when renewing

 5   TPS or not.

 6        So, again, this litany of what they produced so far

 7   from DHS' files, I didn't hear anything in my brother's

 8   presentation which went to the issue of why was the White House

 9   seeking to have this outcome that they were trying to influence

10   DHS to have?  And that's a critical question in the case, and

11   that's a question that can only be answered by at looking at

12   what White House officials were doing and thinking at the time,

13   not what they said to DHS.

14        THE COURT:  Thank you.

15        Counsel, I appreciate the arguments on either side.  I

16   do want to consider not just the substance of the motions but

17   the arguments about timing that were made and either side.  I

18   will do that and either give you my decision and/or further

19   guidance on how to proceed.

20        Thank you, counsel.

21        MR. PEREZ-ALBUERNE:  Thank you, your Honor.

22        THE CLERK:  All rise.

23        (Court adjourned at 3:54 p.m.)

24                   - - - - - - - - - - - -

25

1                        CERTIFICATION

2              I certify that the foregoing is a correct transcript

3       of the record of proceedings in the above-entitled matter to

4       the best of my skill and ability.

5

6

7

8       /s/Debra M. Joyce                    May 1, 2019
        Debra M. Joyce, RMR, CRR, FCRR       Date
9       Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25